**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

KATHERINE NOVOTNY, et al.

    *Plaintiffs*,

v.

WESTLEY MOORE, in his official capacity
as Governor of Maryland, et al.

    *Defendants*.

Case No. 1:23-CV-01295-RDB

**MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................1

STATEMENT OF THE CASE..............................................................................2

I.      Statutory Provisions ............................................................................. 2

II.     The Challenged Provisions' Effect on Plaintiffs ..................................6

ARGUMENT ..................................................................................................7

I.      Standard for a Preliminary Injunction.................................................7

II.     The Challenged Provisions Likely Violate Plaintiffs' Second Amendment Rights ...........8

        A.      Plaintiffs' conduct is covered by the Second Amendment's plain text. .................9

        B.      Controlling considerations under *Bruen*. ...............................10

        C.      The challenged provisions are inconsistent with this nation's historical tradition of firearm regulation. ...............................15

                i.      The anti-carry default.............................................15

                ii.     Locations licensed to sell or dispense alcohol for on-site consumption....18

                iii.    Museums ..............................................................19

                iv.     Health care facilities ............................................20

                v.      Mass transit............................................................22

                vi.     Parks and forests ...................................................24

                vii.    Maryland's location-specific bans are not analogous to permissible sensitive place restrictions. .........................26

III.    The Violation of Plaintiffs' Second Amendment Rights Causes Irreparable Harm..........29

IV.     The Other Factors Weigh in Favor of a Preliminary Injunction ........................31

CONCLUSION................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                          **<u>Page</u>**

*Antonyuk v. Bruen*, No. 1:22-cv-734, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) ................30

*Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ..18, 21, 25

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017) ...........................25, 28

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) ........................................29

*Christian v. Nigrelli*, 22-CV-695 (JLS), 2022 WL 17100631
   (W.D.N.Y. Nov. 22, 2022)......................................................................10, 15, 16, 30

*Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015).........................31

*Di Base v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017)......................................................................8

*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) ..............................................9, 10, 13, 18, 23, 30

*Heller v. District of Columbia*, 670 F.3d 1224 (D.C. Cir. 2011)...................................................13

*Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020) ...............................11

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................................................30

*Fotoudis v. City & Cnty. of Honolulu*, 54 F. Supp. 3d 1136 (D. Haw. 2014) .............................31

*Gamble v. United States*, 139 S. Ct. 1960 (2019)..........................................................................12

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) ................................................31

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016),
   *granting permanent injunctive relief, sub. nom. Wrenn v. District of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017)......................................................................................30

*Guns Save Life, Inc. v. Raoul*, 2019 IL App (4th) 190334, 146 N.E.3d 254 .........................30, 31

*Hardaway v. Nigrelli*, 22-CV-771 (JLS), 2022 WL 16646220
   (W.D.N.Y. Nov. 3, 2022)....................................................................10, 27, 28, 30

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411 (4th Cir. 1999).............................31

*Jones v. Bonta*, 34 F.4th 704, 732 (9th Cir. 2022),
   *op. vacated on reh'g on other grounds*, 47 F.4th 1124 (9th Cir. 2022)..................................30

*Koons v. Platkin*, 22-CV-7463 (RMB/AMD), 2023 WL 3478604
   (D.N.J. May 16, 2023) ....................................10, 13, 14, 15, 16, 17, 19, 20, 21, 27, 28, 29, 30

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) ........................................................31

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ......................................................................................12

*Matter of Rounds*, 255 Md. App. 205, 279 A.3d 1048 (2022).........................................................2

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................................11, 12

*McDougall v. Cnty. of Ventura*, 23 F.4th 1095 (9th Cir. 2022), *on reh'g en banc*,
   38 F.4th 1162 (9th Cir. 2022) .......................................................................................30

*Morris v. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120 (D. Idaho 2014),
    *appeal dismissed*, 2017 WL 11676289 (9th Cir. Dec. 15, 2017)......................................25, 26

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111
    (2022)..............1, 2, 3, 8, 9, 10, 11, 13, 14, 15, 16, 18, 19, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) ...........................................................31

*People v. Chairez*, 2018 IL 121417, 104 N.E.3d 1158 (2018) ......................................25

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) .............................................................12

*Renna v. Bonta*, No. 20-cv-2190, 2023 WL 2846937 (S.D. Cal. Apr. 3., 2023)...................30, 31

*Rhode v. Becerra*, 445 F. Supp. 3d 902 (S.D. Cal. 2020),
    *vacated and remanded* .........................................................................................30

*Rhode v. Bonta*, No. 20-55437, 2022 WL 17099119 (9th Cir. 2022)...........................30

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ...................................................31

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020)...............................29

*Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1987)..........................................................29

*Royal Inv. Grp., LLC v. Wang,* 183 Md.App. 406, 961 A.2d 665 (2008) ....................16

*Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F.Supp.3d 675 (N.D. Ill. 2021)..............26

*St. Michael's Media, Inc. v. Mayor and City Council of Baltimore*,
    566 F.Supp.3d 327 (D. Md. 2021).........................................................................8

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) .................................................................12

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)....................................25

*Virginia v. Moore*, 553 U.S. 164 (2008) ..................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .....................................7, 8

*Worth v. Harrington,* 2023 WL 2745673 (D. Minn. Mar. 31, 2023) ...............................11

*Wrenn v. District of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017) ............................................................................30

## Constitutions and Statutes

U.S. Const. amend. III ...........................................................................................9

U.S. Const. amend. IV ...........................................................................................9

Pub. Law 113-287, § 3, 128 Stat. 3168 (2014), codified at 54 U.S.C. § 104906 .........................25

MD Code, Crim. Law

    § 4-104 .......................................................................................................4
    § 4-111 .....................................................................................................3, 4
    § 4-111(a)(2) ...............................................................................................4
    § 4-111(a)(4) ...............................................................................................4
    § 4-111(f) ....................................................................................................4

§ 4-111 .............................................................................................................3, 4
§ 4-203(a) .........................................................................................................2, 3
§ 4-203(b) .........................................................................................................2, 3
§ 4-203(b)(2) .........................................................................................................3
§ 6-411 .................................................................................................................4
§ 6-411(a)(2)(*i*) ...................................................................................................5
§ 6-411(a)(3) .........................................................................................................4
§ 6-411(a)(6) .........................................................................................................4
§ 6-411(c) .............................................................................................................5
§ 6-411(d) .............................................................................................................4
§ 6-411(e) .........................................................................................................4, 5

MD CODE, PUBLIC SAFETY

§ 5-306 ..............................................................................................................2, 3
§ 5-306(a)(5) .........................................................................................................3
§ 5-306(a)(6) ......................................................................................................2, 3
§ 5-306(a)(6)(ii) ....................................................................................................3

MD CODE, TRANSPORTATION

§ 7-705(b)(6) .........................................................................................................5
§ 7-705(e)(6) .........................................................................................................5

MD. CODE, INS. LAW

Section 15-10B-01(g)(1) .................................................................................20, 21
Section 15-10B-01(g)(2) ......................................................................................21
Section 15-10B-01(g)(3) ......................................................................................21
Section 15-10B-01(g)(4) ......................................................................................21

COMAR

§ 08.01.07.14 (Chesapeake Forest Lands) ..........................................................5
§ 08.07.01.04 (State forests) ...............................................................................5
§ 08.07.06.04 (State parks) .................................................................................5
§ 29.03.02.05 C.(4) .............................................................................................3

1812 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed
Arms, Except in Certain Cases, ch. 89, § 1 ......................................................23

1819 Ind. Acts 39, An Act to prohibit the wearing of concealed weapons, ch. XXIII, § 1 ..........23

1821 Tenn. Acts 15, An Act to prevent the wearing of dangerous and unlawful weapons,
ch. XIII .............................................................................................................23

9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (1841) .............................................22

**Other Authorities**

1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811) ...............................27

1 LAWS OF THE STATE OF NEW YORK 176 (2d ed., Albany: Websters & Skinner 1807) .........26, 27

2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams, eds., 1797)..........................27

5 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE
  FIRST SESSION OF THE LEGISLATURE (Hening ed., 1819) .................................................28, 29

