**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

KATHERINE NOVOTNY, *et al.*,           *

          *Plaintiffs*,           *

      v.           *           No. 1:23-cv-01295-GLR

WESTLEY MOORE, *et al.*,           *

          *Defendants*.           *

   *    *    *    *    *    *    *    *    *    *    *

**DEFENDANTS' CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

ANTHONY G. BROWN
Attorney General of Maryland

ROBERT A. SCOTT
Federal Bar No. 24613
RYAN R. DIETRICH
Federal Bar No. 27945
JAMES N. LEWIS
Federal Bar No. 30220
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
(410) 576-7055
rscott@oag.state.md.us

June 28, 2023           Attorneys for Defendants

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

STATUTORY BACKGROUND .......................................................................... 1

    Maryland's Current Public Carry Permitting Scheme ............................. 1

    The Permit Application Process ............................................................... 2

    Restrictions on Public Carry ..................................................................... 3

    The Supreme Court Announced its Decision in *Bruen* ........................... 4

    The General Assembly Enacted Senate Bill 1 ......................................... 4

    Permits Limited to Concealed Carry ....................................................... 5

    Restrictions on Statutorily-Defined Locations ........................................ 5

    The Private Building Consent Rule .......................................................... 7

PROCEDURAL BACKGROUND ....................................................................... 8

STANDARDS OF REVIEW ................................................................................ 9

ARGUMENT ........................................................................................................ 11

I.     THE SUPREME COURT IN *BRUEN* CLARIFIED THE STANDARD TO BE APPLIED
      TO CHALLENGES UNDER THE SECOND AMENDMENT. ............................................ 11

II.    EVEN IF CARRYING A FIREARM IN SENSITIVE PLACES BURDENS CONDUCT
      PROTECTED BY THE SECOND AMENDMENT, THERE IS A ROBUST HISTORICAL
      TRADITION OF PROHIBITING FIREARMS IN VARIOUS LOCATIONS BASED ON
      THEIR PARTICULAR CHARACTERISTICS. ................................................................ 13

      A.    Because Sensitive Places are Presumptively Constitutional under
         *Bruen*, Plaintiffs Bear the Burden to Demonstrate that Carrying
         Firearms in These Locations Falls Within the Conduct Protected by
         the Second Amendment ............................................................................. 13

B.  Even if Plaintiffs Have Met Their Initial Burden, There is a Robust Historical Tradition of Limiting Firearms in Various Types of Locations. ................................................................................... 15

    1.  *Bruen* Permits Significant Flexibility in Determining Whether a Particular Location is a "Sensitive Place." .................................... 15

    2.  Limiting Firearms in Certain Locations Has a Rich American Tradition that Was Inherited from Its English Forebears. .............. 17

    3.  The History and Tradition of Restrictions on Sensitive Places Yields Several Applicable Principles. ............................................... 21

III.  RESTRICTIONS ON FIREARMS ON GOVERNMENT-OWNED PROPERTY DO NOT IMPLICATE THE SECOND AMENDMENT WHERE THE GOVERNMENT IS ACTING IN ITS PROPRIETARY CAPACITY OR AS A MARKET PARTICIPANT. ......................... 24

IV.  PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION MUST BE DENIED, AND THEIR COMPLAINT DISMISSED, BECAUSE THEY CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS. ............................................... 30

A.  The Challenged Locational Restrictions Are All Either Sensitive Places that Fall Outside of the Second Amendment or Otherwise Supported by this Nation's Historical Tradition of Firearm Regulation. ................................................................................... 31

    1.  Health Care Facilities ...................................................................... 31

    2.  Museums .......................................................................................... 33

    3.  Locations Licensed to Sell or Dispense Alcohol for On-Site Consumption ................................................................................... 34

    4.  Any Transit Vehicle or Transit Facility Owned or Controlled by the Maryland Transit Administration ......................................... 35

    5.  State Parks and Forests ................................................................... 40

B.  Even if Plaintiffs Have Standing, the Private Building Consent Rule Fails to Implicate Conduct Covered by the Second Amendment, and in Any Event is Supported by Historical Tradition. .................................... 44

    1.  Plaintiffs Lack Standing Because They Have Not Sustained an Injury, and Any Purported Injuries They Might Sustain are

Neither Traceable to the Actions of the State nor Redressable by this Court. ................................................................. 45

2.   The Text of the Second Amendment Does Not Cover the Plaintiffs' Conduct Because the Second Amendment does not Bestow the Right to Carry Arms into Another's Building Absent Consent. ............................................................. 48

3.   Even if this Court Concludes that the Text of the Second Amendment Covers Plaintiffs' Conduct, the Private Building Consent Rule is Consistent with the Nation's History and Tradition of Firearm Regulations. ..................................... 54

V.   THE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED BECAUSE THE BALANCE OF THE EQUITIES FAVORS THE STATE. .............. 58

CONCLUSION ........................................................................... 60

INDEX OF EXHIBITS ................................................................. 61

## INTRODUCTION

In 2010, the Supreme Court in *McDonald v. City of Chicago* assured the States that, consistent with historical tradition, "experimentation with reasonable firearms regulations," including "solutions to social problems that suit local needs and values," could "continue under the Second Amendment."  561 U.S. 742, 785 (2010).   Maryland has done just that.  The prohibitions challenged in this case are not only reasonable restrictions on only a limited subset of locations, but are all supported by a rich historical tradition that stretches from the Founding, through the Reconstruction era, and beyond.   Because the people of Maryland have the authority—and indeed the responsibility—to enact the laws that they believe best serve the public safety, plaintiffs' counterhistorical assault on these laws should be rejected. Accordingly, defendants' motion to dismiss should be granted and plaintiffs' motion for preliminary injunction should be denied.

## STATUTORY BACKGROUND

### Maryland's Current Public Carry Permitting Scheme

Like most states, Maryland has a permitting system that allows for certain individuals to publicly carry handguns.  As set forth below, this permitting scheme will be amended by laws passed during the most recent legislative session, and an overview of the current permitting process is necessary to provide proper context for those changes.

Maryland law generally prohibits the wearing, carrying, or transporting of a handgun. Md. Code Ann., Crim. Law § 4-203 (LexisNexis 2021).  This prohibition is subject to several exceptions, including for law enforcement personnel, for individuals on their own residential or business premises, and several other exceptions that relate to transport incidental to some

other purpose (i.e., to a place of sale or repair, between a home and business, to a target shoot, and for hunting).  Crim. Law § 4-203(b).  For purposes here, the most notable exception to the general prohibition is for individuals who have been issued a permit under Title 5, Subtitle 3 of the Public Safety Article.  Crim. Law § 4-203(b)(2); Md. Code Ann., Pub. Safety § 5-303 (LexisNexis 2018) ("A person shall have a permit issued under this subtitle before the person carries, wears, or transports a handgun.").

### The Permit Application Process

Individuals may apply to the Maryland State Police by submitting an application along with an application fee.  Pub. Safety § 5-304(b)(2)(i).  To be eligible to receive a permit, an applicant must pass a background check and pass a firearms training course.

The current statutory scheme provides that the Secretary of State Police may issue a public carry permit only if the applicant "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger."  *Id*. § 5-306(a)(6)(ii).  The Appellate Court of Maryland had interpreted a "good and substantial reason" to require an applicant show more than simply a desire to carry a handgun for self-defense.  *See Scherr v. Handgun Permit Rev. Bd.*, 163 Md. App. 417, 437 (2005).  As noted below, the "good and substantial reason" standard has since been deemed unconstitutional, *In re Rounds*, 255 Md. App. 205, 212 (2022), and therefore is no longer being applied to public carry permit applicants.[1]

---

[1] As noted below, the General Assembly deleted this language from the statutory scheme when it passed House Bill 824 earlier this year.

2

**Restrictions on Public Carry**

Besides the restrictions on *who* is eligible for a public carry permit, Maryland statutes and regulations currently contain several provisions that set forth limitations on *where* handguns (and other firearms) may be carried—even if an individual possesses a valid public carry permit.  Restrictions currently set forth in the Maryland Code include:

- Public school property.  Crim. Law § 4-102.

- Public demonstrations: Having been provided certain notice, an individual may not possess a firearm on their person at a demonstration in a public place or have a firearm in their vehicle within 1,000 feet of the demonstration.  Crim. Law § 4-208.

- Commercial Aircraft.  Md. Code Ann., Transp. § 5-1008 (LexisNexis 2020).

- Public transit:  An individual may not carry or possess a "concealed weapon[]" in any transit vehicle or transit facility owned or controlled by the Maryland Transit Administration ("MTA").  Transp. § 7-705(b)(6).  The MTA "operates public mass transit systems through[out] the State of Maryland, including buses, a subway, light rail system and commuter trains."  (Declaration of Thomas Randall, Director of Treasury for MTA, ¶ 3, attached as Exhibit 6.)

- Legislative buildings.  Md. Code Ann., State Gov't § 2-1702(e) (LexisNexis 2021).

Restrictions currently set forth in the Code of Maryland Regulations (COMAR) include:

- Certain state buildings and grounds.  An individual may not carry firearms on "state public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the Department of General Services."  COMAR 04.05.01.01; 04.05.01.03.

- State parks, state forests, and Chesapeake Forest Lands (with exceptions for target shooting and hunting where approved).  COMAR 08.01.07.14; 08.07.01.04; 08.07.06.04.

Maryland regulations also prohibit a public carry permit holder from carrying a handgun while under the influence of alcohol or drugs.  COMAR 29.03.02.02.

### The Supreme Court Announced its Decision in *Bruen*

As discussed more fully below, in June 2022 the United States Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).  In *Bruen*, the Supreme Court struck down as unconstitutional New York's public carry permit scheme to the extent that it required an applicant to show "proper cause" for carrying a handgun publicly.  Because New York's "proper cause" standard was similar to Maryland's "good and substantial reason" standard in that it required an applicant to "demonstrate a special need for self-protection distinguishable from that of the general community," the *Bruen* decision called into question that aspect of Maryland's public carry permit scheme.  In fact, soon after *Bruen* was decided, the Appellate Court of Maryland concluded that it was compelled by *Bruen* to hold Maryland's "good and substantial reason" standard unconstitutional as well.  *In re Rounds*, 255 Md. App. 205, 212 (2022).

### The General Assembly Enacted Senate Bill 1

In the wake of *Bruen* and *Rounds*, the General Assembly enacted two laws that set forth additional provisions relating to Maryland's public carry permit scheme.  As discussed below, one of these laws—Senate Bill 1, attached as Exhibit 2—expands and clarifies the manner of carry and the areas in which firearms may not be carried regardless of whether an individual possesses a public carry permit.[2]

---

[2] The other law, House Bill 824, amended the State's public carry permitting process, most notably for purposes here by deleting the language that restricted public carry permits to only those individuals who have been found to have "good and substantial reason" to carry a handgun publicly.  2023 Md. Laws ch. 651 (amending Pub. Safety § 5-306).  Although no

**Permits Limited to Concealed Carry**

Under current law, there is no restriction generally on the manner in which a handgun may be carried by an individual who possesses a public carry permit. Senate Bill 1 changes that. It provides that, subject to certain exceptions,[3] a person who carries a handgun pursuant to a public carry permit must keep the handgun concealed under or within an article of the person's clothing or within an enclosed case. 2023 Md. Laws ch. 680 (to be codified at Pub. Safety § 5-307(c)).

**Restrictions on Statutorily-Defined Locations**

Senate Bill 1 identifies three categories of statutorily-defined locations where an individual is prohibited from wearing, carrying, or transporting a firearm: (1) an "area for children and vulnerable individuals," (2) a "government or public infrastructure area," and (3) a "special purpose area."[4] 2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(c)-(e)).

An "area for children and vulnerable individuals" relates generally to daycare facilities, private schools, and medical facilities. It is statutorily defined as: (1) "a preschool or prekindergarten facility or the grounds of the facility," (2) "a private primary or secondary

---

aspect of this law is challenged in this litigation, features of the permitting system (including certain provisions in House Bill 824) have been challenged in a separate lawsuit. *See Kipke v. Moore*, No. 1:23-cv-01293-GLR (D. Md. 2023).

[3] The exceptions generally mirror the exceptions to the general prohibition on wearing and carrying a handgun under Criminal Law § 4-203, including for certain law enforcement personnel and individuals carrying a handgun on their own property. 2023 Md. Laws ch. 680 (to be codified at Pub. Safety § 5-307).

[4] An individual who violates this prohibition is subject to imprisonment not exceeding one year and/or a fine not exceeding $1,000. 2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(f)).

school or the grounds of the school,"[5] and (3) "a health care facility," which is defined to include hospitals, ambulatory surgical centers, and facilities that are "organized primarily to help in the rehabilitation of disabled individuals."[6]  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(a)(2)).

A "government or public infrastructure area" relates generally to government buildings, buildings on college and university campuses, polling places, and power plants.  It is statutorily defined as: "(i) a building or any part of a building owned or leased by a unit of State or local government; (ii) a building of a public or private institution of higher education, as defined in § 10-101 of the Education Article; (iii) a location that is currently being used as a polling place in accordance with [the Election Law Article]"; (iv) an electric plant or electric storage facility . . .; (v) a gas plant . . .; or (vi) a nuclear power plant facility.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(a)(4)).

A "special purpose area" relates generally to certain places where the public gathers for entertainment, educational, or other collective social pursuits.  It is statutorily defined as "(i) a location licensed to sell or dispense alcohol or cannabis for on-site consumption; (ii) a stadium; (iii) a museum; (iv) an amusement park; (v) a racetrack; or (vi) a video lottery facility[7] . . . ."  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(a)(8)).

---

[5] As noted above, firearms (and other weapons) are currently prohibited on *public* school property.  Crim. Law § 4-102(b).