11A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2022).............29

19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES, COLONIAL AND
  REVOLUTIONARY, 1768-1773 (Candler, ed., 1904) .................................................28

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611
  (Watkins ed., 1800)...........................................................................27

*A Museum of Art and Culture*, PEABODY ESSEX MUSEUM, https://bit.ly/439jDtl
  (last visited May 23, 2023) ...................................................................19

*About Us*, CHARLESTON MUSEUM, https://bit.ly/3MPYhMB (last visited May 23, 2023)............19

*About Us*, N.Y. HISTORICAL SOC'Y MUSEUM & LIBRARY, https://bit.ly/3WkCcZF
  (last visited May 23, 2023) ...................................................................20

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42 (Davis ed., 1796)..................27

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century
  Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1 (2021) ...........................24

"AT THE INSTANCE OF BENJAMIN FRANKLIN": A BRIEF HISTORY OF THE LIBRARY COMPANY OF
  PHILADELPHIA 5 (2015), available at https://bit.ly/3vdBGQk .................................20

*Bellevue History*, NYC HEALTH + HOSPITALS, https://bit.ly/4240MiB
  (last visited May 23, 2023) ...................................................................21

BENJAMIN FRANKLIN, The AUTOBIOGRAPHY OF BENJAMIN FRANKLIN (Smyth, ed., 1907) ....18, 19

*Chesapeake Forests*, MARYLAND DEP'T OF NAT'L RESOURCES, https://bit.ly/3OHgSf9
  (last visited May 23, 2023) ...................................................................24

CHRISTINE SISMONDO, AMERICA WALKS INTO A BAR: A SPIRITED HISTORY OF TAVERNS,
  SALOONS, SPEAKEASIES AND GROG SHOPS 15 (Oxford 2011) .................................19

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits
  on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205 (2018).....................................26, 27

DEPT. OF INTERIOR, 1850 CENSUS: COMPENDIUM OF SEVENTH CENSUS 159, Table CLXVII
  (1854), https://bit.ly/3jp7GhR.................................................................20

Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry"
  Defaults on Private Land*, 48 J L. MED. & ETHICS 183 (2020).................................17

Jenna Bridges, *Louisiana panel approves permitless concealed carry for adults*, 4WWL CBS
  (May 17, 2023), https://bit.ly/430FSSS .......................................................3

Johnson, et al., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195
  (3d ed. 2021)................................................................................22, 23

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period
  for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*,
  SSRN, Oct. 1, 2022, https://bit.ly/3CMSKjw...................................................10

*Maryland At A Glance, Parks & Recreation, State Parks*, Maryland Manual On-Line, https://bit.ly/3MmHhfm (last visited May 23, 2023)....................................................24

*Maryland's State Forests*, Maryland Dep't. of Nat. Resources, https://bit.ly/3BGjwK5 (last visited May 23, 2023) ....................................................................................24

Oliver W. Holmes, *The Stage-Coach Business In The Hudson Valley*, The Q. J. of the N. Y. State Hist. Ass'n 231–33 (1931) ................................................................22

Omri Ben-Shahar & John A. E. Pottow, *On the Stickiness of Default Rules*, 33 Fla. St. L. Rev. 651 (2006), https://bit.ly/3pWXM6Y (last visited May 23, 2023) .................17

*Our History*, The Peale, https://bit.ly/41KAZvC (last visited May 23, 2023)...........................20

Pennsylvania Statutes At Large, Volume X: 1779-81 (Stanley Ray ed., 1904)..................26

*Permitless Carry States*, bit.ly/3OxbWJD (last accessed May 23, 2023) .......................................3

Philip J. Cook, et al., *Gun Control After* Heller, 56 U.C.L.A. L. Rev. 1041 (2009)............................3

Rose Williams, *Over 3,000 crimes were committed on light rail last year, despite huge drop in ridership*, AlphaNews (Mar. 29, 2021), https://bit.ly/45pcrLJ ...............................................7

*The Earliest New York City Parks*, N. Y. City Dep't. of Parks and Recreation, available at https://on.nyc.gov/3hBZXfe (last visited May 23, 2022) ...............................................24, 25

The Public Laws of the State of South Carolina 271 (Grimke, ed. 1790) .........................26

Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. of Soc'y of Arch. Hist. 47 (1961) .......................................................................................25

Votes and Proceedings of the House of Delegates of the State of Maryland: November Session 1791 (Green ed., 1795) ........................................................................26

**INTRODUCTION**

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court held that Americans' Second Amendment right to keep and bear arms extends outside the home. In direct response to *Bruen*, Maryland signed into law Senate Bill 1 ("SB 1") on May 16, 2023. SB 1 dramatically restricts the locations where persons with Maryland wear and carry permits may legally exercise their constitutional right to bear arms. It does so in ways that are fundamentally inconsistent with the Second Amendment. And many of the new restrictions especially disrupt Marylanders' ability to go about their day-to-day lives while exercising their right to bear arms, whether running errands, taking a loved one to a health care facility, or going out to dinner. In addition to the restrictions enacted in SB 1, Maryland already restricts the Second Amendment rights of ordinary, law-abiding citizens to carry in other ways as well. For example, Maryland bars ordinary, law-abiding citizens from carrying on and at State owned or controlled mass transit facilities, and in State parks, State forests, and State Chesapeake forest lands.

Plaintiffs are ordinary, law-abiding citizens, who are each duly licensed with a wear and carry permit issued by the Maryland State Police, and three organizations that each have members who possess such permits. In this lawsuit, Plaintiffs focus on the new provisions of SB 1 and those in existing State law that impose particularly egregious restrictions on their Second Amendment right to bear arms and their daily lives. To that end, Plaintiffs seek a preliminary injunction to enjoin enforcement of SB 1's restrictions on carrying on private property open to the public, establishments that are licensed to serve alcohol, certain health care facilities, and museums, and Maryland's existing restrictions on carrying on or at mass transit facilities and in State parks, State forests, and State Chesapeake forest lands.

The provisions challenged herein infringe upon Plaintiffs' Second Amendment rights. In

1

*Bruen*, the Supreme Court reaffirmed that a modern-day government regulation implicating the Second Amendment is constitutional only to the extent the government "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. But the State will simply be unable to point to any historical tradition of regulation that supports these bans on carry by licensed Marylanders. As these provisions infringe a constitutional right, they are either causing or will soon cause Plaintiffs irreparable harm for which no public interest can justify allowing to continue. Accordingly, Plaintiffs respectfully submit this Court should order a preliminary injunction to enjoin the challenged provisions' enforcement.

## STATEMENT OF THE CASE

### I.      Statutory Provisions

In *Bruen*, the Supreme Court assessed a Second Amendment challenge to New York State's licensing regime, which generally restricted permits for carrying firearms outside the home to those who could demonstrate a "proper cause." 142 S. Ct. at 2123. Since the plaintiffs in *Bruen* were citizens who sought to "carry[] handguns publicly for self-defense," the Court held that New York needed to demonstrate that the "proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2134–35. But New York failed to do so. An inevitable consequence of *Bruen*'s holding with respect to New York's "proper cause" standard was that Maryland's "analogous" "good and substantial reason" licensing standard was also unconstitutional. *Id.* at 2124 n.2; *Matter of Rounds*, 255 Md. App. 205, 206, 279 A.3d 1048 (2022) (stating MD. CODE, PUBLIC SAFETY § 5-306(a)(6)(ii) was unconstitutional). In response, Maryland enacted SB 1 as a broadside against Marylanders who are duly licensed to carry firearms in public.

In Maryland, wearing, carrying, and transporting any handgun "on or about the person" or in a vehicle is generally prohibited, subject to a few exceptions. *See* MD. CODE, CRIM. LAW, § 4-203(a),

(b). One of the exceptions to this broad ban is a permit. *Id.* § 4-203(b)(2). Permit holders may "wear, carry, or transport [a] handgun" when they have a permit issued under "Title 5, Subtitle 3 of the Public Safety Article." *Id.* SB 1 specifically targets permit holders and restricts where individuals—who have met Maryland's background check and training requirements—are allowed to carry.