[6] To define "a health care facility," Senate Bill 1 references the definitions provided in §§ 15-10b-01(g)(1), (2), (3), and (4) of the Insurance Article.

[7] A "video lottery facility" is essentially synonymous with a casino.  State Gov't § 9-1A-01.

6

These prohibitions are subject to certain exemptions, most notably for active and retired law enforcement personnel.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(b)(1), (2), (5), (6), (8)).  Moreover, Senate Bill 1 exempts the owner or lessee of a (non-governmental) location and any person expressly authorized to provide security at the location. 2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(a)(9)).  Finally, Senate Bill 1 provides an exemption for a firearm that is carried or transported in a motor vehicle, so long as the firearm is either carried by an individual with a valid public carry permit or is locked in a container.[8]  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(b)(11)).

**The Private Building Consent Rule**

Senate Bill 1 enacts a provision that prohibits individuals from entering buildings on private property while carrying a firearm without first obtaining permission to do so.  The manner in which permission may be expressed or obtained depends on whether the building at issue is a dwelling.

Senate Bill 1 provides that an individual carrying a firearm "may not enter or trespass in the dwelling of another unless the owner or the owner's agent has given express permission, either to the person or to the public generally, to wear, carry, or transport a firearm inside the dwelling."  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(c)).

With regard to all other private buildings, an individual carrying a firearm may not enter or trespass in such a building unless the owner or the owner's agent (1) "has posted a

---

[8] Senate Bill 1 also contains a few other exemptions, including for (1) military personnel (while on duty), (2) employees of armored car companies, and (3) hunting, target shooting, and other shooting activity that is done with the permission of the person or governmental unit that owns, leases, or controls the location.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 4-111(b)(3), (4), (7), (10)).

clear and conspicuous sign indicating that it is permissible to" carry a firearm in the building, or (2) "has given the person express permission" to carry a firearm in the building.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(d)).

It is important to note that Senate Bill 1 affects only buildings, and not the land adjacent to the buildings.  Indeed, Senate Bill 1 defines a "dwelling" as "a *building* or part of a *building* that provides living or sleeping facilities for one or more individuals."[9]  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(a)(2)(i)) (emphasis added)).  Likewise, although Senate Bill 1 prohibits carrying a firearm onto "property" without the owner's permission, the law defines "property" as simply "a building," and expressly excludes "the land adjacent to a building."[10]  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(a)(6)).

## PROCEDURAL BACKGROUND

On the same day that Senate Bill 1 was signed into law, a group of three individual plaintiffs who each possess a public carry permit, joined by three firearms advocacy groups, filed this lawsuit challenging various provisions of Maryland's firearms laws relating to restrictions on where a firearm may be carried with a public carry permit.[11]  As detailed below,

---

[9] Senate Bill 1 excludes from the definition of dwelling the common areas of condominiums and multifamily facilities.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(a)(2)(ii)).

[10] Similar to the prohibition on carrying a firearm at statutorily-defined locations, Senate Bill 1 contains exemptions for active (but not retired) law enforcement officers and on-duty military personnel.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(b)). Senate Bill 1 also provides an exemption for those portions of buildings that are subject to a public easement.  2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(b)(5)).

[11] On that same day, a separate lawsuit was filed by different plaintiffs relating to the firearms laws passed recently by the General Assembly.  The other lawsuit was filed by an individual plaintiff (who possesses a valid public carry permit) and a firearms advocacy group. *Kipke v. Moore*, Case No. 1:23-cv-01293-GLR (D. Md. 2023).  The *Kipke* plaintiffs assert a

plaintiffs' claims—all grounded in the Second Amendment—include challenges to certain restrictions on the carrying of firearms that exist currently as well certain restrictions that were added by Senate Bill 1 (and thus will go into effect on October 1, 2023).

In Count One, plaintiffs challenge restrictions on the following statutorily-defined locations in Senate Bill 1: (1) "health care facilities," (2) locations that are "licensed to sell or dispense alcohol . . . for on-site consumption,"[12] and (3) "museums."  (ECF 1, Compl. ¶ 49.) Count One also includes a challenge to the private building consent rule (ECF 1, Compl. ¶ 50), but the challenge does not extend to dwellings (ECF 1, Compl. ¶ 16).  In Count Two, plaintiffs challenge restrictions in mass transit facilities and vehicles owned or controlled by the MTA. (ECF 1, Compl. ¶¶ 52-54.)  And in Count Three, plaintiffs challenge restrictions in state parks, state forests, and Chesapeake Forest Lands.  (ECF 1, Compl. ¶¶ 55-57.)

Eight days after filing this lawsuit, plaintiffs moved this Court to preliminarily enjoin enforcement of all the restrictions challenged in their complaint.  (ECF 24.)

## STANDARDS OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"

---

widespread challenge to a number of Maryland's firearm laws, including many locational restrictions that are not challenged in this case.  Moreover, unlike the plaintiffs in this case, the *Kipke* plaintiffs challenge certain provisions of Maryland's public carry permitting scheme, including currently applicable requirements.  In addition, whereas this litigation challenges Maryland law only on Second Amendment grounds, the *Kipke* litigation also includes challenges under other constitutional theories.  Currently pending before this Court is the defendants' motion to consolidate this case with *Kipke*.  (ECF 30.)

[12] Plaintiffs are not challenging restrictions on locations that are licensed to dispense cannabis for on-site consumption.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The factual allegations "must be enough to raise a right to relief above the speculative level." *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 71 (4th Cir. 2016) (citation omitted).  Although this Court is required to "'take the facts in the light most favorable to the plaintiff,'" this Court "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (citation omitted).  Nor may this Court credit "'naked assertions devoid of further factual enhancement.'"   *United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Preliminary injunctive relief "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (citation omitted).  To obtain a preliminary injunction, a plaintiff must demonstrate "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Wudi Indus. (Shanghai) Co. v. Wong*, No. 22-1495, 2023 WL 3806373, at *9 (4th Cir. June 5, 2023) (citation omitted).

## ARGUMENT

**I.  THE SUPREME COURT IN *BRUEN* CLARIFIED THE STANDARD TO BE APPLIED TO CHALLENGES UNDER THE SECOND AMENDMENT.**

As discussed above, in June 2022 the United States Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), which struck down the "proper cause" aspect of New York's public carry permit scheme.  In doing so, the *Bruen* majority rejected the two-step interest-balancing framework previously used by nearly all federal courts of appeal to evaluate Second Amendment challenges.  Instead, the Supreme Court clarified that if "the Second Amendment's plain text covers an individual's conduct," then the government seeking to regulate that conduct "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126; *see also id.* at 2129.

*Bruen* recognized the necessity and constitutionality of modern firearm regulation, explicitly endorsing at least two types of restrictions.  First, the Court announced that nothing in its analysis was meant to undermine the constitutionality of licensing regimes that require applicants to "undergo a background check or pass a firearms safety course" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  *Id.* at 2138 n.9 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)); *see also id.* at 2161-62 (Kavanaugh, J., concurring).  Second, the Court "assume[d] it settled" that certain locations are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment."  *Id.* at 2133.  The opinion endorsed such "longstanding" bans in schools, government buildings, legislative assemblies, polling places, and courthouses, while recognizing that this list was *non-exhaustive* and "that modern regulations prohibiting

11

the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original).

      *Bruen* acknowledged that the application of the restated Second Amendment standard would require further development in the lower courts.  For example, as it did in *Heller*, the Court declined to "undertake an exhaustive historical analysis of the full scope of the Second Amendment."  *Id.* at 2134 (quotation and ellipsis omitted).  And although *Bruen* instructed that the historical inquiry required in Second Amendment cases "will often involve reasoning by analogy," it similarly declined to "provide an exhaustive survey of the features that render regulations relevantly similar," except to identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2132-33.  As the Court recognized, in some cases, historical analogies will be "relatively simple to draw," while "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Id.* at 2132.

      *Bruen* also cautioned that its standard was not intended to be a "regulatory straightjacket" and made clear that governments were not required to identify "historical twin[s]" or "dead ringer[s]" to support modern regulations.  *Id.* at 2133.  The Court recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and further underscored that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."  *Id.* at 2132.  Accordingly, when "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."  *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

II.   **EVEN IF CARRYING A FIREARM IN SENSITIVE PLACES BURDENS CONDUCT PROTECTED BY THE SECOND AMENDMENT, THERE IS A ROBUST HISTORICAL TRADITION OF PROHIBITING FIREARMS IN VARIOUS LOCATIONS BASED ON THEIR PARTICULAR CHARACTERISTICS.**

Plaintiffs' lawsuit relates to a variety of "sensitive places" restrictions that they claim violate the Second Amendment.  As explained below, plaintiffs' claims lack merit because the challenged restrictions are consistent with our Nation's historical tradition of firearms regulation.

A.   **Because Sensitive Places are Presumptively Constitutional under *Bruen*, Plaintiffs Bear the Burden to Demonstrate that Carrying Firearms in These Locations Falls Within the Conduct Protected by the Second Amendment.**

*Bruen* expressly recognized that the Second Amendment protects the right to carry a firearm outside of the home.  The Court, however, went no further, characterizing the right as only a "general right to publicly carry."  142 S. Ct. at 2135.  And acknowledging the limitations on this "general right," the Court "assume[d] it settled" that there are certain "sensitive places" where the carrying of firearms may be prohibited consistent with the Second Amendment.  *Id.* at 2133.  Indeed, the Supreme Court has repeatedly explained that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful" and outside the "scope of the Second Amendment."  *Heller*, 554 U.S. at 626-27 & n.26; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010).

As "presumptively lawful" regulations, plaintiffs bear the burden of demonstrating that the prohibitions at the specific locations challenged in this case implicate conduct that falls within the scope of the Second Amendment.  In other words, plaintiffs must affirmatively establish that the Second Amendment confers a right to carry firearms into health care facilities, museums, bars, public transit, and state parks and forests.  *See, e.g.*, *National Ass'n*

13

*for Gun Rights, Inc. v. City of San Jose*, 618 F. Supp. 3d 901, 914 (N.D. Cal. 2022) (noting that a plaintiff bears the initial burden to demonstrate that the "conduct at issue is covered by the text of the Second Amendment").  Yet, in their complaint, plaintiffs simply assert that the locational restrictions at issue here violate the Second Amendment.  This type of hit-and-run pleading is insufficient.[13]

Plaintiffs also fail to recognize that, unlike the First and Fourteenth Amendments, which prohibit laws "*abridging* the freedom of speech" or that "*abridge* the privileges or immunities of citizens," the Second Amendment uses a different term: "[T]he right of the people to keep and bear Arms, shall not be *infringed*."  U.S. Const. amend II (emphasis added).  As Professor Saul Cornell notes, the terms "abridge" and "infringe" had different meanings to the Founding generation.  (Declaration of Professor Saul Cornell, ¶ 30, attached as Exhibit 3.)  Whereas the Framers understood the term "abridge" to mean "reduce," thereby prohibiting any diminishment of the rights that the First Amendment protected, the Framers understood that the term "infringement" meant to "violate" or "destroy."  (Cornell Decl., Ex. 3 at ¶ 30.)  Under this framework, "[m]embers of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable

---

[13] This approach is consistent with other constitutional claims.  First Amendment plaintiffs must prove that a regulation burdens "speech" or other protected activities before the State bears the burden of justifying its regulation.  *See, e.g.*, *Kennedy v. Bremerton*, 142 S. Ct. 2407, 2421-22 (2022); *Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir. 2014).  Fourth Amendment plaintiffs making an "unreasonable seizure" claim must first show that a seizure occurred within the meaning of the Constitution.  *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010). And Equal Protection plaintiffs must make a threshold showing that state action treated similarly situated people differently. *Caswell v. Calderon*, 363 F.3d 832, 837-38 (9th Cir. 2004).  Here, plaintiffs must make a similar predicate showing that their conduct is covered by the plain text of the Second Amendment, just as they would for other Constitutional claims.

state arms bearing provisions as long as such regulations did not negate the underlying *right*."
(Cornell Decl., Ex. 3 at ¶ 30.)  Regulations that merely restrict the public carrying of firearms
in certain locations thereby do not on their face implicate the text of the Second Amendment.[14]

**B.  Even if Plaintiffs Have Met Their Initial Burden, There is a Robust Historical Tradition of Limiting Firearms in Various Types of Locations.**

Even if plaintiffs can overcome their burden to establish that their proposed conduct
falls within the scope of the Second Amendment, their claims nonetheless fail because
Maryland's restrictions are all consistent with the Nation's historical tradition of limiting
firearms at various types of locations.

**1.  *Bruen* Permits Significant Flexibility in Determining Whether a Particular Location is a "Sensitive Place."**

Although *Bruen* identified only a few examples of what qualifies as a "sensitive place,"
the Supreme Court made clear that its list was not exhaustive, and its overall analysis set forth
several principles that should further guide this Court's determination in this case.  First,
because the Supreme Court has already made the threshold determination that the Second
Amendment embodies a general tradition of limiting firearms at some places, relatively few
analogues will be necessary to establish the constitutionality of sensitive-place restrictions.
The Supreme Court illustrated this principle when, in concluding that the constitutionality of
firearm bans in schools, government buildings, polling places, courthouses and legislative
assemblies was "settled," it acknowledged that the available historical record contained

---

[14] The nature of the challenge here—relating to the ability to carry publicly only in certain locations—is in contrast to both *Heller* and *Bruen*, where the Court invalidated restrictions that completely (or in essence) destroyed either the right to own a handgun or carry outside of the home.

15

"relatively few" examples of such restrictions.  *Bruen*, 142 S. Ct. at 2133; (*see* Declaration of Patrick Charles, ¶10, attached as Exhibit 4 (examining the sources relied upon by the Court)).