Maryland wear and carry permits are issued by the Maryland State Police pursuant to Maryland Code, Public Safety, § 5-306. All the individual plaintiffs in this suit are Maryland permit holders. The members of MSI, SAF, and FPC on whose behalf these organizations bring this suit are likewise Maryland permit holders. Permit holders in Maryland are fingerprinted, thoroughly investigated by the State Police and, unless training-exempt, receive at least 16 hours of training. MD. CODE, PUBLIC SAFETY, § 5-306(a)(5), (6). These training requirements include a mandatory course of live fire in which the applicant must achieve a specific minimum score. COMAR § 29.03.02.05 C.(4). Of the 43 "shall issue" States identified in *Bruen*, 142 S. Ct. at 2123 n.1, only Illinois requires as many hours of training as Maryland. Indeed, 27 States in the United States do not require a permit to carry in public.[1] Permit holders, nationwide, are disproportionately law-abiding. *See* Philip J. Cook, et al., *Gun Control After* Heller, 56 U.C.L.A. L. REV. 1041, 1082 (2009).

SB 1 adds two new MD Code Sections to the Criminal Law Article of the Maryland Code, Section 4-111 and Section 6-411, which restrict where duly licensed individuals may wear, carry, and

---

[1] Those States are Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Utah, Vermont, West Virginia, and Wyoming. *Permitless Carry States*, bit.ly/3OxbWJD (last accessed May 23, 2023) (listing these States with corresponding statutory citations). A 28th State, Louisiana, limits permitless carry to those with military service. *Id.* The legislature is currently considering expanding permitless carry to all adults. *See* Jenna Bridges, *Louisiana panel approves permitless concealed carry for adults*, 4WWL CBS (May 17, 2023), https://bit.ly/430FSSS.

transport a "firearm."[2] Section 4-111 sets out location-based restrictions in three specific categories. The first category is what Section 4-111 defines as "area[s] for children and vulnerable individuals," which include "(1) a preschool or prekindergarten facility and its grounds, (2) a private primary or secondary school or the grounds of the school, and (3) a health care facility." Section 4-111(a)(2). The second category is "government or public infrastructure area[s]." Section 4-111(a)(4). The third category is what Section 4-111 defines as "special purpose area[s]," which includes "(i) a location licensed to sell or dispense alcohol . . . for on–site consumption; (ii) a stadium; (iii) a museum; (iv) an amusement park, (v) a racetrack, or (vi) a video lottery facility, as defined in § 9–1A–01 of the state government article." Section 4-111(a)(8). A person who willfully violates the prohibition on wearing, carrying, or transporting a firearm in these areas "is guilty of a misdemeanor" and "subject to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both." Section 4-111(f).

Section 6-111 bans the wear, carry, and transport of firearms in a different manner than the outright prohibitions in Section 4-111. This provision alters the default rules for carrying, wearing, or transporting firearms in Maryland for the first time in its history by established an "Anti-Carry Default." Section 6-411(d) is a presumption against wearing, carrying, or transporting a firearm in all privately owned buildings that are open to the public across the state. MD. CODE, CRIM. LAW § 6-411(a)(6) (defining "property" as a "building" that "does not include the land adjacent"). A Marylander is presumptively barred from carrying in any such building "unless the owner or the owner's agent has posted a clear and conspicuous sign indicating that it is permissible to wear, carry, or transport a firearm on the property" or has otherwise obtained "express permission." *Id.* § 6-411(d). "[A] person who willfully violates this section is guilty of a misdemeanor and on conviction is subject

---

[2] A "firearm" is defined by Section 4-111(a)(3), and Section 6-411(a)(3), as enacted by SB 1, to include all "firearms" as defined by MD. CODE, CRIM. LAW, § 4-104. That definition includes all modern handguns and long guns.

to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both." Section 6-411(e). Section 6-411(c) operates in much the same way except it separately applies a presumption against carrying in a "dwelling," which is a "building or part of a building that provides living or sleeping facilities for one or more individuals." MD. CODE, CRIM. LAW § 6-411(a)(2)(i).

SB 1's new provisions are in addition to Maryland's existing restrictions on duly licensed wear and carry permit holders. Maryland has a "Mass Transit Ban." As relevant here, MD. CODE, TRANSPORTATION, § 7-705(b)(6), makes it "unlawful for any person . . . in any transit vehicle or transit facility, designed for the boarding of a transit vehicle," which is owned or controlled by the Maryland Mass Transit Administration or operated by a private company under contract to the Administration, to "[c]arry or possess any . . . concealed weapons." MD. CODE, TRANSPORTATION, § 7-705(b)(6). This ban applies to (1) commuter and local bus transit services in the Baltimore area, (2) the Metro Subway services in Baltimore area, (3) Light Rail services in Baltimore, (4) weekday MARC commuter train service between Baltimore and Washington, D.C, and (5) passenger railroad service on MARC commuter trains that travel through Frederick and Montgomery Counties, Maryland, with stops in Maryland. Any person who violates any provision of this section is guilty of a misdemeanor and is subject to a fine of not more than $500 for each offense. *Id.* § 7-705(e).

Maryland additionally bans firearms in State parks, State forests, and State Chesapeake Forest Lands (the "State Park and Forest Ban"). In a set of three regulations with functionally identical language, the Maryland Department of Natural Resources bars ordinary, law-abiding citizens from "possessing a weapon." COMAR 08.07.06.04 (State parks); COMAR 08.07.01.04 (State forests); COMAR 08.01.07.14 (Chesapeake Forest Lands). Save for exceptions for target shooting and hunting-related activities, nothing in the Department of Natural Resources regulations allows the carry of a firearm by a permit holder for self-defense.

## II.      The Challenged Provisions' Effect on Plaintiffs

Without implying that other provisions of Maryland law restricting ordinary, law-abiding citizens' right to carry arms are constitutional, Plaintiffs only seek a preliminary injunction on a subset of the State's restrictions that pose particularized obstacles to their day-to-day lives. Specifically, Plaintiffs seek to preliminarily enjoin enforcement of SB 1's Anti-Carry Default presumption against carrying in privately owned buildings open to the public, the new restrictions on carry in "health care facilities," and two so-called "special purpose area[s]": museums and locations licensed to sell or dispense alcohol for on-site consumption, namely bars and restaurants. Additionally, Plaintiffs seek a preliminary injunction against enforcement of Maryland's existing Mass Transit Ban and the State Park and Forest Ban.

The adverse effects of on Plaintiffs are profound and obvious. Each of the Individual Plaintiffs has a wear and carry permit issued by the Maryland State Police. Declaration of Katherine Novotny ¶ 4 (May 23, 2023), attached hereto as Exhibit B. ("Novotny Dec."); Declaration of Sue Burke ¶ 4 (May 23, 2023), attached hereto as Exhibit C. ("Burke Dec."); Declaration of Esther Rossberg ¶ 4(May 23, 2023), attached hereto as Exhibit D ("Rossberg Dec."). Indeed, one Plaintiff, Katherine Novotny, was issued such a permit prior to *Bruen* and thus satisfied Maryland's good and substantial reason requirement for a permit. Novotny Dec ¶ 4.All these Plaintiffs, along with the many members of MSI, SAF, and FPC who have Maryland permits will no longer be allowed to carry in privately owned buildings, restaurants, museums, and health care facilities where they have carried in the past and would carry after October 1, 2023, the effective date of SB 1, but for the bans imposed by SB 1. Novotny Dec. ¶¶ 5–7; Burke Dec ¶¶ 5–12; Rossberg Dec ¶¶ 5–10; Declaration of Daniel Carlin-Weber ¶¶ 5–10 (May 24, 2023), attached hereto as Exhibit E ("MSI Dec."); Declaration of Alan M. Gottlieb ¶¶ 5–10 (May 24, 2023),

attached hereto as Exhibit F ("SAF Dec."); Declaration of Brandon Combs ¶¶ 5–10 (May 24, 2023), attached hereto as Exhibit G ("FPC Dec."). All these persons are thus stripped of their general right to carry in public.