Second, the Court made clear that its list of sensitive places in *Bruen* was not intended to be comprehensive, and that the Court expressly contemplated that the historical record would reveal "*new* and analogous" sensitive places that are "constitutionally permissible."  142 S. Ct. at 2133 (emphasis in original).

Third, when searching the historical record, it is appropriate to consider evidence from both the Founding era as well as the era around when the Fourteenth Amendment was ratified. Because the people's adoption of the Fourteenth Amendment is the mechanism through which the Second Amendment right is applied to the States, declining to consider the prevailing attitudes of that era would be to disregard the fundamental focus underlying a scope-of-rights analysis: "the scope they were understood to have *when the people adopted them*."  *Bruen*, 142 S. Ct. at 2136 (emphasis in original; citation omitted); *National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) ("[T]he understanding of the Second Amendment right that ought to control in this case—where a State law is at issue—is the one shared by the people who adopted 'the Fourteenth Amendment, not the Second.'").  This is especially pertinent in the context of the sensitive place doctrine, given that "[i]t was not until the mid-to-late nineteenth century that state and local governments within the United States began enacting express, location specific armed carriage restrictions."  (Charles Decl., Ex. 3 at ¶ 15); (Charles Decl., Ex. 3 at ¶ 18 (explaining the concept of "firearms localism")).

Finally, building on that principle, *Bruen* teaches that an important factor in whether the historical record will support an analogous modern restriction is whether a historical regulation faced contemporaneous challenges to its constitutionality.  In other words, "where

16

a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation" of the ambiguities inherent in the Second Amendment. *Bruen*, 142 S. Ct. at 2137 (citation omitted). *Bruen* applied these principles in striking down aspects of New York's public carry scheme. There, although the Court was faced with several statutes and case law from the Reconstruction era that purported to show a tradition of limiting public carry permits to only those individuals who showed a need to carry, the Court nonetheless discounted these statutes and case law because, in its view, they were inconsistent with an earlier-established historical tradition of public carry. *Id.* at 2155. *Bruen* thus ratifies the principle that, where a historical tradition does not conflict with an earlier tradition, and that historical tradition stands without contemporaneous challenge, that will be prima facie evidence that a similar modern restriction is consistent with the Second Amendment. *See id.* at 2133 (noting that restrictions at certain sensitive places were constitutional because the Court was "aware of no disputes regarding the lawfulness of such prohibitions").

**2.     Limiting Firearms in Certain Locations Has a Rich American Tradition that Was Inherited from Its English Forebears.**

"For nearly five centuries in England, from the late thirteenth century through the late eighteenth century, what constituted a 'sensitive place' in which arms bearing could be regulated and restricted was rather broad. It encompassed densely populated areas, as well as areas where people regularly congregated for lawful purposes or conducted commerce." (Charles Decl., Ex. 4 at ¶ 11.) This foundational history is most notably embodied in the 1328 Statute of Northhampton, which prohibited Englishmen from bringing "force in affray of the peace, nor [going] nor rid[ing] armed by night nor by day, in Fairs, Markets, nor in the presence

17

of the Justices or other Ministers[.]"  (Charles Decl., Ex. 4 at ¶ 11 (noting restrictions in 1351 and 1419 that prohibited "go[ing] armed" in London).)  Although these restrictions were "relatively silent" as to specific locations, "[t]his is because English restrictions on going armed in 'sensitive places' were worded quite broadly, and therefore there was no need for the law to carve out individual locations."  (Charles Decl., Ex. 4 at ¶ 12.)

Historical evidence "unequivocally" demonstrates "that armed carriage restrictions and the English common law against 'going armed' in urban and densely populated locations indeed made their way into the American Colonies and subsequent United States."  (Charles Decl., Ex. 4 at ¶ 14.)  In fact, around the time of the Founding, two jurisdictions—Virginia and North Carolina—expressly enacted or retained their own versions of the Statute of Northhampton.  (Ex. 12 (Virginia, 1786)); (Ex. 13 (North Carolina, 1792)).  *See Bruen*, 142 S. Ct. at 2136 (noting that "[a] long, unbroken line of common-law precedent stretching from Bracton to Blackstone" will demonstrate a relevant historical tradition).

"It was not until the mid-to-late nineteenth century that state and local governments within the United States began enacting express, location specific armed carriage restrictions."  (Charles Decl., Ex. 4 at ¶ 15); (*see also* Cornell Decl., Ex. 3 at ¶ 43 (describing laws from Louisiana (1831) and New Mexico (1852) restricting weapons at "ball rooms").  These "Reconstruction era laws did not represent a new constitutional principle different than the common law restrictions that existed for centuries, but an application of the same legal principles to new circumstances brought about by changes in firearms technology, consumer behavior, and the demographic changes associated with greater urbanization."  (Cornell Decl., Ex. 3 at ¶ 45.)  One exemplar is an 1870 law from Texas that prohibiting going armed:

into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, . . . or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly[.]

(Ex. 17.)  Around this same time, several other States enacted specific locational restrictions on firearms:

- Tennessee (1869): "any election in this State, . . . any fair, race course, or other public assembly of the people" (Ex. 14).

- Georgia (1870): "any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State" (Ex. 16).

- Missouri (1874): "any church or place [of worship], any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose [other than militia mustering] (Ex. 18).

- Arizona (1889): "any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct . . ., or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly" (Ex. 19).

- Oklahoma (1890): "any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly" (Ex. 20).

- Idaho (1901): "any public assemblage" (Ex. 21).

- Montana (1903): "any church or religious assembly, any school room or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election . . ., or to any other place where people may be assembled to perform any public duty, or at any public assembly" (Ex. 22).

(*See also* Charles Decl., Ex. 4 at ¶¶ 15-17 (chronicling state laws).)

In addition to these state laws, there were a large number of local ordinances that restricted the carrying of firearms in specific locations. As historian Patrick Charles explains, "[t]he reason that so many localities enacted these ordinances was the prevalence of the legal concept of 'firearms localism'—this concept being a preference among state and local lawmakers to regulate firearms and deadly weapons more strictly at the local rather than state level." (Charles Decl., Ex. 4 at ¶ 18.) Similar to the state statutes set forth above, these ordinances, such as ones enacted in Columbia, Missouri and Stockton, Kansas, contain restrictions in specific areas such as places "where people have assembled for educational, literary or social purposes" and, more generally, at "any other public assemblage of persons met for any lawful purpose[.]" (Ex. 23 (Columbia, Mo.).); (Charles Decl., Ex. 4 at ¶¶ 18-19.) Moreover, consistent with the concept of firearms localism, many local jurisdictions enacted ordinances that restricted the carrying of firearms in "corporate" or "incorporate" areas. (Charles Decl., Ex. 4 at ¶ 20.) These ordinances, which would have restricted wholesale the carrying of firearms within the entire municipality, thus would have effectuated (and rendered unnecessary) any and all of the specific restrictions enacted by the other jurisdictions. (*See* Charles Decl., Ex. 4 at ¶¶ 20-21 (setting forth ordinances from local jurisdictions in North Carolina (1882), Louisiana (1874), Pennsylvania (1873), Utah (1893), Nebraska (1889), and modern-day South Dakota (1882).)

It is significant that there is no evidence that any of these sensitive-place restrictions were ever found to be unconstitutional.  Indeed, the opposite is true.  (*See* Charles Decl., Ex. 4 at ¶ 23 n.30 (citing, *e.g.*, *Hill v. State*, 53 Ga. 472 (1974); *State v. Shelby*, 90 Mo. 302 (1886); *Owens v. State*, 3 Tex. App. 404 (1878).)  And these cases not only show that these restrictions passed legal muster, but the language set forth in the opinions provides a revealing window into the prevailing attitudes of the very same people who made the decision to submit their state police powers to the limitations of the Second Amendment:

> We confess that it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together.

*English v. State*, 35 Tex. 473, 478-79 (1871); *see also Andrews v. State*, 50 Tenn. 165, 182 (1871) ("[A] man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them."); *Hill*, 53 Ga. at 476 ("[T]he bearing of arms of any sort [at concerts] is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majesty of the laws, and a marked breach of good manners.").

### 3.     The History and Tradition of Restrictions on Sensitive Places Yields Several Applicable Principles.

From the history detailed above, several general principles can be distilled regarding the types of locations that have historically been considered sensitive places for which firearms may be regulated.

First, the sensitive places doctrine acknowledges that the personal exercise of Second Amendment rights should yield when necessary to protect the exercise of other fundamental

rights, such as the exercise of religious or political rights.  *See* Darrell Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 466 (2019) (asserting that certain places "are sensitive because they are the locus of the production of other kinds of public goods protected by other kinds of constitutional rights, and that the protection of the character of these types of institutions justifies limits on private firearms.").

Second, the sensitive places doctrine furthers the important interest in protecting places where vulnerable or impaired people might ordinarily be present.  *See United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (noting that some "places are 'sensitive' for purposes of the Second Amendment because of 'the people found there'").  This explains why the Supreme Court used "schools" as an undisputed category notwithstanding the paucity of Founding era evidence of relevant governmental restrictions.  *Bruen*, 142 S. Ct. at 2133.  Recognizing this principle, several courts have concluded that places are sensitive based on the presence of children.  *See, e.g., Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (Wash. App. 2021) (noting that sensitive places are implicated by "public safety concerns" regarding children); *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) (concluding that "GMU is a 'sensitive place'" because it "is a school" with many students "under the age of 18," including "elementary and high school students" in the summer).  This facet of the doctrine is based on the notion that these groups—which includes not only children but the physically or mentally ill, the elderly, and intoxicated individuals—may not be physically, intellectually, or emotionally capable of defending themselves with a firearm, or may lack the judgment necessary to do so in a way that does not endanger others.  *See, e.g.*, *United States v. Masciandaro*, 648 F. Supp. 2d 779, 791 (E.D. Va. 2009), *aff'd*, 638 F.3d 458

(4th Cir. 2011) (noting that schools may be classified as sensitive places because "possessing firearms in such places risks harm to great numbers of defenseless people").

Third, one thread that stretches throughout nearly all historically sensitive places is a tradition of prohibiting firearms in crowded locations.  Whether it is the Statute of Northhampton's restrictions at fairs and markets, or the various states' restrictions at places of "public assembly," the rationale for these restrictions does not require much elaboration.  With crowds come an inherent risk of disorder, and inserting firearms into such circumstances adds yet another layer of potential chaos and social breakdown.  These restrictions thus reflect the fact that the use (or threatened use) of firearms in such crowded locations, even in legitimate self-defense, is not only impractical, but poses deadly risks to everyone present.

Finally, despite plaintiffs' assertions otherwise, the application of the sensitive place doctrine does not depend upon whether a restriction is consistent with some purported "tradition of the government providing comprehensive security."  (ECF 24-1 at 26-27.) Plaintiffs simply get the history wrong.  As Professor Cornell explains, there were no places in the Founding era that provided such comprehensive security.  (Cornell Decl., Ex. 3 at ¶ 42.) And plaintiffs have no answer for why the Supreme Court would have identified schools as a paradigmatic sensitive place, given that there is no evidence that schools were subjected to such security at any relevant time period.  Simply stated, whether a location is a "sensitive place" does not depend on some perceived "need" for security.  *See Class*, 930 F.3d at 465 (concluding that "the 'level of threat' posed" does not determine which "places are 'sensitive' for purposes of the Second Amendment," and applies to locations even where "the risk of crime may be no different than in any other publicly accessible building"').

**III.**   **RESTRICTIONS ON FIREARMS ON GOVERNMENT-OWNED PROPERTY DO NOT IMPLICATE THE SECOND AMENDMENT WHERE THE GOVERNMENT IS ACTING IN ITS PROPRIETARY CAPACITY OR AS A MARKET PARTICIPANT.**

As discussed above, a Second Amendment challenge must fail where the plaintiff cannot show that a particular law or action burdens conduct covered by the Second Amendment.  *See Bruen*, 142 S. Ct. at 2126 (stating that if the "regulated conduct falls beyond the Amendment's original scope, 'then the analysis can stop there'").  As plaintiffs concede, the Second Amendment does not confer a right to carry firearms onto the property of another against that property's owner's wishes.  (ECF 24-1 at 16.)  This is because the Second Amendment, which codified a pre-existing right, must be interpreted in light of the background principles that existed at the time of its adoption.  Relevant here, and as discussed more fully below in Section IV.B., the ability of a property owner to exercise exclusive dominion and control over their land, including the ability to expel trespassers, is a fundamental aspect of Anglo-American (and Maryland) law that formed the backdrop of the canvas upon which the Second Amendment was written.  (Cornell Decl., Ex. 3 at ¶¶ 35-41); *see also GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1262 (11th Cir. 2012), *cert. denied*, 568 U.S. 1088 (2013) ("An individual's right to bear arms . . ., whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land."); *Silbert v. Ramsey*, 301 Md. 96, 101 (1984) ("The common law right to exclude can be traced from English common law.").