Similarly, Plaintiff Esther Rossberg commonly rides the Baltimore Metro rail system and would very much like to be armed while doing so, especially given the deeply alarming rise in violent crime in Baltimore and in mass transit, but for Maryland's ban. Rossberg Dec. ¶¶ 9–10; *see also* Rose Williams, *Over 3,000 crimes were committed on light rail last year, despite huge drop in ridership*, ALPHANEWS (Mar. 29, 2021), https://bit.ly/45pcrLJ. Maryland's law strips her of that right. A ban on carrying firearms on mass transit causes multiple deprivations of her ability to carry a firearm. After all, not only is Rossberg unable to carry a firearm arm while traveling on mass transit, but this ban also means that Rossberg is denied the ability to carry a firearm everywhere she uses mass transit to travel to. Plaintiff Sue Burke regularly visits State Parks, State Forests, and Chesapeake forest lands and intends to do so in the future, but cannot do so armed because of the State's ban on self-defense in these locations. Burke Dec. ¶¶ 9–12. That leaves her defenseless while in these hundreds of thousands of acres of forests and wild lands, often far from any potential State-provided public safety or emergency response. All these Plaintiffs and other members of MSI, SAF, and FPC are harmed by being denied the right to carry that they previously enjoyed or (in the case of mass transit and State parks and forests) that they are entitled to enjoy under *Bruen* and the U.S. Constitution. All these injuries are directly traceable to the Maryland laws and regulations challenged herein and are redressable by the relief sought.

## ARGUMENT

### I.    Standard for a Preliminary Injunction

A party seeking a preliminary injunction order must establish the following elements: (1)

a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Base v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (collecting case law). "[A] preliminary injunction can also act to restore, rather than merely preserve, the status quo, even when the nonmoving party has disturbed it." *Id*. at 231. All these elements are satisfied here.

## II.   The Challenged Provisions Likely Violate Plaintiffs' Second Amendment Rights

The element of a likelihood of success "does not require a 'certainty of success,'" but rather only that "the plaintiff 'must make a clear showing that he is likely to succeed at trial.'" *St. Michael's Media, Inc. v. Mayor and City Council of Baltimore*, 566 F.Supp.3d 327, 351 (D. Md. 2021) (quoting *Di Biase*, 872 F.3d at 230). Plaintiffs are able to demonstrate that here because the challenged provisions are unconstitutional under *Bruen*.

"[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. Accordingly, the "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2156 (emphasis added). To determine whether a state's restriction is constitutional, the Court in *Bruen* explained that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129–30. It is the State's burden to "affirmatively prove that its firearms regulation is part of

the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127; *see also id.* at 2150 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). If the State fails to meet its burden, then the State's restrictions must be enjoined.

### A.  Plaintiffs' conduct is covered by the Second Amendment's plain text

If Plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, then "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. The Supreme Court has defined all of the Second Amendment's key terms. "The people" means "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; and, most relevant here, to bear simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008). "Nothing in the Second Amendment's text draws a home/public distinction," *Bruen*, 142 S. Ct. at 2134—or for that matter, any distinction between locations at all. That makes the Second Amendment unlike other Amendments. *See* U.S. CONST. amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."); U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."). And it means that any locational restrictions on Second Amendment rights must come from history, not from the plain text.

The Supreme Court's binding determination of the meaning of these words and phrases definitively resolves the question of whether Plaintiffs' proposed conduct is presumptively protected by the Second Amendment. Plaintiffs and their members are Americans who seek to carry bearable arms for self-defense. As in *Bruen*, these undisputed facts end the textual inquiry: "the plain text of the Second Amendment protects [Plaintiffs'] proposed course of conduct—

carrying handguns publicly for self-defense." 142 S. Ct. at 2134. Accordingly, under *Bruen*'s unambiguous directions, "the burden falls on [the State] to show that [the challenged ban] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135; *see also Koons v. Platkin*, 22-CV-7463 (RMB/AMD), 2023 WL 3478604, at \*62 (D.N.J. May 16, 2023); *Christian v. Nigrelli*, 22-CV-695 (JLS), 2022 WL 17100631, at \*7 (W.D.N.Y. Nov. 22, 2022); *Hardaway v. Nigrelli*, 22-CV-771 (JLS), 2022 WL 16646220, at \*13 (W.D.N.Y. Nov. 3, 2022).

### B. Controlling considerations under *Bruen*

The State bears a burden that it will not be able to meet for the challenged provisions because there is no historical tradition of analogous regulations that demonstrate these provisions are consistent with the Second Amendment. In *Bruen*, the Supreme Court set out several requirements to determine whether a tradition of historical regulations is sufficiently analogous to justify a modern restriction.

First, the relevant time period for the historical analogue must be the Founding, centering on 1791. *Bruen*, 142 S.Ct. at 2135–36; *see also* Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN, Oct. 1, 2022, https://bit.ly/3CMSKjw. That is because "'[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S. Ct. at 2136, quoting *Heller*, 554 U.S. at 634–35. Although the Court in *Bruen* noted an academic debate surrounding whether courts should look to 1868 and Reconstruction (when the Fourteenth Amendment was adopted), the Court found no need to address the point as the result with respect to carry was the same. *Bruen*, 142 S. Ct. at 2138 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, *for all relevant purposes*, the same with respect to public carry." (emphasis added)).

But there can be no doubt that the actual analysis of the Court is focused on 1791. *See Worth v. Harrington,* 2023 WL 2745673 at *11 (D. Minn. Mar. 31, 2023) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters"). The Court noted that its past precedents had "assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137. The Court likewise stated that the courts should "guard against giving post-enactment history more weight than it can rightly bear." *Id.* at 2136. Justice Barrett, in her concurring opinion, stressed this point, noting that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.* at 2163 (Barrett, J., concurring). And the Court "made no small effort to distance itself from even *Heller's* reliance on post-enactment history except to the extent that such history was consistent with the founding era public meaning." *Worth*, 2023 WL 2745673 at *11, (citing *Bruen*, 142 S. Ct. at 2136–37). *Bruen*'s characterization of the Court's precedents as assuming that 1791 is the proper answer is an understatement. In *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), for example, the Court held that "more than *30*" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions lacked grounding in Founding Era practice. *Id*. at 2258–59 (emphasis added).

Second, *Bruen* reiterated that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137. In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court decisively rejected a different standard for States under the Second Amendment, holding that

11

"incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment," *id.* at 765 (internal quotation marks omitted)). There should be no dispute that 1791 is controlling as to the federal government and, since the standard is the same, there can be no reasonable dispute that standard is likewise applicable to the States.

 *Bruen* relied on two very recent decisions, *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Timbs v. Indiana*, 139 S. Ct. 682 (2019), to illustrate the point. *Ramos* held that the Sixth Amendment right to a unanimous jury verdict was incorporated against the States and overruled prior precedent that had allowed the States to adopt a different rule under a "dual track" approach to incorporation. The relevant historical benchmark for the Court's analysis was 1791. 140 S. Ct. at 1396 (discussing the history in "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791). Similarly, in *Timbs*, the Court held that the Excessive Fines provision of the Eighth Amendment was incorporated as against the States. 139 S. Ct. at 686–87. The Court once again looked to the scope of the right as it existed in 1791. *Id.* at 687–88 (discussing "colonial-era provisions" and the "constitutions of eight States"). The Court's other precedents are in accord. *See, e.g., Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance."). That this case challenges State-imposed restrictions and not federal law is thus irrelevant.

 In all events, "to the extent later history contradicts" the text of the Second Amendment, "the

text controls." *Bruen*, 142 S. Ct. at 2137. "Thus, 'post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1224, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Moreover, 20th century and late 19th century statutes and regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 & n.28. Thus, restrictions on the right to keep and bear arms dating after the Civil War and after the adoption of the Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot be used alone to provide the appropriate historical analogue required by *Bruen*. In other words, only "enduring" and "well-established" restrictions with roots in the Founding are relevant in assessing whether the challenged restrictions comport with the Second Amendment's "unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Third, the historical analogues the State points to must be "representative." Historical "outlier" requirements of a few jurisdictions or of territorial governments are to be disregarded. *Bruen*, 142 S. Ct. at 2133, 2153, 2147 n.22 & 2156. This means regulations from only a handful of states or those that cover only a small portion of the population are not enough to demonstrate that modern regulations are consistent with the Second Amendment. *Id.* at 2155 (rejecting regulations applying to only 1% of the American population); *see also Koons*, 2023 WL 3478604 at *78, *85 (finding regulations covering 10% and 15% of American population insufficient). *Bruen* also categorically rejected reliance on laws enacted in the Territories, including expressly "Arizona, Idaho, New Mexico, Oklahoma," holding that such laws "are *most unlikely* to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'" *Bruen*, 142 S. Ct. at 2154 (quoting *Heller*, 554 U.S. at 614) (emphasis added).