These principles are in all relevant aspects applicable to locations, including those challenged in this case, that are owned or operated by a governmental entity.[15]  Courts have

---

[15] Although the government's fundamental ability to exercise control over its own property does not implicate the Second Amendment, a conclusion that a government-as-

consistently recognized that "the government, 'no less than a private owner of property,'

retains the 'power to preserve the property under its control for the use to which it is lawfully

dedicated.'" *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (quoting

*Adderley v. Florida*, 385 U.S. 39, 47 (1966)); *see also Camfield v. United States*, 167 U.S. 518,

524 (1897) ("[T]he government has, with respect to its own lands, the rights of an ordinary

proprietor, . . . and may deal with such lands precisely as a private individual may deal with

his [similarly situated] property."); *Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1126 (10th

Cir. 2015) ("As a government-owned business acting as a proprietor rather an as a sovereign,

the USPS has broad discretion to govern its business operations according to the rules it deems

appropriate."); *cf. Greer v. Spock*, 424 U.S. 828, 836 (1976) (rejecting the "principle that

whenever members of the public are permitted freely to visit a place owned or operated by the

Government, then that place becomes a 'public forum'").[16]

---

proprietor is entitled to regulate firearms on its property is nonetheless entirely consistent with
*Bruen*'s command to look to history and tradition.  Stated simply, to the same extent that
history at the time of the Founding supports a private property owner's authority to regulate
firearms on their property when engaged in a particular pursuit (i.e., operating a hotel), so too
does the historical tradition support the government's authority when engaged in the same type
of pursuit.

[16] These principles are consistent with the authority granted to the federal government,
through the Property Clause of the United States Constitution, which provides that "the
Congress shall have Power to . . . make all needful Rules and Regulations respecting . . .
Property belonging to the United States[.]"  U.S. Const. art IV, § 3, cl. 2; *see United States v.
Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011) (in upholding conviction for possession of a
handgun on federal park property, noting that "[t]he government, after all, is invested with
'plenary power' to protect the public from danger on federal lands under the Property Clause");
*United States v. Dorosan*, 350 Fed. App'x 874, 875 (5th Cir. 2009) (citing the Property Clause
to support the court's position that firearms could constitutionally be prohibited on the grounds
of a post office).

The government's ability to control its internal operations is especially strong where the government acts in a capacity as proprietor or market participant rather than its traditional sovereign or regulatory capacity.[17]  Under this doctrine, when the government provides a good or service for consumption in the private marketplace, the government will not be subject to the ordinary constitutional restrictions that would otherwise bind it when acting in a regulatory capacity.  *See Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980) ("There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market."); *Building and Const. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 227 (1993) ("Our decisions in this area support the distinction between government as regulator and government as proprietor."); *cf. Enquist v. Oregon Dep't of Agr*., 553 U.S. 591, 598 (2008) ("[T]here is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation." (citation omitted)).  This doctrine recognizes that, although "state proprietary activities may be, and often are, burdened with the

---

[17]  In contrast, the government's ability to manage its property free from ordinary constitutional restrictions may be at its ebb when the property has been dedicated to a traditionally public function, such as sidewalks, streets, and other public thoroughfares.  *See Marsh v. Alabama*, 326 U.S. 501, 506 (1946) (holding that a privately-run "company town" could not prohibit solicitation on its sidewalks because, by opening its sidewalks and roads to the public, it was performing "essentially a public function"); *see also Heffron v. International Soc. for Krishna Consciousness, Inc*., 452 U.S. 640, 651 (1981) (observing that a public street serves "a necessary conduit in the daily affairs of a locality's citizens"). As the quintessential "public" space, the government may therefore be required to affirmatively justify a restriction on the public carrying of firearms on roads and sidewalks.  *See Class*, 930 F.3d at 464 (concluding that a restriction on carrying a handgun in a parking lot was constitutional based on the fact that the lot was in close proximity to the Capitol, and therefore fell within the "sensitive places" doctrine).

same restrictions imposed on private market participants," "[e]venhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints[.]" *Reeves*, 447 U.S. at 439; *see id*. at 436 (stating that the constitutional distinction "between States as market participants and States as market regulators makes good sense and sound law").

In other words, when a government entity acts as an ordinary market participant, it acts on the same plane as a private actor.  Thus, a state-owned concrete plant will not be subject to the restraints of the Commerce Clause, and may restrict—just as any other private operator in that market—its sales to only in-state customers.  *Id*. at 440.  Or a government that chooses to operate a mass transit system may decide—just like a private transit service—which types of advertising it will allow on its vehicles.  *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304 (1974).  Or a city that wishes to decorate a public park may choose which monuments it will accept for display from private donors without running afoul of the First Amendment.[18] *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009).

_____

[18] Although cases applying the First Amendment provide helpful guidance, the State acknowledges that there is some tension between First Amendment forum analysis and the general principle that the government has the same authority to conduct its affairs on its own property as a private property owner.  *See United States v. Kokinda*, 497 U.S. 720, 725-26 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business[.]").    Thus, although *Lehman* instructs that a publicly-owned transit system may pick and choose which types of advertisements to accept, "any speech restrictions must still be 'reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *White Coat Waste Project v. Greater Richmond Transit Co*., 35 F.4th 179, 198 (4th Cir. 2022) (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

But putting aside the fact that viewpoint- and content-discrimination principles simply do not translate to the Second Amendment context, there is another, more foundational reason why the restrictions inherent in the First Amendment context do not similarly limit the government's ability to regulate firearms on its own property.  Although the First Amendment

Courts applying these principles have thus concluded that governments may, without running afoul of the Second Amendment, prohibit the possession of firearms on government property.  *See Class*, 930 F.3d at 464 ("[A]s the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property," including with respect to weapons); *Bonidy*, 790 F.3d at 1126-27; *United States v. Dorosan*, 350  Fed. App'x 874, 875 (5th Cir. 2009) (concluding that the government's "restrictions on guns stemmed from its [valid] constitutional authority as the property owner").

A conclusion to the contrary would result in absurd consequences that would defy logic, common sense, and the "[e]venhandedness" that is the foundation of the market participant doctrine.  *Reeves*, 447 U.S. at 439; *see also Building and Const. Trades Council*, 507 U.S. at

---

protects *individual* rights to speech, the Supreme Court has recognized that it serves a more *collective* purpose: preserving "the foundation of free government by free men."  *Marsh v. Alabama*, 326 U.S. 501, 509 (1946); *see also Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2055 (2021) ("At the heart of the first amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." (citation omitted)); *Mills v. Alabama*, 384 U.S. 214, 219 (1996) (noting that First Amendment freedoms are "the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free").  This underlying collective purpose thus restrains government, in the context of speech, from acting with the same absolute control as a private property owner.  But unlike individual speech, which inherently serves the collective purpose of preserving ordered liberty, an individual's exercise of their Second Amendment right to carry publicly (at least outside of the militia context) serves only to further the perceived security interests *of that individual*.  *See Heller*, 554 U.S. at 599-602 (noting that the Second Amendment serves two distinct purposes: a collective safeguard against the elimination of the militia so as to restrain government overreach, and an "*individual* right to bear arms for defensive purposes" (emphasis added)); *see also* Joyce Malcolm, *To Keep and Bear Arms* 1 (1994) (noting that the English Bill of Rights, the predecessor to the Second Amendment, "transform[ed]" the "duty to have arms" for the collective security of the state "into a right" of individual self-defense).  In other words, because individuals who wish to carry a firearm onto government property are seeking only to vindicate their personal security concerns, there is no underlying foundational principles that override (or otherwise must be balanced against) the exclusive dominion and control that inheres in the government in its role as property owner.

231 (stating that, where government "pursues its purely proprietary interests," it may act "where analogous private conduct would be permitted"); *Camfield*, 167 U.S. at 524 (stating that a government "may deal with [its farmland] precisely as a private individual may deal with his farming property"). Indeed, if the State may not regulate firearms on the grounds of its publicly-owned stadiums, it would mean that weapons could be prohibited at a Washington Commanders game at the privately-owned FedEx Field, but not at a Baltimore Ravens game at publicly-owned Ravens stadium.[19] Likewise, it would mean that a private museum (such as the Maryland Center for History and Culture[20]) could prohibit patrons from carrying weapons inside its premises, but a public museum (such as the Jefferson Patterson Park and Museum in Calvert County) could not. The inability of the government to regulate the carrying on firearms on its own property would be especially unsound, given that, "[u]nlike private ent[ities], government is vested with the responsibility of protecting the health, safety, and welfare of its citizens." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342-43 (2007).

In sum, like a private corporation, a government that chooses to act in a proprietary or market participant capacity should similarly have the ability to choose the firearms policy that best reflects the preferences of those who are responsible for its governance, i.e., its citizenry.[21]

---

[19] All entrants to FedEx Field, including law enforcement personnel not on duty at the game, are prohibited from bringing weapons into the stadium. *See* https://www.commanders.com/stadium/stadium-guide.

[20] The Maryland Center for History and Culture prohibits "[g]uns, knives, and other weapons" on its property. *See* https://www.mdhistory.org/rules-of-conduct/.

[21] As might be the case generally, the guardrail on government overreach in this context is the democratic process itself. Indeed, this was the Supreme Court's response to concerns in *Summum* about the lack of restraints on the government speech doctrine: "[A] government entity is ultimately 'accountable to the electorate and the political process for its advocacy.'

Consistent with these well-established principles, all of the challenged locations that implicate government-owned or operated property do not burden conduct covered by the Second Amendment, and therefore are categorically constitutional.[22]

**IV.    PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION MUST BE DENIED, AND THEIR COMPLAINT DISMISSED, BECAUSE THEY CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS.[23]**

As noted above, a party seeking a preliminary injunction "must 'clear[ly] show[ ]' that it is likely to succeed on the merits."  *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (citation omitted).  Plaintiffs fail to meet this high bar, and therefore their motion should be denied.  Plaintiffs have similarly failed to state a claim upon which relief may be granted, and therefore this Court should also dismiss the complaint in its entirety.  This is because the restrictions on the specific locations challenged by plaintiffs either fall outside

---

'If the citizenry objects, newly elected officials later could espouse some different or contrary position.'"  555 U.S. at 468-69 (citation omitted).

[22] These principles thus provide a complete defense to Counts Two (MTA) and Three (state parks, state forests, and the Chesapeake Forest Lands).  All of the other challenged locations in Count One (hospitals, museums, and restaurants that serve alcohol), however, are implicated to the extent that they include locations that are government owned or operated.

[23] As indicated in plaintiffs' motion for preliminary injunction, similar lawsuits to this one are pending in other federal courts.  New York and New Jersey, for example, also passed laws following the Supreme Court's decision in *Bruen* that, among other things, place limits on where handguns may be carried publicly.  These laws have been challenged on Second Amendment grounds and, because of the timing for those states' legislative sessions relative to Maryland's, the district courts have already rendered decisions.  *See Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023), *appeal pending*, No. 23-1900 (3d Cir.); *Christian v. Nigrelli*, 22-CV-695 (JLS), 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022), *appeal pending*, No. 22-2987 (2d Cir.); *Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), *appeal pending*, Nos. 22-2908, 22-2972.  Some locational restrictions have been upheld and others struck down.  But whatever precedential value those decisions might have once had, the weight of authority for each is, at least temporarily, inconsequential because all of those cases are now pending before their respective courts of appeals.

of the scope of the Second Amendment or are supported by a robust historical tradition. Likewise, assuming that the plaintiffs have standing to challenge it, the private building consent rule in Senate Bill 1 does not implicate Second Amendment principles and, even if it did, it is supported by a historical tradition of excluding individuals from carrying firearms onto another's property with first receiving permission to do so.

A.     **The Challenged Locational Restrictions Are All Either Sensitive Places that Fall Outside of the Second Amendment or Otherwise Supported by this Nation's Historical Tradition of Firearm Regulation.**

As explained above, any challenge to the specific locations identified in the Maryland Code and regulations should be rejected because plaintiffs have failed to demonstrate that these locations fall outside of the "presumptively lawful" "sensitive place" restrictions that were approved by the Supreme Court in *Heller* (and reaffirmed in *Bruen*).  But even if this Court determines that plaintiffs have met their initial burden, their claims nonetheless fail because each of the categories is supported by historical tradition.

1.     **Health Care Facilities**

Plaintiffs challenge to restrictions in Senate Bill 1 relating to "health care facilities" must be rejected because health care facilities are sensitive places under *Bruen*.

Any analysis of this restriction must begin with the fact that modern hospitals and other health care facilities are unlike anything that existed at the time of the Founding.  As a result, when considering whether the public understanding of the Second Amendment would have contemplated these modern restrictions, this Court must apply the more "nuanced approach" approved in *Bruen*.

This approach reveals that health care facilities not only fulfill one of the inherent characteristics of a "sensitive place," but that restrictions on these facilities are consistent with the historical tradition discussed above.  First, health care facilities are, by their very nature, places that serve vulnerable individuals, including the sick and disabled.  As with protecting the learning environment for children at schools, restrictions on firearms at health care facilities preserve an environment that is most conducive to the location's purposes of healing and rehabilitation.  Introducing firearms into such circumstances would thus disrupt the sense of security and serenity that individuals with compromised health need.  Indeed, health care facilities are places of heightened emotions and uncertainty, as individuals and their families often confront literal life-and-death decisions in a perhaps unfamiliar location.[24]

Moreover, the various health care facilities, especially hospitals, are similar to the many historical analogues referenced above in which several states prohibited firearms in places where persons are assembled for "scientific purposes."  (*See, e.g.*, Exs. 17, 18, 19, 20, & 22.) Recognizing that firearms are inconsistent with environments designed for "scientific purposes" thus dovetails with restrictions on places, such as health care facilities, where science is being applied in furtherance of such a vital purpose as human health.

Plaintiffs have no answer for these principles other than to point to a few examples of hospitals that existed at the time of the Founding and the lack of governmental restrictions at those specific locations.  (ECF 24-1 at 20-22.)  But given the novelty of those locations and their relatively small number, the lack of specific governmental regulation at these few

---

[24] The Supreme Court recognized that impaired health could be a basis for restricting firearm possession.  *See Heller*, 554 U.S. at 626 ("[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by . . . the mentally ill").

institutions is not significant, and plaintiffs' shallow historical analysis fails. Instead, because the historical tradition supports the conclusion that health care facilities are sensitive places due to their purposes and service of vulnerable populations, firearm possession at these locations may be restricted consistent with the Second Amendment.