Fourth, the historical analogues must be "relevantly similar," which is to say that they must burden ordinary, law-abiding citizens' right to carry for self-defense in a similar manner and for similar reasons. *Bruen*, 142 S. Ct. at 2132. *Bruen* held that the inquiry into whether an analogue is proper is controlled by two "metrics" of "how and why" any restriction was historically imposed during the Founding era. *Id.* at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* (emphasis in original). For example, poaching and hunting restrictions are thus generally insufficient to demonstrate the constitutionality of a modern-day restriction that regulates carrying firearms during day-to-day life. Both *how* hunting laws burdened the right to carry firearms for self-defense (when hunting) and *why* they did so (to regulate hunting, to reduce the taking of certain animals in certain places during certain seasons) have little or nothing to do with restricting the right of self-defense in modern-day Baltimore or urban Maryland. *See, e.g.*, *Koons*, 2023 WL 3478604 at *64–*65.

In attempting the "affirmatively prove" that its restrictions on public carry are consistent with the Nation's historical tradition, Maryland may refer to historical analogues, such as restrictions on carrying in "sensitive places" at the Founding and claim those meet *Bruen*'s "how" and "why" standard. 142 S. Ct. at 2127, 2133. The Supreme Court has endorsed only three such places "where weapons were altogether prohibited," naming "legislative assemblies, polling places, and courthouses." *Id.* at 2133. While *Bruen* cites *Heller*'s suggestion that sensitive places may include "schools and government buildings," the Court focused on only "legislative assemblies, polling places, and courthouses" for purposes of conducting the inquiry into analogues. *Id.* The Court stated explicitly that "courts can use analogies to *those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new

14

and analogous sensitive places are constitutionally permissible." *Id.* (emphasis added). Accordingly, "sensitive places" cannot be construed "too broadly," *i.e.*, beyond what the historical tradition at the Founding demonstrates, and these certainly do not authorize restrictions that "would in effect exempt cities" or entire States "from the Second Amendment." *Id.* at 2134. Sensitive places may not be used to "eviscerate the general right to publicly carry arms for self-defense." *Id.* After all, governments may bar the carrying of firearms in only "exceptional circumstances." *Id.* at 2145. The exception cannot become the rule.

Fifth, the historical analysis required by the Supreme Court is a legal inquiry that examines legal history, which is appropriately presented in briefs. *See Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "*legal* questions" that judges can address) (emphasis in original); *see also id.* at 2135 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend upon any of the factual questions raised by the dissent"). Accordingly, the required analysis does not require fact-finding by a court. With these analytical guideposts established by *Bruen*, the State cannot meet its burden to justify the challenged restrictions on carrying firearms.

### C. The challenged provisions are inconsistent with this Nation's historical tradition of firearm regulation

#### i. The anti-carry default

SB 1 enacts, for the first time in Maryland's history, a presumption against carrying firearms in buildings open to the public. The State will be unable to demonstrate that this new Anti-Carry Default "permissibly regulates the right to carry for self-defense in public." *Koons*, 2023 WL 3478604 at *68. The main reason is that the Anti-Carry Default is the *exact opposite* of this Nation's traditional regulatory approach, which has entrusted "private property owners" with principal responsibility to exercise the "right to exclude others from their property" throughout

American history. *Christian*, 2022 WL 17100631 at *9. The historical default rule has been that "carrying on private property" is "generally permitted absent *the owner*'s prohibition." *Id.* (emphasis added).

This concept is basic to the law of trespass. "[T]the well-developed concept of implied license . . . operates to grant permission to enter another's premises according to custom or other indicia of consent." *Koons*, 2023 WL 3478604 at *58. As to property otherwise open to the public, "the public has the implied consent to enter, unless such consent is conditioned or subsequently revoked by the property owner." *Id*; *see also Royal Inv. Grp., LLC v. Wang*, 183 Md.App. 406, 961 A.2d 665, 688 (2008) ("Consent may be express or implied."). *Bruen* confirms that there is a "general right to publicly carry arms for self-defense." 142 S. Ct. at 2134. That "general right" necessarily means that "[t]he right to armed self-defense follows the individual everywhere he or she lawfully goes" in public outside of the "exceptional circumstances" when a government may bar firearms. *Koons*, 2023 WL 3478604 at *61; *Bruen*, 142 S. Ct. at 2155. The right to carry for self-defense thus "presumptively" extends to private property open to the public unless the owner affirmatively "withdraw[s] consent." *Koons*, 2023 WL 3478604 at *61. Plaintiffs here do not challenge that right of a private property owner. Given this basic and well-established premise of trespass law, the State will be unable to point to any relevant historical tradition of firearm regulation from the Founding suggesting otherwise. *See, e.g., Koons*, 2023 WL 3478604 at *68; *Christian*, 2022 WL 17100631 at *9.

This is unsurprising as the academic proponents behind the Anti-Carry Default conceded that it would be novel and be a significant departure from this Nation's history of firearm regulation. In their book expanding on anti-carry default rules, the proponents stated that "[a]n implied condition of every invitation [onto another's property] is that the invitee is welcome to

16

bring a firearm." *Koons*, 2023 WL 3478604 at *58 n.35. In fact, as of 2020, "*no state* ha[d] adopted generalized 'no carry' defaults for retail establishments." Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J L. MED. & ETHICS 183 (2020) (emphasis added).

The reason the State has sought to change the default rule is plain: "[g]iven the inertial tendency to stick with the status quo, lawmakers should expect that a 'prohibited-unless permitted' default would radically expand the private spaces where guns could not be carried." *Id.* After all, a "default rule" of interaction with strangers, i.e., members of the public coming to a property open to the public, is particularly "sticky." *See generally* OMRI BEN-SHAHAR & JOHN A. E. POTTOW, *On the Stickiness of Default Rules*, 33 FLA. ST. L. REV. 651, 653 (2006), https://bit.ly/3pWXM6Y (last visited May 23, 2023). By "sticky," legal scholars mean that individuals have a well-known tendency to stick by the default rule *even when* they would otherwise take a different position. *Id.* at 651–54. Thus, Maryland can expect many owners of buildings, who would otherwise allow or be indifferent to lawful carrying of firearms on their property, to simply stick with the new default. As they do so, the Anti-Carry Default "might have knockon effects, reducing preferences to carry and possess firearms more generally, as it becomes increasingly inconvenient to do so." Ayres & Jonnalagadda, 48 J L. MED. & ETHICS at 184. This is likely for individual Plaintiffs, who have all declared that they would drastically reduce their carry for self-defense when the Anti-Carry Default goes into effect. Novotny Dec. ¶¶ 6–7; Burke Dec. ¶¶ 6, 8**;** Rossberg Dec. ¶¶ 6, 8. The same is equally true for the members of MSI, SAF and FPC who possess Maryland carry permits. MSI Dec. ¶ 8; SAF Dec. ¶ 8; FPC Dec. ¶ 8.

At bottom, the State may have policy reasons that it seeks to change the default rule for carrying firearms in buildings open to the public as a means to stop individuals from exercising

their rights. But the Second Amendment "is the very product of an interest balancing by the people" and it "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Because of "this balance—struck by the traditions of the American people," *id*.,—"certain policy choices" have been definitively taken "off the table," *Heller*, 554 U.S. at 636. Among these policy choices is establishing a presumption against carrying in buildings open to the public because the Second Amendment itself establishes a presumption that Plaintiffs and other licensed, law-abiding citizens have a "right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. Maryland may not flip a presumption codified in the Constitution. But that is exactly what Maryland has done by dictating that all buildings open to the public are now presumptively off-limits without conspicuous signage or express consent. No historical analysis can support such a law.