### 2.     Museums

Museums, like health care facilities, are sensitive places for which restrictions on carrying firearms are constitutional. In fact, museums share many of the same characteristics as schools, for which the Supreme Court has expressly concluded are sensitive places outside of the purview of the Second Amendment. First, museums are analogous to schools in that they serve an educational purpose and, despite serving all ages, are predominantly geared to serve the interest of children. (*See, e.g.*, Declaration of Anita Kassof, Executive Director of the Baltimore Museum of Industry ("BMI"), ¶¶ 4-7, attached as Exhibit 8 (noting that "[m]any of the exhibits and programs at the [BMI] are designed to be of interest to children").) And museums in Maryland can, and do, host hundreds (and sometimes thousands) of children at one time.[25] Because the presence of children justifies the approved restrictions on schools (and other vulnerable populations), it similarly justifies Maryland's restrictions on firearms in museums. Finally, carry restrictions in museums also are plainly supported by the more

---

[25] *See also* Kassof Declaration, Ex. 8 at ¶ 7 (BMI hosts up to 230 children at a time); Declaration of Mark J. Potter, President and Chief Executive of the Maryland Science Center, ¶ 6, attached as Exhibit 9 (hosting as many as 2,000 children); Declaration of Carter Arnot Polakoff, President and Chief Executive Officer of the Port Discovery Children's Museum, ¶ 7, attached as Exhibit 10 (hosting as many as 500 children); Declaration of Terri Lee Freeman, Executive Director of the Reginald F. Lewis Museum of African American History & Culture, ¶ 7, attached as Exhibit 11 (hosting as many as 100 children).

specific historical limitation related to any "place where persons are assembled for educational, literary, or scientific purposes."  (*See, e.g.*, Exs. 17, 18, 19, 20, & 22.)

### 3. Locations Licensed to Sell or Dispense Alcohol for On-Site Consumption

Plaintiffs next challenge firearms restrictions at locations that are licensed to sell or dispense alcohol for on-site consumption.  These restrictions are broadly consistent with restrictions on firearms at social gatherings and places of public assembly.  And more specifically, this restriction is substantively identical to laws, like that enacted in Oklahoma in 1890, that prohibited the carrying of firearms in "any place where intoxicating liquors are sold[.]"  (Ex. 20.)

Laws restricting firearms at places where alcohol is served thus stands at the intersection of two of the fundamental principles underpinning the historical tradition of restrictions at sensitive places: crowds and vulnerable populations.  As discussed above, States that prohibited firearms at places where large numbers of people gathered recognized that the ability of individuals to safely defend themselves with firearms would be diminished in such circumstances, and that the potential for other harms (whether through mass panic or an errant bullet) made the carrying of firearms in such circumstances dangerous and imprudent.  When alcohol is added to crowds, and people begin to lose their inhibitions and their judgment becomes impaired, these concerns are amplified.

Although the dangers of mixing firearms and alcohol are readily apparent, the historical tradition also reflects this commonsense understanding.  "[B]y the mid-eighteenth century, many colonial lawmakers viewed liquor and arms bearing as a potentially dangerous combination." (Charles Decl., Ex. 3 at ¶24 (compiling statutes that prohibited the sale of liquor

34

to militiamen both before and around the time of the ratification of the Constitution).)  And at the same time that States were prohibiting the carrying of firearms in public gatherings, they were prohibiting outright the carrying by people who were intoxicated.  (*See* Charles Decl., Ex. 4 at ¶ 26 (citing laws from Kansas (1867), Mississippi (1878), Missouri (1879), Oklahoma (1890), and Wisconsin (1883), as well as laws from local jurisdictions).)

Even if the person carrying the firearm is not themselves consuming alcohol, the underlying concerns about crowds, conflict, and the diminished capacity and safety of defensive use of a firearm remain.  Moreover, the historical tradition has never required a "least restrictive means" fit between the interests served by a sensitive place restriction and the individuals affected.  Indeed, nothing in *Bruen* or *Heller* suggests that a restriction at schools could only be applied to students and not staff or visitors.  Instead, as with schools, the restriction on firearms in locations that serve alcohol is designed to preserve the safety of *all* individuals who are present.[26]

### 4.      Any Transit Vehicle or Transit Facility Owned or Controlled by the Maryland Transit Administration

Plaintiffs also challenge firearms restrictions on public transportation vehicles and facilities that are operated by the MTA.  This challenge fails for several independent reasons.

First, plaintiffs' claim is, by its nature, limited to transit vehicles and transit facilities that are owned or controlled by an agency of the State of Maryland.  As discussed above, because the State operates these transportation services and facilities in its proprietary capacity, it possesses the fundamental authority—just like any private entity similarly engaged in

---

[26] Likewise, there can be no guarantee that an individual who carries a firearm into a bar with no intention to consume alcohol will later change their mind.

transportation services—to determine the regulations that will apply to its own property, including with respect to firearms. Because the State can lawfully condition entry to these locations both as an inherent feature of its ownership rights and as a matter of historical tradition, this prohibition on firearms does not offend the Second Amendment.

Second, restrictions on public transportation vehicles and facilities are consistent with the historical tradition of limiting firearms in sensitive places. Although there appear to be no governmental regulations from the Founding or Reconstruction eras relating specifically to public transportation, this is for good reason. "Until the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers." (Declaration of Dr. Brennan Rivas, ¶ 13, attached as Exhibit 5); (*see also* Cornell Decl. Ex. 3 at ¶ 13 ("There was no modern style mass transportation [in the Founding era]. All forms of transport were all privately owned.").) And because public transportation is therefore a modern phenomenon "implicating unprecedented societal concerns or dramatic technological changes," any analysis of whether firearms restrictions fall outside of the scope of the Second Amendment requires a "nuanced approach" that allows for a measured flexibility. *Bruen*, 142 S. Ct. at 2132.

Applying that standard reveals that public transit vehicles and facilities are properly considered sensitive places, and thus outside of the scope of the Second Amendment, because they share many of the same characteristics of those places where firearms have historically been limited. First, public transportation vehicles and facilities are crowded locations, and thus similar to the restrictions on public assemblies discussed above. And accommodating large crowds is by design, as the purpose of a mass transit system is to move large numbers of people in an efficient manner. Therefore, just as with the crowded ballrooms of the

36

Reconstruction era, the carrying of firearms on a crowded bus or subway train has the potential to insert chaos into an already chaotic environment. And even more so. As anyone who has taken the MTA's CityLink Red bus down York Road in Baltimore knows, passengers on buses and subway trains can expect to find themselves jam-packed into extremely close contact with each other, often so close as to be actually touching. These circumstances render effective self-defense with a firearm entirely impractical, and vastly increase the chance that any attempt to use a firearm will result in disastrous and unintended consequences. Not only would the discharge of a firearm in a crowded transit vehicle have the potential to strike any number of innocent bystanders, but would cause extreme panic in closed environments (whether the vehicle itself or a subway station with controlled entry/exit points) where any mass attempt to escape could cause injury or worse. Further, use of a firearm, even in legitimate self-defense, would likely result in massive disruptions of the transit system as the circumstances were investigated, thus interfering with the State's purpose and interest in providing a reliable form of transportation for the public. Indeed, in contrast to the use of a firearm at a social gathering, which would have an immediate effect only on that particular event, the use of a firearm on a public transit system would have cascading impacts with the potential to grind entire routes to a halt.

The MTA's vehicles and transit facilities are also sensitive places because they serve vulnerable populations, most notably children. Like many municipal public transit systems, MTA "provides free transportation to and from school and school-related activities to eligible students of the Baltimore City Public School system." (Randall Decl., Ex. 6 at ¶ 4); (*see* Randall Decl., Ex. 6 at ¶ 7 (noting that, through April 2023, "MTA will have recorded approximately 134,000 rides by Baltimore City Public School students for the 2022-23 school

year").)  And by serving this integral role in getting children to and from school, the transit system occupies the same sphere as the school itself.[27]

Finally, restrictions on public transit are consistent with the restrictions that private entities have historically imposed on their transit systems.  As Dr. Brennan Rivas explains in her declaration, "[p]rivate companies would have had the authority to decide where and how legally transported weapons could be stowed and carried by customers aboard their vehicles and within their stations."  (Rivas Decl., Ex. 5 at ¶ 13.)  And surviving records demonstrate that railroad companies operating in the Reconstruction era did in fact restrict firearms on their trains.  For example, the North Pennsylvania Railroad's "'rules and regulations' document for conductors . . . specifically charged passenger conductors with the responsibility of preventing passengers from taking 'into the cars guns, dogs, valises, large bundles or backets.'"  (Rivas Decl., Ex. 5 at ¶ 13 & Ex. B); (*see* Rivas Decl., Ex. 5 at ¶ 14 (noting that railroad companies shipped firearms by "separating [them] from the passenger and placing [them] in a designated baggage space").)  During this period, various States vested railroads and their employees with the authority to police their trains, and that "[i]ncluded within this power . . . was a responsibility to enforce weapon regulations in effect at the time."  (Rivas Decl., Ex. 5 at ¶ 14-15.)

Plaintiffs have presented nothing to rebut this historical tradition.  Nor can they, especially since the historical tradition has persisted to this day.  The four largest rail rapid

---

[27] Maryland state law provides free "ridership on transit vehicles to any permanent employee in any unit of the Executive Branch of State government[.]"  Transp. § 7-711(a). Restrictions on carrying firearms on public transit thus further the government's strong interest in, and preferred method of, keeping its workforce safe.

transit systems in the United States by ridership—the New York City subway, the Washington, D.C. Metro, the Chicago "L," and the "T" in Massachusetts—all prohibit firearms under a state, local, or system rule.[28]

Instead, plaintiffs attempt to cobble together a historical tradition out of exceptions for "travelers" that appeared in various statutes that otherwise restricted the carrying of firearms. (ECF 24-1 at 23.)  But this term, as used in those statutes, did not have the freewheeling definition that plaintiffs wish to ascribe it.  As Dr. Rivas explains, this was "[f]ar from a blanket exception for people to go armed at all times outside their homes[,]" but was an affirmative defense that "was narrowly defined by state appellate courts."  (Rivas Decl., Ex. 5 at ¶ 9.) This defense "encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society[.]" (Rivas Decl., Ex. 5 at ¶ 9.)  Thus, "[w]earing one's weapons in an unfamiliar town or city could fall within the travel exception so long as such carriage was limited to merely passing through the area or conducting one's business." (Rivas Decl., Ex. 5 at ¶ 9.)  But, contrary to plaintiffs' assertions, it could not encompass a person carrying a firearm "within the routine of his daily business." *Eastlick v. United States*, 104 S.W.941, 942 (Indian Terr. 1907); (*see also* Rivas Decl., Ex. 5 at ¶ 9 (collecting cases denoting the limitations of the traveler exception).)

When plaintiffs forego private modes of transportation and opt to use the State's public transit system for their own benefit, they do so under those rules that the people of Maryland, through the General Assembly, have determined best serves their safety interests.  And because

---

[28] *See* N.Y. Penal Law § 265.01-e(2)(n); D.C. Code § 7-2509.07(a)(6); 430 Ill. Comp. Stat. 66/65(a)(8); Mass. Bay Transportation Authority, Rider Rules and Regulations, available at https://www.mbta.com/safety/rider-rules-and-regulations.

Maryland's decision to restrict the carrying of firearms on public transit is consistent with historical practice, plaintiffs' challenge to those restrictions must fail.

### 5.     State Parks and Forests

Finally, plaintiffs challenge regulations prohibiting the carrying of firearms in state parks and state forest lands.  Like their challenge to publicly owned and operated public transit, plaintiffs' challenge fails for multiple reasons.

First, as with the challenge to public transportation, plaintiffs' claim is, by its nature, limited to parks and forests owned and operated by the State of Maryland.  Accordingly, just as a private park may restrict firearms as it sees fit on its own property, the State, as proprietor of lands dedicated to a recreational purpose, may restrict those who choose to enter these locations from carrying firearms.

Second, state parks and forests are also "sensitive places" that are outside of the scope of the Second Amendment.  This is because state parks and forests often host large gatherings of people, and specifically cater to children.[29]  (*See* Declaration of Daryl Anthony, Acting Deputy Director of the Maryland Park Service of the Maryland Department of Natural Resources, ¶¶ 4-6, attached as Exhibit 7 (noting that "Maryland State parks offer programs

---

[29] It is no response that state parks and forests cannot be sensitive places because they contain wooded or other remote areas that may not ordinarily be crowded or have children present.  Plaintiffs' claim is a facial challenge, which is "disfavor[ed]", and therefore they must show that the prohibition on firearms in state parks cannot be applied in any circumstances. *See Fusaro v. Howard*, 19 F.4th 357, 373 (4th Cir. 2021) ("To succeed in a facial constitutional challenge, a movant 'must establish that no set of circumstances exists under which [an act] would be valid.'" (citation omitted)).

geared toward school-age children, including arts and crafts programs, educational programs and nature presentations . . .").)  The Department of Natural Resources "encourages children and families to visit the State forests and State parks, through advertising and other marketing methods." (Anthony Decl., Ex. 7 at ¶ 6.)  It is for these reasons, among others, that several courts have held that parks and similar recreational areas are sensitive areas where firearms may be prohibited.  *See, e.g.*, *GeorgiaCarry.Org v. U.S. Army Corps of Engineers*, 212 F. Supp. 3d 1348, 1366 (N.D. Ga. 2016); *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010); *United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009), *aff'd*, 638 F.3d 458 (4th Cir. 2011); *Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (Wash. App. 2021).