### ii.  Locations licensed to sell or dispense alcohol for on-site consumption

SB 1 also designates that locations licensed to sell or dispense alcohol, namely bars and restaurants, are "special purpose areas" where Plaintiffs and other ordinary, law-abiding citizens are forbidden to wear, carry, or transport firearms. With this and its other location-specific prohibitions, Maryland has made it doubly illegal to carry into such locations, first by prohibiting all carry of firearms into a privately owned building without express consent or signage and second, by banning carry in such places *regardless* of the owner's wishes. The State will be unable to support this restriction with historical evidence from the Founding.

It is undisputable that "taverns, inns, public houses, 'tippling houses,' 'victualing houses,' or 'ordinaries'" existed during the Founding. *Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 16744700, at *74 (N.D.N.Y. Nov. 7, 2022) ("*Antonyuk III*"). In fact, Benjamin Franklin engaged in "constant study" at a library that he founded to avoid the "amusement" that he would otherwise

find "in taverns, games, or frolicks of any kind." BENJAMIN FRANKLIN, The AUTOBIOGRAPHY OF BENJAMIN FRANKLIN 148 (Smyth, ed., 1907). While Franklin sought to regulate his private habits, other members of the Founding generation sought to regulate these institutions by public means. "In all states" during the Founding era, "tavern legislation was involved and constantly changing." CHRISTINE SISMONDO, AMERICA WALKS INTO A BAR: A SPIRITED HISTORY OF TAVERNS, SALOONS, SPEAKEASIES AND GROG SHOPS 15 (Oxford 2011). Nevertheless, Plaintiffs are unaware of any ban on mere possession of firearms in these places. The absence of any Founding era analogues is dispositive. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

In sum, public establishments serving alcohol have existed for centuries. So have firearms. Nevertheless, the State will be unable to demonstrate a historical tradition of "criminaliz[ing]" an ordinary, law-abiding citizen's "*mere* presence at those locations with a handgun." *Koons*, 2023 WL 3478604 at *86.

### iii.  Museums

SB 1 additionally designates museums as "special purpose areas" where Plaintiffs may not carry firearms. There is no well-established, representative historical tradition banning firearms in these locations. Museums and, more broadly, similar institutions such as libraries date to the colonial era in the United States. The Charleston Museum dates to 1773. *See About Us*, CHARLESTON MUSEUM, https://bit.ly/3MPYhMB (last visited May 23, 2023). The Peabody Essex Museum was founded by sea captains in Salem, Massachusetts in 1799 as the East India Marine Society. *See A Museum of Art and Culture*, PEABODY ESSEX MUSEUM, https://bit.ly/439jDtl (last

19

visited May 23, 2023). New York's first museum opened in 1804. *About Us*, N.Y. HISTORICAL SOC'Y MUSEUM & LIBRARY, https://bit.ly/3WkCcZF (last visited May 23, 2023). The Peale Center in Baltimore opened its doors in 1814. *Our History*, THE PEALE, https://bit.ly/41KAZvC (last visited May 23, 2023). Benjamin Franklin founded America's first lending library in Philadelphia in 1731. "AT THE INSTANCE OF BENJAMIN FRANKLIN": A BRIEF HISTORY OF THE LIBRARY COMPANY OF PHILADELPHIA 5 (2015), *available at* https://bit.ly/3vdBGQk. In the beginning, it was open on Saturday afternoons where members and nonmembers could borrow books. *Id.* at 13–14. By 1787, "it had become the public library of the University and City." *Id*. at 25. Franklin's library would not be alone in the early Republic. By 1850, the Census reported 1,217 public libraries in the United States. *See* DEPT. OF INTERIOR, 1850 CENSUS: COMPENDIUM OF SEVENTH CENSUS 159, Table CLXVII (1854), https://bit.ly/3jp7GhR.

Despite the existence of museums (or analogous institutions like libraries) in America during the Founding and the decades after, the State will be unable to point to regulations that support a historical tradition of banning firearms. *Koons*, 2023 WL 3478604 at *86.

### iv.  Health care facilities

SB 1 bans the possession of firearms in "health care facilities," which the law defines with reference to other provisions of Maryland law. Specifically, Section 4-111(a)(2)(iii), as enacted by SB 1, defines "health care facilities" by cross-reference to Section 15-10B-01(g)(1), (2), (3) and (4), of the Insurance Article of the Maryland Code. MD. CODE, INS. LAW Section 15-10B-01(g)(1) refers to a "hospital" which is defined by a cross-reference to § 19-301 of the Health-General Article to mean:

> an institution that: (1) Has a group of at least 5 physicians who are organized as a medical staff for the institution; (2) Maintains facilities to provide, under the supervision of the medical staff, diagnostic and treatment services for 2 or more unrelated individuals; and (3) Admits or retains the individuals for overnight care.

Section 15-10B-01(g)(2) refers to a "related institution," which is defined by a cross-reference to § 19-301 of the Health-General Article as:

> "an organized institution, environment, or home that: (i) Maintains conditions or facilities and equipment to provide domiciliary, personal, or nursing care for 2 or more unrelated individuals who are dependent on the administrator, operator, or proprietor for nursing care or the subsistence of daily living in a safe, sanitary, and healthful environment; and (ii) Admits or retains the individuals for overnight care."

Section 15-10B-01(g)(3) refers to an "ambulatory surgical facility or center which is any entity or part thereof that operates primarily for the purpose of providing surgical services to patients not requiring hospitalization and seeks reimbursement from third party payors as an ambulatory surgical facility or center." Section 15-10B-01(g)(4) refers to "a facility that is organized primarily to help in the rehabilitation of disabled individuals."

The State's ban on carrying firearms in these "health care facilities" cannot be supported by a historical tradition of firearms regulation. As the District Court of New Jersey recently held, "hospitals and medical care facilities existed before and after this Nation's founding." *Koons*, 2023 WL 3478604, at *93. For instance, in New York, Bellevue Hospital "is America's oldest operating hospital," and it opened in New York City in 1736. *Bellevue History*, NYC HEALTH + HOSPITALS, https://bit.ly/4240MiB (last visited May 23, 2023). Benjamin Franklin again played a role in a founding an institution that would persist from the Founding until today: he "worked with Thomas Bond, a physician and surgeon, to form the Pennsylvania Hospital in 1751." *Koons*, 2023 WL 3468604 at *93. Weill Cornell Medical Center opened as New York Hospital in 1791. *Id.* "Up north, Massachusetts opened the Boston Medical Dispensary in 1796—today Tufts Medical Center—and then the Massachusetts General Hospital in 1811." *Id.*

There can be no doubt that "the medical profession existed in 18th and 19th century America," and so too did firearm violence. *Antonyuk III*, 2022 WL 16744700 at *60. Nevertheless, the State will

21

be unable to demonstrate a tradition of "relevantly similar" regulations prohibiting firearms in these locations, such as hospitals, from the Founding. *Bruen*, 142 S. Ct. at 2133. Here too, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131.

### v. Mass transit

Separate from the new provisions of SB 1, Maryland has a "Mass Transit Ban," which bans ordinary, law-abiding citizens like Plaintiffs from carrying firearms, whether they are commuting or seeking to travel to other parts of the State. This blanket prohibition on carrying in and around common modes of transportation cannot be "justif[ied]" as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Plaintiffs are not aware of a single remotely analogous law from the Founding era that could be used to justify Maryland's Ban.

Public transportation itself is not a new phenomenon and existed at the time of the Founding. For instance, passengers would share stagecoaches on journeys throughout the colonies before the Revolution and in the states after it. *See, e.g.,* Oliver W. Holmes, *The Stage-Coach Business In The Hudson Valley*, The Q. J. of the N. Y. State Hist. Ass'n 231–33 (1931) ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia."). In addition to stagecoaches, the public utilized riverboats and ferries during the Founding. And members of the public carried arms on these forms of transportation. For example, South Carolina established a "public ferry" as early as 1725 and mandated "free" "ferriage" for "all persons under arms in times of alarms and expresses." 9 Statutes at large of South Carolina 61 (1841). And arms, such as blunderbusses, were carried on stagecoaches. *See* Johnson, et al., Second Amendment: Regulation, Rights, and Policy 2195 (3d ed. 2021)

("Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or (most often) a pair of ordinary pistols."). Plaintiffs are not aware of any Founding-era tradition of banning the possession of a firearm while traveling on these public modes of transportation.