Even if this Court determines that state parks and forests are not presumptively constitutional "sensitive places," restrictions on firearms in those locations nonetheless do not violate the Second Amendment because they are consistent with the Nation's historical tradition of firearm regulation.  (*See* Cornell Decl., Ex. 3 at ¶ 56) ("During the era of the Fourteenth Amendment there was little disagreement that state and local governments had the authority under the police power to regulate and prohibit guns in parks.").)

Any discussion of the historical tradition relating to parks must start with the fact that "[t]here were no modern-style parks in the era of the Second Amendment." (Cornell Decl., Ex. 3 at ¶ 54.)  Instead, "[t]he creation of parks as we now know them began in the middle of the nineteenth century and was influenced by the slow impact of romanticism and the Transcendentalist ideas of visionaries such as Henry David Thoreau." (Cornell Decl., Ex. 3 at ¶ 55.)  "[I]nspired by a new attitude toward nature and public spaces," the modern parks movement re-envisioned certain public spaces "as places of relaxation, repose, and recreation." (Cornell Decl., Ex. 3 at ¶ 55.)  Thus, "[b]y the middle of the [nineteenth] century these new

41

public spaces . . . had become places of refuge from the congestion, grime, and stresses of city life." (Cornell Decl., Ex. 3 at ¶ 14 (noting "[t]he development of [modern-style parks] in the period before the Civil War was itself a response to the greater urbanization of the nation and a perception that America needed to create havens of tranquility to offset the negative impacts of the market revolution").)

The park movement is perhaps "best exemplified by New York's Central Park," which opened in 1858. (Cornell Decl., Ex. 3 at ¶ 55.) From its inception, the adopted ordinances applicable to Central Park provided that "[a]ll persons are forbidden . . . to carry fire-arms[.]" (Ex. 37.) As the modern parks movement spread across the country, so too did firearms restrictions. Around the time the Fourteenth Amendment was ratified, laws were passed prohibiting firearms in public parks in the five most populous cities in the Nation: New York City (1858), Ex. 37; Philadelphia (1868), Ex. 39; Chicago (1873), Ex. 41; St. Louis (1881), Ex. 46; and Boston (1886), Ex. 49. (Cornell Decl., Ex. 3 at ¶ 56.) But these bans were not just limited to the Nation's largest municipalities. Indeed, dozens of laws prohibited firearms in public parks in at least 14 States by 1900,[30] and in at least 24 States by 1921.[31]

Pertinent to this case, "[t]here was a close connection between the urban park movement and the rise of state parks." (Cornell Decl., Ex. 3 at ¶ 55.) Similarly, "[t]he federal

---

[30] These include jurisdictions in: (1) New York (1858), Ex. 58; (2) Pennsylvania (1867), Ex. 39; (3) Illinois (1873), Ex. 41; (4) California (1875), Ex. 42; (5) Missouri (1881), Ex. 46; (6) Massachusetts (1887), Ex. 49; (7) Utah (1888), Ex. 50; (8) Minnesota (1889), Ex. 51; (9) New Jersey (1980), Ex. 52; (10) Michigan (1891), Ex. 53; (11) Washington (1892), Ex. 57; (12) Delaware (1893), Ex. 58; (13) Indiana (1896), Ex. 63; and (14) Colorado (1989), Ex. 66.

[31] These include jurisdictions in: (15) Connecticut (1902), Ex. 69; (16) Texas (1904), Ex. 74; (17) Nebraska (1904), Ex. 75; (18) Tennessee (1909), Ex. 86; (19) Kentucky (1909), Ex. 88; (20) Virginia (1910), Ex. 89; (21) Alabama (1917), Ex. 95; (22) Wisconsin (2017), Ex. 97; (23) Vermont (1921), Ex. 100; and (24) North Carolina (1921), Ex. 101.

government's decision to create Yellowstone [National Park] in 1872 added yet another type of park to America's roster of public spaces."  (Cornell Decl., Ex. 3 at ¶ 55.)    It is thus not surprising that Yellowstone National Park imposed a firearms ban in 1897, (Ex. 104, at 1), and the federal government instituted regulations limiting firearms in all national parks in 1936, (Ex. 105).[32]

These laws demonstrate a robust historical tradition of laws that are not only analogous, *but substantively identical to*, the regulations at issue here.  And it is significant that these laws, numerous as they were, stood without challenge until only very recently. *See Bruen*, 142 S. Ct. at 2133 (noting that one indicia of whether locational restrictions  are constitutional is if there are, as a historical matter, "no disputes regarding the lawfulness of such prohibitions").

Nonetheless, in their motion for preliminary injunction, plaintiffs attempt to distract this Court away from the robust history described above by pointing to locations that have existed since before the Founding, such as Boston Common, and then arguing that, because no restrictions on firearms at these locations have been located, there can be no relevant historical tradition on firearm regulation in "parks" generally.  (ECF 24-1 at 24-25.)  But this reasoning is flawed on many levels.  First, it would be constitutional folly to attempt to derive a historical tradition from the *absence* of a particular type of regulation in such a small number of places. And it would be especially problematic to do so, given that the concept of a dedicated space for public recreation would have been a novel and undeveloped concept at the time.  Moreover, plaintiffs mischaracterize the nature of the use of these few public spaces.  At the time of the

---

[32] That the federal government opted to ban firearms in national parks is especially pertinent, given that federal lands were indisputably governed by the Second Amendment irrespective of the incorporation doctrine.

Founding, Boston Common "was used primarily as a pasture, a place of execution, and site for the militia to muster and drill." (Cornell Decl., Ex. 3 at ¶ 54.) "Yet, even when used for militia purposes these public spaces were tightly regulated," with "Massachusetts prohibit[ing] coming to muster with a loaded firearm." (Cornell Decl., Ex. 3 at ¶ 54.) Finally, and perhaps most importantly, plaintiffs ignore the integral role and purpose of the collective parks movement described above, and the fact that when parks proliferated throughout the Nation, firearms regulations were a complementary aspect of that movement.

Plaintiffs simply have no legitimate answer to the vast number of firearms regulations pertaining to public parks that were enacted in the era both before and immediately after the ratification of the Fourteenth Amendment. Because these laws reflect and implement an understanding of the historical tradition of the right to bear arms embodied in the Second Amendment, plaintiffs' challenge to Maryland's substantively identical regulations should be rejected.

**B.      Even if Plaintiffs Have Standing, the Private Building Consent Rule Fails to Implicate Conduct Covered by the Second Amendment, and in Any Event is Supported by Historical Tradition.**

In Count One of their complaint, plaintiffs also challenge Senate Bill 1's prohibition on carrying a firearm into another person's private building unless the owner or their agent has posted clear and conspicuous signage or given express permission allowing individuals to carry a firearm into that building (hereinafter the "private building consent rule"). (ECF 1, Compl. ¶¶ 15-17, 50.) Plaintiffs allege that the private building consent rule injures them by impractically burdening their Second Amendment right to carry firearms for self-defense. More specifically, plaintiffs claim that, were it not for the private building consent rule, they would bring their firearms into privately-owned buildings that they typically visit that do not

expressly prohibit firearms on their property, such as grocery stores, drug stores, and gas stations.  As set forth below, plaintiffs' claim fails for several reasons: (1) plaintiffs lack standing to challenge the law, (2) the private building consent rule does not implicate conduct within the scope of the Second Amendment, and (3) the law is consistent with the historical tradition of firearm regulation.

> **1.**     **Plaintiffs Lack Standing Because They Have Not Sustained an Injury, and Any Purported Injuries They Might Sustain are Neither Traceable to the Actions of the State nor Redressable by this Court.**

To establish Article III standing, a plaintiff must allege (1) an "injury in fact" (2) that is "fairly traceable" to the defendant's conduct and (3) "that is likely to be redressed by the requested relief." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Plaintiffs' claim fails at all three levels.

First, plaintiffs have failed to allege that they will suffer a legally cognizable injury.  "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, [and] not conjectural or hypothetical." *Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009).  Here, however, plaintiffs' alleged injury is entirely hypothetical.  Their claim is based on the premise that there exists some private building (that plaintiffs wish to enter armed) for which the owner both (1) consents to individuals entering their building armed, and (2) for whatever reason will decline to express that consent through a sign (or other express permission).  Because plaintiffs

have identified no such building, they have failed to meet their burden to show a constitutionally-cognizable injury.[33]

For similar reasons, plaintiffs' allegations do not establish traceability. A plaintiff fails to establish traceability when the injuries that are alleged are attributable to the "broad and legitimate" discretion of independent third parties not before the court, unless the defendant's conduct had a "determinative or coercive effect" on the third party's actions. *See Lujan*, 504 U.S. at 560; *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *Bennett v. Spear*, 520 U.S. 154, 169 (1997). For example, in *Simon*, the Supreme Court held that indigent patients lacked standing to challenge an IRS ruling that extended charitable tax exemptions to nonprofit hospitals that did not provide hospitalization services to patients who could not pay. 426 U.S. at 29. The Court so held because plaintiffs' alleged harm—reduced access to hospital services—was not traceable to the IRS's ruling. *Id.* at 42-43. Instead, their alleged harm was properly attributable to the legitimate discretion of hospitals, which could decide to reduce access to hospital services for indigent patients for reasons other than the tax implications. *Id.* at 43. The same is true here; plaintiffs' alleged harm is not attributable to any state actor, but rather the legitimate discretion of the property owners.

---

[33] Plaintiffs claim that they are affected by the private building default rule due to its alleged "knockon effects," i.e., its potential to "reduc[e] preferences to carry and possess firearms more generally, as it becomes increasingly inconvenient to do so." (ECF 24-1 at 17 (citation omitted).) This exemplifies the speculative nature of their asserted injury. Although in the First Amendment context "[i]ndividuals suffer a concrete injury even when the state has simply 'chilled' the right to engage in free speech and expression," *Speech First, Inc. v. Sands*, 69 F.4th 184, 192 (4th Cir. 2023), no court has recognized such a doctrine in the Second Amendment context. And that makes sense, given the differences between the personal nature of the exercise of Second Amendment rights and the collective principles that the First Amendment seeks to vindicate.

46

Indeed, plaintiffs' alleged harm flows from property owners withholding consent to the wearing, carrying, or transporting of firearms on their property.  But the private building consent rule preserves property owners' ability to allow or prohibit firearms on their property at their discretion.  Owners of private buildings—even those open to the public—already have the right to exclude individuals from their grounds for carrying a firearm.  *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) (stating that the right to exclude is "'one of the most essential sticks in the bundle of rights that are commonly characterized as property'"); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1931 (2019) (stating that, if all private property owners were subject to First Amendment constraints, they would "face the unappetizing choice of allowing all comers or closing the platform altogether. 'The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use.'"); *cf. Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972) ("Nor does property lose its private character merely because the public is generally invited to use it for designated purposes.").  Further, the private building consent rule preserves property owners' legitimate discretion to allow firearms on their premises through signage or express permission. *Compare* 2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(d)) (preserving property owner discretion); *with Bennett*, 520 U.S. at 169 (concluding that plaintiffs had standing under "determinative or coercive effect theory" to challenge administrative opinion from non-action agency because statutory scheme "presupposed" administrative opinion would play a "central role" in action agency decision making).  Consequently, plaintiffs' alleged harm ultimately depends on the legitimate discretion of property owners, not the State. Because "'legitimate discretion' breaks the chain of constitutional causation" necessary for traceability, *Turaani v. Wray*, 988 F.3d 313, 317 (6th Cir. 2021), it eliminates plaintiffs' standing along with it.

Finally, plaintiffs fail to establish redressability.  Plaintiffs must show that a favorable judicial decision will "likely, as opposed to merely speculative[ly]," eliminate their alleged injury.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).  In *Lujan*, the Supreme Court concluded that plaintiffs failed to establish redressability when they asked the court to enjoin regulations that they alleged would increase funding for programs that harmed endangered species. 504 U.S. at 562-63.  The Court reasoned that even if it enjoined the regulation, their order would not stop private entities and agencies arguably not bound by the regulations from funding the programs at issue and the plaintiff's alleged harms could persist.  *Id.* at 570-71.  Similarly, when the private building consent rule takes effect, there is no certainty that plaintiffs' alleged "injury"—not being able to carry a firearm into particular private buildings—would dissipate.  Plaintiffs have not alleged that any establishment would consent to their carrying firearms absent the private building consent rule, but would not do so if the private building consent rule took effect.  Because Senate Bill 1 has no tangible effect on a building owner's ultimate decision whether to allow firearms into their building, plaintiffs fail to establish redressability and therefore lack standing.

> **2.    The Text of the Second Amendment Does Not Cover the Plaintiffs' Conduct Because the Second Amendment does not Bestow the Right to Carry Arms into Another's Building Absent Consent.**

In any case, plaintiffs still fail because they cannot meet their burden under *Bruen*'s first step to show that the plain text of the Second Amendment covers plaintiffs' conduct at issue.  *Bruen*, 142 S. Ct. at 2129-30.  Only upon this showing must the State demonstrate that its regulation is consistent with the Nation's historical tradition of firearm regulation.  *Id.*  In *Heller*, the Court examined history to determine that the scope of the Second Amendment's

text (i.e. "the right . . . to keep and bear arms") included a right to carry in the home.  554 U.S. at 581-95, 626-27.  And in *Bruen*, the Court extended that right to include a "general right" to carry publicly.  142 S. Ct. at 2134.  But neither decision addressed whether "the right" embodied in the Second Amendment overrides a property owner's right to exclude.  *See Bruen*, 142 S. Ct. at 2134 ("Like *Heller*, we 'do not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment.'").  Here, plaintiffs fail to make the predicate showing that the Second Amendment's text confers a right to carry firearms into another's building absent their consent.  As a result, plaintiffs failed to satisfy the first step in *Bruen*, obviating the need for further analysis under the Second Amendment.