The absence of Founding era restrictions on public conveyances makes sense given that several States *exempted* travelers from then-existing firearms regulations. *See, e.g.*, 1812 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89, § 1 ("[A]ny person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined. . . ."); 1819 Ind. Acts 39, An Act to prohibit the wearing of concealed weapons, ch. XXIII, § 1 ("That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor . . . Provided, however, that this act shall not be so construed as to affect travelers."); 1821 Tenn. Acts 15, An Act to prevent the wearing of dangerous and unlawful weapons, ch. XIII (exempting "any person that may be on a journey to any place of out his county or state").

As *Bruen* explained, where the government seeks to address a "perceived societal problem," such as violence while traveling, and it "employ[s] a regulation" that the "Founders themselves could have adopted to confront that problem," such as a "flat ban on the possession of handguns," the absence of any such bans from the Founding is proof that modern ban is "unconstitutional." 142 S. Ct. at 2131 (citing *Heller*, 554 U.S. at 631, 634). Moreover, *Bruen* also instructs that a modern law is likely unconstitutional "if earlier generations addressed the societal problem, but did so through materially different means." *Id*. In this case, both are true—the Founders did not ban those traveling on public conveyances from carrying firearms, and in fact

they at times exempted travelers from restrictions.

### vi.  Parks and forests

By regulation, the Department of Natural Resources has generally banned the possession of firearms by ordinary, law-abiding citizens in Maryland's State Parks, State Forests, and State Chesapeake Forest Lands. These bans cover hundreds of thousands of acres of land. The State Park System covers 142,433 acres as of 2022. *Maryland At A Glance, Parks & Recreation, State Parks*, MARYLAND MANUAL ON-LINE, https://bit.ly/3MmHhfm (last visited May 23, 2023). Maryland has over 214,000 acres of State Forest. *Maryland's State Forests*, MARYLAND DEP'T. OF NAT. RESOURCES, https://bit.ly/3BGjwK5 (last visited May 23, 2023). Chesapeake Forest Lands are an additional 75,376 acres. *Chesapeake Forests*, MARYLAND DEP'T. OF NAT. RESOURCES, https://bit.ly/3OHgSf9 (last visited May 23, 2023). Throughout these lands, Marylanders are deprived of their Second Amendment rights.

There is nothing new about parks and there is nothing new about potential violence in parks or public green spaces set aside by the government generally. Boston Common is considered "America's oldest park" and was established in 1634. *See Koons*, 2023 WL 3478604 at *83. Not only was it commonly used for militia purposes (making it *not* a gun-free zone), "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3–6 (2021). In New York, City Hall Park began as a "public common" in the 17th century. *The Earliest New York City Parks*, N.Y. CITY DEP'T. OF PARKS AND RECREATION, available at https://on.nyc.gov/3hBZXfe (last visited May 23, 2022). New York's Bowling Green Park was established "for the Recreation & Delight of the Inhabitants of [New

York] City" in 1733. *Id.* In the South, Savannah was planned around public squares—open green spaces which became the landscaped parks that residents know today. *See* Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. OF SOC'Y OF ARCH. HIST. 47, 48 (1961) (noting Savannah's squares started initially as "open, unplanted plazas" and were "remodel[ed] . . . around 1800 . . . into landscaped neighborhood parks").

Despite the existence of parks dating to the Founding, there is no relevantly similar historical tradition of banning firearms by ordinary, law-abiding citizens. Moreover, much, if not all, of the land covered by the Department of Natural Resource's regulation are "vast expanses" of the great outdoors "where people are generally free to roam." *Antonyuk III*, 2022 WL 16744700 at *66. And the State will simply be unable to point to any historical tradition of banning firearms in the wild reaches of Maryland's State Parks, State Forests, and State Chesapeake Forest Lands.[3] Even prior to *Bruen*, courts had rejected such locations as "sensitive places." *See*, *e.g.*, *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 658 (Del. 2017) (holding that State parks and State forests were not "sensitive places" and that the State's ban on firearms in such places was unconstitutional under Delaware's version of the Second Amendment); *People v. Chairez*, 2018 IL 121417, 104 N.E.3d 1158, 1176 (2018) (holding that an Illinois statute that banned the possession of a firearm within 1000 feet of a public park violated the Second Amendment, rejecting the argument that the area was a "sensitive" place); *Morris v. Army Corps of Eng'rs*, 60 F. Supp.

---

[3] The Fourth Circuit's decision in *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), which addressed restrictions on firearms in a national park area, is no longer controlling or persuasive precedent in light of the Supreme Court's decision in *Bruen. See Bruen*, 142 S. Ct. at 2124 (abrogating *Masciandaro* and decisions of other courts that had applied a "two step" means-ends or intermediate scrutiny to sustain restrictions on firearms); *id.* at 2126–27 & n.4 (rejecting this lower court line of cases and mode of analysis). Significantly, the federal regulation banning firearms at issue in *Masciandaro* was legislatively abrogated by Congress for Second Amendment reasons with the enactment of Pub. Law 113-287, § 3, 128 Stat. 3168 (2014), codified at 54 U.S.C. § 104906.

3d 1120, 1123–25 (D. Idaho 2014), *appeal dismissed*, 2017 WL 11676289 (9th Cir. Dec. 15, 2017),

(rejecting the government's argument that U.S. Army Corps of Engineers' outdoor recreation sites

were sensitive places); *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F.Supp.3d 675, 690–96 (N.D.

Ill. 2021) (finding a forest preserve district was not a "sensitive place").

### vii. Maryland's location-specific bans are not analogous to permissible sensitive place restrictions

Recognizing that it lacks analogous regulations from the Founding (or any relevant

historical period), the State will likely attempt to justify its location-specific bans as sufficiently

analogous to the "sensitive place" restrictions that *Bruen* assumed would be constitutional. But

such analogies are inapt.

In *Bruen*, the Supreme Court endorsed only three "sensitive places" where firearms

historically "were altogether prohibited:": legislative assemblies, polling places, and courthouses.

142 S. Ct. at 2133. *Bruen* directed courts to consider "analogies to those historical regulations . . .

to determine" whether "modern regulations prohibiting the carry of firearms in new and analogous

sensitive places are constitutionally permissible." *Id*. What ties all these locations together and

therefore what is relevant is the long tradition of the government providing comprehensive

security, *see e.g.* THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 271 (Grimke, ed. 1790)

("The said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts

hereby appointed, or directed to be held, within their respective districts."),[4] for instance, because

---

[4] Other examples of Founding Era regulations in these places: VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND: NOVEMBER SESSION 1791, at *2 (Green ed., 1795) (appointing sergeant at arms and door-keeper for state legislature); PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, 378 (Stanley Ray ed., 1904) ("sergeant-at-arms" and "door-keeper" for legislature); 1 LAWS OF THE STATE OF NEW YORK 176 (2nd ed., Albany: Websters & Skinner 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons… . And the said respective sheriffs and their officers shall then and there attend

government officials are "at acute personal risk of being targets of assassination." David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 290 (2018); *see also Hardaway*, 2022 WL 16646220, at *14; *Koons*, 2023 WL 3478604 at *78.

At the Founding, comprehensive security meant officials who were armed and able to control every point of access. Today, it means security akin to that provided before entering courthouses or the TSA-secured areas of an airport, i.e., armed guards and metal detectors at a minimum. *See Koons*, 2023 WL 3478604 at *90 ("Airports have many security measures such as Transportation Security Administration (TSA) officers, air marshals, police officers, metal detectors, and luggage scanners that all check people and their baggage for weapons and dangerous devices, like explosives."); *Hardaway*, 2022 WL 16646220, at *14 (explaining sensitive places are "typically secured locations"). That the government can prohibit firearms in these sensitive places makes sense. The historic central purpose of the Second Amendment is ensuring Americans can be "armed and ready" for "ordinary self-defense needs." *Bruen*, 142 S. Ct. at 2150. But when the government secures a location and protects Americans, there is less of a need for ordinary, law-abiding Americans to be ready to defend themselves. *See id.* at 2133 (requiring courts to assess "how and why the regulations burden a law-abiding citizen's right to armed self-defense").