Indeed, plaintiffs' complaint does not challenge a private property owner's right to exclude an individual from their building for any lawful reason, including the fact that the individual is carrying a firearm.  Instead, they allege that the private building consent rule generally burdens their right to carry in public, but without discussing the scope of that right. (ECF 24-1 at 9.)  These bare allegations do not establish that the plain text of the Second Amendment allows them to carry firearms onto another's property absent consent.

In fact, history suggests the opposite.  *"The right"* codified in the Second Amendment was a preexisting right in English common law.  *Heller*, 554 U.S. at 592.  So, as applied to private property, the Second Amendment right is best understood in light of the common law history of private property rights.  *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012).  At English common law, the right to exclude was fundamental to property rights.  *Id.* at 1262.  Blackstone wrote: "There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property; or that sole and despotic dominion which one man claims and exercises over the external things of the world,

49

in total exclusion of the right of any other individual in the universe." *Id.* (quoting 2 William Blackstone, *Commentaries* *2); *see Cedar Point Nursery*, 141 S. Ct. at 2072 (citing the same). A guest was only allowed to enter or stay on private property with the owner's permission and was removable at the owner's discretion. *GeorgiaCarry.Org*, 687 F.3d at 1262. Tort law supported that right by granting private property owners a private cause of action of trespass against any individual who entered their property without consent. *Id.* at 1263 (citing 3 William Blackstone, *Commentaries* *209). This system reflected representative views of the time that the rights of "personal security," "personal liberty," and "private property" were "inviolate" and equally necessary for the preservation of civil liberties. *Id.* at 1265 (citing 1 William Blackstone, *Commentaries* *120). Thus, the English common law right to self-defense that the Framers memorialized in the Second Amendment was not meant to "expand, extend or enlarge the individual right to bear arms at the expense of other fundamental rights." *Id.* at 1264. It is against this historical background that the Framers wrote, and the people adopted, the Second Amendment. *Id.*

The Framers shared Blackstone's strong view of property rights. Influential colonial leaders and scholars embraced the concept that an individual's "right to control his or her own private property occupied a special role in American society and in our freedom." *Georgiacarry.org*, 687 F.3d at 1264 (citing William Tudor, *Life of James Otis* 66-67 (1823); John Locke, *Two Treatises on Government*, 209-10 (1821)). The Framers saw the protection of the right to own and acquire property as a paramount goal for the new Constitution. *See* James W. Ely, *The Guardian of Every Other Right: A Constitutional History of Property Rights*, 43 (Oxford University Press 2008). Like Blackstone, the Founders believed that the defense of both property and personal security rights were core aims of government and

essential to liberty.  (*See* Cornell Decl., Ex. 3 at ¶ 36 ("Anglo-American constitutionalism was founded on the Lockean trinity of life, liberty, and property.")); The Federalist No. 10 (James Madison) (favoring republicanism over "pure democracy" because the latter is "incompatible with personal security or the rights of property"); James W. Ely, *supra*, at 43.  It defies reason to suggest that the Founders would consider property owners' fundamental right to exclude others from their property to be nonnegotiable in every instance except when another individual wanted to bring firearms into their private buildings.  Indeed, as Professor Cornell explains, "this robust view of property rights was captured in a celebrated English case where the Lord Chief Justice of the King's Bench summarized the implications of [the Blackstonian] view for English law: 'our law holds the property of every man so sacred, that no man can set his foot upon his neighbor's close without his leave; if he does he is a trespasser, though he does no damage at all; if he will tread upon his neighbor's ground, he must justify it by law.'" (Cornell Decl., Ex. 3 at ¶ 37 (citing *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765)).)

The Eleventh Circuit's reasoning in *GeorgiaCarry.Org* fully supports these principles.  There, the court held that a Georgia law barring licensed individuals from carrying guns in certain locations unless the individual sought and received permission to do so from security or management personnel was constitutional because the Second Amendment did not grant plaintiffs the right to carry on another's property absent consent. 687 F.3d at 1248-49.  Just like Maryland's private building consent rule, the Georgia law prohibited individuals from carrying firearms on another's property without seeking their consent, although the Georgia legislature limited the law's reach to certain specific locations.  *Compare id.* at 1248-49 *with* 2023 Md. Laws ch. 680 (to be codified at Crim. Law § 6-411(d)).  The *GeorgiaCarry.Org* court surveyed the history canvassed above and concluded that "there is no constitutional

infirmity when a private property owner exercises his, her, or its . . . right to control who may enter, and whether that invited guest can be armed, and the State vindicates that right."  687 F.3d at 1264.  Plaintiffs have presented no reason for departing from the Eleventh Circuit's reasoning here.

The State thus does not offend the Second Amendment by adopting a framework governing private property that best effectuates private owners' preferences.  The people, through their elected representatives, should have the ability to adopt the rules that best suit their private rights and the circumstances under which those rights must be respected.  And the evidence demonstrates that the private building consent rule does, in fact, effectuate the preferences of the majority of Marylanders.  *See* Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L., Medicine & Ethics 183, 189-90, Table A4 (2020) (finding statistically significant majority of Americans and Marylanders reject default right to carry weapons onto other people's property).

That the majority of Marylanders would support this policy choice is not surprising. For over 50 years, Marylanders operated under a legal and social landscape in which only those individuals who had an atypical need for self-defense were permitted to carry handguns publicly.  As critics of that system were quick to point out, Maryland's good-and-substantial-reason requirement resulted in relatively few individuals carrying a handgun publicly.  And one consequence of that was that Marylanders could go about their daily lives with the understanding that very few ordinary citizens would be armed.  But now that the good-and-substantial-reason requirement has been eliminated, there are significantly more people who

are permitted to carry a handgun publicly in Maryland.[34]  Yet because Maryland has opted for a concealed-carry only regime, as it is entitled to do under *Bruen*, Marylanders are left in the dark as to who may be carrying a firearm.  By requiring individuals to receive permission before entering a private building with a firearm, the private building consent rule thus furthers the important purpose of allowing Marylanders to be better informed about who may be carrying a firearm into their building.

Moreover, the State's ability to set the rules for entry on private property is consistent with the fact that state legislatures regularly set reversible defaults to effectuate the preferences of their constituents in cases of silence.  *See, e.g.,* Md. Code Ann., Est. & Trusts, § 3-101 (intestacy statute governing property distribution given decedent's silence on subject); Md. Code Ann., Comm. Law § 2-314 (implying warranty of merchantability "[u]nless excluded or modified" by parties).  The reversibility of the private building consent rule in particular mitigates constitutional concerns.  For example, in *Sveen v. Melin*, 138 S. Ct. 1815 (2018), the Supreme Court held that a Minnesota statute automatically revoking a former spouse's insurance beneficiary designation following divorce did not violate the Contracts Clause because it effectuated the presumed intent of policy holders and was easily reversible.  *Id.* at 1819, 1825. The private building consent rule similarly effectuates the presumed intent of property owners and is easily reversible by those who personally held another preference.

Thus, importantly, the State's private building consent rule maintains the proprietor's discretion.  As a result, any limitation plaintiffs experience on their right to carry is derivative

---

[34] *See* Erin Cox, *Md. tightened gun laws after watershed high-court ruling. The NRA sued.*, The Washington Post, May 16, 2023 (noting that approved public carry permits "skyrocketed" from 39,797 as of July 1, 2022 to 125,233 as of May 2023).

not of some state-sanctioned policy, but rather the independent decision of a property owner who withholds (or provides) consent. Plaintiffs ask this Court to force the foundational rights of property owners to give way to the plaintiffs' individual right to carry a firearm for self-defense. But the right to exclude "is a fundamental element of the property right that cannot be balanced away." *Cedar Point Nursery*, 141 S. Ct. at 2077 (quotation omitted). Accordingly, plaintiffs fail to meet their burden to establish that the plain text of the Second Amendment covers their ability to carry their firearms into another's private building without the owner's consent. Having failed to meet that burden, plaintiffs' claim fails.

> **3.** **Even if this Court Concludes that the Text of the Second Amendment Covers Plaintiffs' Conduct, the Private Building Consent Rule is Consistent with the Nation's History and Tradition of Firearm Regulations.**

As set forth above, the State may show that a regulation is consistent with the Nation's history and tradition of firearm regulations by identifying analogous historical regulations throughout the Nation's history. *Bruen*, 142 S. Ct. at 2132-33. Although these historical regulations may range from the pre-Founding era to the Reconstruction era, ultimately the analogous regulation inquiry is meant to reveal whether the original public understanding of the Second Amendment right at the time of ratification or incorporation would permit the modern regulation. *See id.* at 2136-38.

The statutes discussed below merely effectuate the robust common law view of private property rights at the Founding discussed above. This is important because the operative analysis here relates not to restrictions that specifically affect firearms, but rather the background principles against which the Second Amendment was adopted. And because of our English common law tradition, it would be error to draw dispositive significance from the

absence of enacted statutes that expressly set forth these principles.  Instead, looking to the common law discussed above reveals that there would have been a fundamental understanding at the time of the Founding that *all* entry onto another's land without consent constituted a trespass, even though the entrant "does no damage at all."  (Cornell Decl., Ex. 3 at ¶ 37 (citation omitted).)  As Professor Cornell explains, because "[i]t would have been unthinkable to members of the Founding generation that any person could enter another's land armed, without permission or appropriate legal authority," Maryland's private building consent rule "simply restores the legal rule in place at the Founding."  (Cornell Decl., Ex. 3 at ¶¶ 36, 38); (Cornell Decl., Ex. 3 at ¶ 38 ("The prohibition on entering another's land without permission was part of the background assumptions against which the right to keep and bear arms would have been understood by those who wrote it and enacted the Second Amendment into law.").)

Nonetheless, the following Colonial-era statutes reinforce this history and tradition of making firearm carriage onto another's property a trespass absent consent.  In 1715, Maryland imposed criminal penalties against anyone "of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned."  (Ex. 24.)  A 1721 Pennsylvania Colony statute made it unlawful for anyone "to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he has license or permission from the owner of such lands or plantation."  (Ex. 25.) And in 1722, New Jersey passed a similar statute recognizing that "divers[e] abuses have been committed and, great Damages and Inconveniences arisen by Persons carrying of Guns and presuming to hunt on other Peoples Land."  (Ex. 26.)

In 1763, New York passed a law providing that nobody "other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants," shall "carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, Cornfield, or other inclosed Land whatsoever, within the City of New-York, or the Liberties thereof, without Licence in Writing first had and obtained for that Purpose from such Owner, Proprietor or Possessor."  (Ex. 27.)  The New York legislature intended the statute to "more effectually [] punish and prevent" "idle and disorderly" individuals from "hunt[ing] with Fire-Arms, and to tread down the Grass, and Corn and other Grain standing and growing in the Fields and Inclosures there, to the great Danger of the Lives of his Majesty's Subjects," and "the grievous Injury of the Proprietors.  *Id.*  In 1771, New Jersey passed another statute prohibiting individuals from carrying "any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor."  (Ex. 28.)  And in 1789, Massachusetts enacted a law, applicable to several islands in Dukes County, that made it unlawful for a person to "be seen with any gun or guns" unless the person had "the special license of the proprietors of the said Islands, or shall be able to shew sufficient reason therefor."  (Ex. 29.)

Legislatures passed similar laws in the Reconstruction era.  For example, in 1865 Louisiana passed a law declaring that "it shall not be lawful for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order."  (Ex. 30.)  The next year, Texas passed a nearly identical statute.  (Ex. 31.)  And in 1893, Oregon made it "unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other

56

firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof." (Ex. 32.)

These laws are relevantly similar to the State's private building consent rule. A law is "relevantly similar" if it uses similar means to achieve similar purposes. *Bruen*, 142 S. Ct. at 2133. Here, the private building consent rule and its analogs use the law of trespass as an incentive for firearm owners to seek consent from property owners before they enter armed. Property owners are then better equipped to be able to exercise their property rights by choosing to allow or prohibit a guest to carry a firearm on their premises according to their preference. Without this incentive, property owners may never know whether a guest is armed and could not meaningfully exercise their right to exclude for the security and protection of themselves and their property. Maryland's law even facilitates this exchange of information between firearm owners and proprietors by excluding the "land adjacent to a building" and portions of buildings subject to a public easement from the private building consent rule. *See* 2023 Md. Laws ch. 680 (to be codified at Crim. Law §§ 6-411(a)(6), 6-411(b)(5)). Firearm owners are thus not precluded from being able to walk up to the doorway of a proprietor's building to seek consent. But beyond that point, both the private building consent rule and its historical analogs empower property owners to make their own decisions. In other words, both the private building consent rule and its historical analogs make it a trespass to carry a firearm onto another's property absent consent so as to facilitate a proprietor's exercise of the right to exclude and secure their property. As a result, the private building consent rule is consistent with the Nation's tradition of firearms regulation and is constitutional under the Second Amendment.

## V.   THE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED BECAUSE THE BALANCE OF THE EQUITIES FAVORS THE STATE.

As shown above, plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims, which itself is fatal to their motion for preliminary relief.  *See DiBiase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).  But plaintiffs have also failed to establish, as they must in order to prevail, that "'the balance of equities tips in [their] favor, and that an injunction is in the public interest.'"  *Id.* (quoting *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008)).

The State's authority to enforce duly enacted laws "clearly inflicts irreparable harm on the State."  *Abbot v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also Cameron v. EMW Women's Surgical Ctr.*, 142 S. Ct. 1002, 1011 (2022).  That harm is especially clear where, as here, there is an "ongoing and concrete harm" to the State's "law enforcement and public safety interests."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Here, plaintiffs seek to enjoin laws designed to prevent gun violence.  The risks of allowing firearms in public places like museums, public transit vehicles carrying school children, hospitals, state parks, and taverns serving alcohol are obvious.  As shown by the declarations submitted herewith, many of these locations frequently host large numbers of school children.