As a general matter, no state-provided comprehensive security will be found at establishments serving alcohol, museums, health care facilities, public transportation facilities, or

---

in their own proper persons."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42 (Davis ed., 1796) (court's "serjeant at arms"); A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed., 1800) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); 1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811) (polling places); 2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams, eds., 1797) (polling places).

state parks and forests. One does not walk through security screening to order a burger at a local restaurant or hike in Chesapeake Forest Lands. In the words of *Bruen*, recognized sensitive places restrictions are not "relevantly similar" to Maryland's modern bans on possession by ordinary, law-abiding Americans in these places. *Id.* at 2132.

For example, take the Mass Transit Ban. Plaintiffs are unaware of any law, regulation, or practice requiring ordinary citizens to be "screened by security" before entering mass transit facilities. *Bridgeville Rifle & Pistol Club*, 176 A.3d at 659; *Hardaway*, 2022 WL 16646220, at *14; *Koons*, 2023 WL 3478604 at *78. In addition, many modes of public transportation "do not have controlled entry points." *Bridgeville Rifle & Pistol Club*, 176 A.3d at 659. Public transportation offerings are unlike areas secured by TSA screening at airports where entry *is* controlled, and comprehensive security *is* provided. The same can be said of establishments serving alcohol, museums, health care facilities, and state parks and forests.

Moreover, other regulations during and preceding the Founding era demonstrate a principle that when assemblies of people could be vulnerable to violence, the government imposed an obligation *to carry*. *See Koons*, 2023 WL 3478604 at *72–*73 ("The colonial generation recognized that citizens attending public gatherings exposed themselves to violent attack . . . To abate that risk, American colonists obligated their citizenry to arm themselves for protection."). For instance, Colonial and Founding era governments imposed an obligation to carry in churches during times of worship. *See, e.g.*, 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES, COLONIAL AND REVOLUTIONARY, 1768-1773, at 137–40 (Candler, ed., 1904) (1770 Georgia statute mandating that all those "liable to bear arms in the militia" and "resorting, on any Sunday or other times, to any church, or other place of divine worship . . . shall carry with him a gun . . . and shall take the said gun or pistols with him to the pew or seat . . . ."); 5 THE STATUTES

AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 19 (Hening ed., 1819) (1738 Virginia statute providing that "it shall and may be lawful, for the chief officer of the militia, in every county, to order all persons listed therein, to go armed to their respective parish churches"); *see also Koons*, 2023 WL 3478604 at *72–*73 (collecting similar statutes) The Founding era's response to vulnerable assemblies was to arm the law-abiding, not disarm them.

To construe "sensitive places" to cover so many locations throughout the State would "eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S. Ct. at 2134. Moreover, it would invert the presumptive protection for carrying firearms for self-defense that the Second Amendment provides. As *Bruen* explains, governments may ban the carrying of firearms in only "exceptional circumstances." *Id*. at 2156. To hold these locations were "sensitive places" would mean the opposite: ordinary, law-abiding would only be able to carry in "exceptional circumstances." *Id.* Such a result however is inconsistent with this Nation's historical tradition of firearms regulation and thus the Second Amendment's "unqualified command." *Id.* at 2126.

### III. The Violation of Plaintiffs' Second Amendment Rights Causes Irreparable Harm

"The denial of a constitutional right, if denial is established, constitutes irreparable harm." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). That is why "[w]hen an alleged deprivation of a constitutional right is involved ... most courts hold that no further showing of irreparable injury is necessary." 11A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2022). As there is no "hierarchy of constitutional rights," *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 628 (1989), and the Second Amendment is not a "second-class right," the same presumption

that applies to "other Bill of Rights guarantees," *Bruen*, 142 S. Ct. at 2156, must apply to Plaintiffs' Second Amendment rights too. To hold otherwise would be to impermissibly "subject" the Second Amendment "to an entirely different body of rules." *Id.*

In all events, the Second Amendment protects fundamental, intangible interests—much like the First Amendment—and such interests are quintessentially irremediable by damages and are irreparable after the fact. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (internal quotation marks omitted). The Second Amendment protects the right to bear arms for self-defense, which is to say to be "armed *and ready* for offensive or defensive action in a case of conflict with another person." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 584 (2008)) (emphasis added). Because this is a right "*for* self defense," it is "a right that can be infringed upon whether or not plaintiffs are ever actually called upon to use their weapons to defend themselves." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016), *granting permanent injunctive relief, sub. nom. Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017). "When one needs to defend herself, family, or property right now, but is defenseless," that "is the heaviest kind of irreparable harm." *Rhode v. Becerra*, 445 F. Supp. 3d 902, 954 (S.D. Cal. 2020), *vacated and remanded Rhode v. Bonta*, No. 20-55437, 2022 WL 17099119 (9th Cir. 2022).

Accordingly, this Court should join the many courts around the country to hold that Second Amendment injuries are irreparable. *McDougall v. Cnty. of Ventura*, 23 F.4th 1095, 1112 (9th Cir. 2022), *on reh'g en banc*, 38 F.4th 1162 (9th Cir. 2022); *Jones v. Bonta*, 34 F.4th 704, 732 (9th Cir. 2022), *op. vacated on reh'g on other grounds*, 47 F.4th 1124 (9th Cir. 2022); *Koons*, 2023 WL 3478604 at *105; *Renna v. Bonta*, No. 20-cv-2190, 2023 WL 2846937, at *14 (S.D. Cal. Apr. 3., 2023); *Christian*, 2022 WL 17100631 at *10; *Hardaway*, 2022 WL 16646220 at *17; *Antonyuk v. Bruen*, No. 1:22-cv-734, 2022 WL 3999791, *36 (N.D.N.Y. Aug. 31, 2022); *Guns Save Life, Inc.*

30

*v. Raoul*, 2019 IL App (4th) 190334, ¶ 52, 146 N.E.3d 254, 277; *Def. Distributed v. U.S. Dept. of State*, 121 F. Supp. 3d 680, 689 (W.D. Tex. 2015); *Fotoudis v. City & Cnty. of Honolulu*, 54 F. Supp. 3d 1136, 1145 (D. Haw. 2014).

## IV. The Other Factors Weigh in Favor of a Preliminary Injunction

When the State is the opposing party to a preliminary injunction, the last two factors—the balance of equities and the public interest—merge. *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020). And the State has no interest in enforcing an unconstitutional law because "*upholding constitutional rights is in the public interest.*" *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) (emphasis added). Further, "[a] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks omitted).[5]

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction and enjoin enforcement of the challenged provisions.

---

[5] Under Rule 65(c), this Court has discretion to waive the security requirement. *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). It should do so here as enjoining an unconstitutional law—especially those provisions that have yet to be implemented—will impose the State no financial harm and any harm in *not* enforcing an unconstitutional law is "remote." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n. 3 (4th Cir. 1999).

Dated: May 24, 2023

/s/ Mark W. Pennak
Mark W. Pennak (Bar ID# 21033)
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd
Ste C #1015
Baltimore, MD 21234-21502
Tel: (301) 873-3671
mpennak@marylandshallissue.org

*Attorney for Plaintiffs Katherine Novotny, Sue Burke, Esther Rossberg, Maryland Shall Issue, Inc., Second Amendment Foundation, and Firearms Policy Coalition*

Matthew Larosiere*
THE LAW OFFICE OF MATTHEW LAROSIERE
6964 Houlton Circle
Lake Worth, FL 33467
Tel: (561) 452-7575
larosieremm@gmail.com
*Admitted *pro hac vice*

*Attorney for Plaintiff Maryland Shall Issue, Inc.*

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
*Admitted *pro hac vice*

*Attorneys for Plaintiffs Katherine Novotny, Sue Burke, Esther Rossberg, Maryland Shall Issue, Inc., Second Amendment Foundation, and Firearms Policy Coalition*