The risk is not merely of intentional, criminal acts.  Accidental shootings, misunderstandings, or arguments can result in serious injury to innocent bystanders when firearms are present.  Studies show that the presence of weapons increases aggressive behavior and thoughts, meaning that a person in possession of a firearm is more likely to perceive others

as hostile and react aggressively to ambiguous situations.[35]  Serious risks also flow from the possible loss or theft of a firearm in sensitive places like a crowded bar, museum, or city bus.[36]

According to the Centers for Disease Control, in 2020, 45,222 people died from gun-related injuries in the United States, the most in any year recorded.  *See* Centers for Disease Control and Prevention, *Fast Facts: Firearm Violence Prevention*, https://www.cdc.gov/violenceprevention/firearms/fastfact.html.  Gun violence has now surpassed motor vehicle crashes as the leading cause of death among children and adolescents. J. Goldstick, R. Cunningham, & P. Carter, *Current Causes of Death in Children and Adolescents in the United States*, 386 New England J. Med. 1955 (May 19, 2022)

Courts historically recognize that public safety is an important governmental interest. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 750 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984).  Staying enforcement of Maryland's sensitive places restrictions would undermine the strong interest that the public has in preventing gun violence in areas where people,

---

[35]  *See* Arlin J. Benjamin Jr., Sven Kepes, & Brad. J. Bushman, *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 Personality & Social Psych. R. 347, 359 (2018), attached as Exhibit 33; David Hemenway, Chloe Shawah, & Elizabeth Lites, *Defensive gun use: What can we learn from news reports?*, 9 Injury Epidemiology 19, 8 (2022), attached as Exhibit 34 (reviewing more than 400 news reports on defensive gun use and finding that in about one in five instances either both parties were engaged in illegal behavior or it was difficult to distinguish the perpetrator from the victim).

[36] David Hemenway, Deborah Azrael, & Matthew Miller, *Whose guns are stolen? The epidemiology of gun theft victims*, 4 Injury Epidemiology 11, 4 (2017), attached as Exhibit 35 (finding that persons who carry firearms for self-defense are more than three times more likely to have a firearm stolen); *see also* John J. Donohue et al., *More guns, more unintended consequences: the effects of right-to-carry on criminal behavior and policing in U.S. cities*, Nat'l Bureau of Econ. Research, Working Paper Series, Working Paper 30190 at 27, http://www.nber.org/papers/w30190 (2022), attached as Exhibit 36.

especially vulnerable populations, congregate.  Both the balance of equities and the public interest mandate denial of plaintiffs' request for extraordinary relief.

## CONCLUSION

Defendants' motion to dismiss the complaint should be granted and plaintiffs' motion for preliminary injunction should be denied.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland


/s/ Robert A. Scott
_____
ROBERT A. SCOTT
Federal Bar No. 24613
RYAN R. DIETRICH
Federal Bar No. 27945
JAMES N. LEWIS
Federal Bar No. 30220
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
(410) 576-7055
rscott@oag.state.md.us

June 28, 2023                             Attorneys for Defendants

# INDEX OF EXHIBITS

Ex. 1:        Intentionally Left Blank

Ex. 2:        Maryland Senate Bill 1 (2023)

Ex. 3:        Declaration of Saul Cornell

Ex. 4:        Declaration of Patrick J. Charles

Ex. 5:        Declaration of Brennan Rivas

Ex. 6:        Declaration of Thomas Randall

Ex. 7:        Declaration of Daryl Anthony

Ex. 8:        Declaration of Anita Kassof

Ex. 9:        Declaration of Mark J. Potter

Ex. 10:       Declaration of Arnot Polakoff

Ex. 11:       Declaration of Terri Freeman

Ex. 12:       Virginia, An Act Forbidding and Punishing Affrays, Ch. 49.

Ex. 13:       Statutes of the Parliament of England in force in North Carolina, Ch. 3 (1792)

Ex. 14:       Acts of the State of Tennessee, Ch. 22 § 2 (1869)

Ex. 15:       New Mexico Deadly Weapons Act, Ch. 32 §§ 1-6 (1869)

Ex. 16:       Georgia Offenses Against the Public Morality, Health, Police, etc. Part 5, Title 1, § 4528(1870)

Ex. 17:       Gen. Laws of the State of Texas, An Act Regulating the Right to Keep and Bear Arms, Chapter 46. § 1 (1870)

Ex. 18:       Laws of Missouri, An Act to Prevent the Carrying of Concealed Weapons § 1 (1874)

Ex. 19:       Session Laws of the Leg. Assembly of the Territory of Arizona (1889)

Ex. 20:       Statutes of Oklahoma, Crimes and Punishments, Ch. 25 §§7-10 (1890)

Ex. 21:       Penal Code of State of Idaho, Persons Other than Officers Carrying Certain weapons, Ch. 218 § 4781 (1901)

Ex. 22:       Montana General Laws, An Act to Prohibit Unlawful Carrying of Concealed Weapons, Ch. 35 § 1 (1903)

Ex. 23:       Columbia, Missouri General Ordinances, Ch. 17 (1890)

Ex. 24:  Maryland Assembly, An Act for the Speedy Trial of Criminals, and Ascertaining their Punishment, Ch. 26 (1715)

Ex. 25:  The Statutes at Large of Pennsylvania, Vol. 3, Ch. 246 (1721)

Ex. 26:  Acts Passed by the General Assembly of the Province of New Jersey, Ch. 35 (1722)

Ex. 27:  Laws of New York, An Act to prevent hunting with Fire-Arms in the City of New York, Ch. 1233 (1763)

Ex. 28:  Acts of the General Assembly of the Colony of New Jersey (1771)

Ex. 29:  Acts and Laws of Massachusetts, Ch. 28 (1789)

Ex. 30:  Acts of the State of Louisiana, An Act to Prohibit the Carrying of Firearms on Premises or Plantations, without the Consent of the Owner (1865)

Ex. 31:  Laws of Texas, Offenses Against the Public Peace, Title II (1867)

Ex. 32:  General Laws of Oregon, 79 § 1 (1893)

Ex. 33:  Benjamin, Kepes, and Bushman, *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta Analytic Review of the Weapons Effect Literature*, 22 Personality & Social Psych. R. 347 (2018)

Ex. 34:  Hemenway, Shawah, and Lites, *Defensive Gun Use: What Can We Learn from News Reports?*, 9 Injury Epidemiology 19 (2022)

Ex. 35:  Hemenway, Azrael, and Miller, *Whose Guns are Stolen? The Epidemiology of Gun Theft Victims*, 4 Injury Epidemiology 11 (2017)

Ex. 36:  Donohue, Cai, Bondy, et al., *More Guns, More Unintended Consequences: the effects of right-to-carry on criminal behavior and policing in U.S. Cities*, Nat'l Bureau of Econ. Research, Working Paper Series, Working Paper 30190

Ex. 37:  Minutes of the Proceedings of the Board of Commissioners of Central Park, New York (1858)

Ex. 38:  Annual Report of the Brooklyn Park Commissioners, Park Ordinance No. 1, Art. 1 (1867)

Ex. 39:  Laws of the General Assembly of the State of Pennsylvania, No. 1020 § 21 (1868)

Ex. 40:  Annual Report of the Commissioners of Fairmount Park, § 21 (1869)

Ex. 41:  Laws and Ordinances of the City of Chicago, Ch. 31 § 6 (1873)

Ex. 42:        San Francisco Municipal Reports, Park Commissioners Ordinances, Ordinance No. 2 § 2 (1875)

Ex. 43:        Laws and Ordinances Governing the Village of Hyde Park, IL., South Park Ordinances § 6 (1876)

Ex. 44:        Ordinances of the Town Council of the Borough of Phoenixville, Penn., Parks § 1 (1878)

Ex. 45:        Municipal Code of Chicago, Art. 43 § 1690 (1881)

Ex. 46:        The Revised Ordinance of the City of St. Louis, Art. 11 § 3 (1881)

Ex. 47:        The Revised Ordinance of the City of Danville, IL., § 4 (1883)

Ex. 48:        Rule and Regulations of Tower Grove Park of the City of St. Louis (1883)

Ex. 49:        City of Boston Department of Parks Ordinances (1887)

Ex. 50:        The Revised Ordinances of Salt Lake City, Ch. 27 § 6 (1888)

Ex. 51:        Rules and Regulations of the Public Parks and Grounds of the City of Saint Paul, MN. § 6 (1889)

Ex. 52:        Charter and Ordinances of the City of Trenton, N.J. (1890)

Ex. 53:        Ordinances of the City of Grand Rapids, Parks §432 (1891)

Ex. 54:        Laws and Ordinances of the City of Williamsport, Penn., Brandon Park § 21 (1891)

Ex. 55:        Annual Report of the Park Commissioners of the City of Lynn, MA., Ordinances § 3 (1892)

Ex. 56:        Laws and Ordinances of the City of Peoria, Il., Art. 35, Parks and Public Grounds §1724 (1892)

Ex. 57:        Municipal Code of the City of Spokane, WA., Ordinance No. A170 § 4 (1892)

Ex. 58:        Rules and Regulations of the Board of Park Commissioners of City of Wilmington, DE, § 7 (1893)

Ex. 59:        Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh, PA, Bureau of Parks §5 (1883)

Ex. 60:        Revised Ordinances of the City of Canton, IL., § 26 (1895)

Ex. 61:        Local Acts of the Legislature of the State of Michigan, No. 436 § 44 (1895)

Ex. 62:        Report of the Board of Park Commissioners of the City of Rochester, N.Y., § 4 (1896)

Ex. 63:       The General Ordinances of the City of Indianapolis §1971 (1896)

Ex. 64:       Laws and Ordinances of the City of Reading, PA., Park Rules and Regulations § 20 (1897)

Ex. 65:       Park Commissioners' Report for Springfield, MA., Park Ordinance No. 3 (1897)

Ex. 66:       Revised Ordinances of the City of Boulder, CO., Parks 511 § 1 (1898)

Ex. 67:       Charter and Revised Ordinances of Kansas City, Ordinance No. 9637 § 11 (1898)

Ex. 68:       Report of the Board of Commissioners of Wilmington DE., Park Regulations (1898)

Ex. 69:       Municipal Register of the City of Hartford, CT., Rules and Regulations No. 9 (1902)

Ex. 70:       Ninth Annual Report of the Department of Parks of the City of New Bedford, Massachusetts (1902)

Ex. 71:       First Annual Report of the Board of Park Commissioners of the City of Lowell, Massachusetts (1903)

Ex. 72:       Proceedings of the Board of Alderman of the City of New York, New York (1903)

Ex. 73:       Municipal Ordinances of the City of Troy, New York (1903)

Ex. 74:       Revised Code of Ordinances of the City of Houston, Texas (1904)

Ex. 75:       The Ordinances of the City of Neligh, Nebraska (1904)

Ex. 76:       Ordinances of the City of Pueblo, Colorado (1904)

Ex. 77:       A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Harrisburg, Pennsylvania (1905)

Ex. 78:       Annual Report of the Park Commissioners of the City of Haverhill, Massachusetts (1905)

Ex. 79:       General Laws of the State of Minnesota (1905)

Ex. 80:       Charter of the City of Saginaw, Michigan (1905)_

Ex. 81:       Amendments to "The Revised Municipal Code of Chicago of 1905" and New

General Ordinances (1905)

Ex. 82:        Municipal Code of the City and County of Denver, Colorado (1906)

Ex. 83:        Penal Ordinances of the City of Los Angeles, California (1906)

Ex. 84:        Ordinances of the City of Olean, New York (1907)

Ex. 85:        The Charter of the City of Seattle and the Ordinances of the City of Seattle, Washington (1907)

Ex. 86:        A Digest of the Laws Ordinances and Contracts of the City of Memphis, Tennessee (1909)

Ex. 87:        General Municipal Ordinances of the City of Oakland, California (1909)

Ex. 88:        Constitution, Charter and Revision of the Ordinances and Municipal Laws of the City of Paducah, Kentucky (1909)

Ex. 89:        The Code of the City of Staunton, Virginia (1910)

Ex. 90:        The Code of Colorado Springs, Colorado (1913)

Ex. 91:        Compiled Ordinances of the City of Grand Rapids, Michigan (1914)

Ex. 92:        Charter and Ordinances of the City of New Haven, Connecticut (1914)

Ex. 93:        State of Connecticut Report of the State Park Commission for the Fiscal Year Ended September 30, 1914

Ex. 94:        New Code of Ordinances of the City of New York, New York (1912)

Ex. 95:        The Code of City of Birmingham, Alabama (1917)

Ex. 96:        The Joplin, Missouri Code of 1917

Ex. 97:        Wisconsin Session Laws Acts, Resolutions and Memorials (1917)

Ex. 98:        State of Connecticut Report of the State Park Commission for the Two Fiscal Years Ended September 30, 1918

Ex. 99:        Revised Ordinances of Salt Lake City, Utah (1920)

Ex. 100:       Revised Ordinances of 1921 for the City of Burlington, Vermont

Ex. 101:       State of North Carolina Public Laws and Resolutions (1921)

Ex. 102:       Digest of the Charter and Ordinances of the City of Chattanooga, Tennessee (1922)

Ex. 103:       Guide to Connecticut State Parks and Forests (1924)

Ex. 104:       National Park Service Publication on Firearm Regulations in the National Parks, 1897-1936

Ex. 105:       Federal Register- Rules and Regulations of National Park Service (1936)