# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KATHERINE NOVOTNY, ET AL., | * | |
| *Plaintiffs*, | | |
| | * | |
| v. | | |
| | * | No. 1:23-cv-01295-GLR |
| | | |
| WESTLEY MOORE, ET AL., | * | |
| *Defendants*. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## EXPERT REPORT AND DECLARATION OF SAUL CORNELL

I, Saul Cornell, declare that the following is true and correct:

1.      I have been asked by the Office of the Attorney General for the State of Maryland to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.  In *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence.  This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past.  My report explores these issues in some detail.  Finally, I have been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

2.      This declaration is based on my own personal knowledge, research and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.      I am the Paul and Diane Guenther Chair in American History at Fordham University.  The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history.  In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

4.      My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2]  My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals.  I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3]  Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

5.      I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo. 2014); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty. 2018), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal. 2014), *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill. 2018); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal. 2019); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal. 2019); *Worth v. Harrington*, No. 21-cv-1348 (D. Minn. 2021); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal. 2019); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal. 2017); *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal. 2020); *Boland v. Bonta*, No. 8:22-cv-1421-CJC-ADS (C.D. Cal. 2022); *Rupp v. Bonta*, No. 8:17-cv-746JLS-JDE (C.D. Cal. 2017); *B&L Productions, Inc. v. Newsom*, No. 21-cv-1718-AJB-DDL (S.D. Cal. 2021); *Nat'l Assoc. for Gun Rts. v. Campbell*, No.1:22-cv-11431-FDS (D. Mass. 2022); *Nat'l Assoc. for Gun Rts. v. Lamont*, No. 3:22-cv-0118 (D. Conn. 2022); *Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn. 2023); and *Nat'l Assoc. for Gun Rts. v. Lopez*, No. 1:22-cv-00404 (D. Haw. 2022).

## BASIS FOR OPINION AND MATERIALS CONSIDERED

6.      The opinion I provide in this report is based on my review of the  complaint filed in this lawsuit, plaintiffs' motion for preliminary injunction,  the laws at issue in this lawsuit, my education, expertise, and research in the field of legal history.  The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

## SUMMARY OF OPINIONS

7.      Understanding text, history, and tradition requires a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment's original understanding.

8.      It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights.  In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas.  Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4]  Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]  No legal principle was more important to the common law than the concept of the peace.[6]  As one early American justice of the peace manual noted:  "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7]  Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8]  Any approach to the Second Amendment that ignores the importance of the peace to Founding era constitutional and legal thought is both anachronistic and profoundly distorted.[9]

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[9] Edwards, *supra* note 6.

9.      Early American constitutionalism built on Lockean theory; a fact evident in many early state constitutions.  Thus, Pennsylvania, the first state to assert a right to bear arms, also unambiguously preceded the statement of that principal with an assertion closely tracking Locke: "That all men are born equally free and independent, and have certain natural, inherent and inalienable rights, amongst which are, the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety."[10] The right of self-defense and property rights were each viewed  as fundamental, inalienable, and foundational  in the Founding era.[11] Although the right associated with property and self-defense could  not be alienated (a term that was itself derived from English property law) both rights were subject to robust regulation.[12]

10.      In *Bruen*, Justice Kavanaugh reiterated *Heller*'s[13] invocation of Blackstone's authority as a guide to how early Americans understood their legal inheritance from England.[14] In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased, a natural response to new challenges posed by changes in technology and society. As had been true in England, the newly independent states exercised their broad police powers to address longstanding issues and any novel problems created by firearms in American society.

---

[10] 5 Federal and State Constitutions 568 (F. Thorpe ed. 1909) Pa. Const., Decl. of Rights, Art. IX (1776) at 3083; more generally, see Willi Paul Adams, The First American Constitutions: Republican Ideology and the Making of State Constitutions in the Revolutionary Era (1980).

[11] Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J. L. & PUB. POL'Y 568 (2017).

[12] Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[13] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

[14] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775).  The modern terminology to describe this concept is "ordered liberty."  *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937).

11.     American law, including the regulation of firearms, sought to protect ordered liberty. As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution:  "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [*sic*] our persons and property."[15]  By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.

12.     The members of the Founding generation lived in a pre-modern rural society. There were no modern style police forces to keep the peace. Even after the creation of modern style police forces in the period before the Civil War, firearms were rarely carried routinely in public outside of the South and frontier regions.  Indeed, none of the nation's early police forces in Boston, New York, and Philadelphia issued firearms to those charged with enforcing the peace and protecting society from criminals.

13.     Few of the institutions modern Americans take for granted existed in Founding era America.   Outside of major cities there were few hospitals and even fewer museums, and these were private institutions that served the public. There was no modern-style mass transportation.   All forms of transport were privately owned.

14.     Although many public spaces existed in early America, modern style parks did not emerge until the nineteenth century.   The development of such spaces in period before the Civil War was itself a response to the greater urbanization of the nation and a perception that America needed to create havens of tranquility to offset the negative impacts of the market revolution.  From their inception, these new public spaces prohibited firearms.

---

[15] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

I.   THE HISTORICAL INQUIRY REQUIRED BY *BRUEN, MCDONALD,* AND *HELLER:*
     *RIGHTS AND REGULATION*

15.   The United States Supreme Court's decisions in *Heller*, *McDonald*,[16] and *Bruen*
have directed courts to look to text, history, and tradition when evaluating the scope of
permissible firearms regulation under the Second Amendment.  In another case involving
historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted
that judges must avoid approaching history, text, and tradition with an "ahistorical literalism."[17]
Legal texts must not be read in a decontextualized fashion detached from the web of historical
meaning that made them comprehensible to Americans living in the past. Instead, understanding
the public meaning of constitutional texts requires a solid grasp of the relevant historical
contexts.[18]

16.   Moreover, as *Bruen* makes clear, history neither imposes "a regulatory straitjacket
nor a regulatory blank check."[19]  The Court acknowledged that when novel problems created by
firearms are at issue the analysis must reflect this fact:  "other cases implicating unprecedented
societal concerns or dramatic technological changes may require a more nuanced approach."
*Bruen* differentiates between cases in which contested regulations are responses to longstanding
problems and situations in which modern regulations address novel problems with no clear
historical analogues from the Founding era or the era of the Fourteenth Amendment.

17.   In the years between *Heller* and *Bruen*, historical scholarship has expanded our
understanding of the history of arms regulation in the Anglo-American legal tradition, but much
more work needs to be done to fill out this picture.[20]  Indeed, such research is still ongoing: new

---

[16] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

[17] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.)
(criticizing "ahistorical literalism").

[18] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84
FORDHAM L. REV. 935 (2015).

[19] *Bruen*, 142 S. Ct. 2111.

[20] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second
Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

materials continue to emerge; and in the year since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[21]

18.     Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence: "Like most rights, the right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Crucially, the Court further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense."[22]

19.     The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty are both hard wired into the Amendment's text.[23] The inclusion of rights guarantees in Founding era constitutional texts was not meant to place them beyond the scope of legislative control.  "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune

---

[21] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[22] *Bruen*, 142 S. Ct. at 2132–33.

[23] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation). Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016). *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions).

from governmental regulation.  Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[24]

20.    Rather than limiting rights, regulation was the essential means of preserving rights, including self-defense.[25]  In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.  Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[26]  The individual states also imposed loyalty oaths, disarming those who refused to take such oaths.  No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties.  Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[27]

21.    "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined with the scope they were thought to have when the people adopted them."[28]  The most basic right of all in Founding era constitutionalism was the right of the people to regulate their own internal police.  Although modern lawyers and jurists are accustomed to thinking of state police power, the

---

[24] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016).

[25] *See* Jud Campbell, *Republicanism and Natural Rights at the Founding*, 32 CONST. COMMENT 85 (2017).

[26] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[27] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 *CONSTITUTIONAL COMMENTARY* 988 (1999).

[28] *Heller*, 554 U.S. at 634–35; Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution,* 20 J. POL'Y HIST. 47 (2008).

Founding generation viewed this concept as a right, not a power.[29]  The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms.[30]  Pennsylvania's Constitution framed this estimable right succinctly:  "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."  Although Justice Scalia's observation on the scope of the right to bear arms has figured prominently in recent Second Amendment jurisprudence, the equally important right of the people to regulate their internal police has not been similarly acknowledged by many lower courts. This asymmetry is not only inconsistent with Founding era conceptions of law and constitutionalism, but also not consistent with *Heller*, a point that Chief Justice Roberts and Justice Kavanaugh have each asserted in their interpretations of *Heller* and subsequent jurisprudence.  In short, an asymmetrical approach to gun rights and regulation, favoring the former over the latter is precluded by *Heller* and not consistent with *Bruen*'s focus on text, history, and tradition.  The history of gun regulation in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this key point. The right to bear arms was seldom interpreted, (outside of a few outlier cases in the South) as precluding robust regulation of arms and gun powder.

## II.    FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

22.     Guns have been regulated from the dawn of American history.[31]  At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of

---

[29] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[30] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

[31] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

quality scholarship on early American gun culture.[32]  Fortunately, a burgeoning body of
scholarship has illuminated both topics, deepening scholarly understanding of the relevant
contexts needed to implement *Bruen*'s framework.[33] Indeed, in the year following *Bruen*, new
sources have come to light and new scholarship as well.[34]

23.     The common law that Americans inherited from England always acknowledged
that the right of self-defense was not unlimited but existed within a well-delineated
jurisprudential framework.  The entire body of the common law was designed to preserve the
peace and the right of self-defense existed within this larger framework.[35]  Statutory law, both in
England and America, functioned to further secure the peace and public safety.  Given these
indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never
understood to prevent government from enacting a broad range of regulations to promote the
peace and maintain public safety.[36]

24.     Recent historical research has illuminated the nature of Founding era gun culture
and the history of regulation. There was no analogue to the types of gun violence that plague
modern America.  The nature of firearms technology and early American society militated
against guns as the preferred tool for most forms of interpersonal violence.[37]

---

[32] *Id.*

[33] Ruben & Miller, *supra* note 20, at 1.

[34] *See Atkinson v. Garland*, No. 22-1557, 2023 WL 4071542 (7th Cir. June 20, 2023) at
37 citing new scholarship by Andrew Willinger, *The Territories Under Text, History, and
Tradition*, 101 Wash. U. L. Rev. __ (forthcoming 2023) at 27.

[35] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving
Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[36] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable
firearms regulations will continue under the Second Amendment'").

[37] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth
Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY
IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

25.     Weapons in the Founding era were muzzle loaded guns that were not particularly accurate and took a long time to load.  The black powder used in these firearms was corrosive and attracted moisture like a sponge: two facts that militated against storing weapons loaded. Given the state of firearms technology in the Founding era, it is not surprising that recent scholarship has demonstrated that there was not a widespread gun violence problem in the era of the Second Amendment.[38]

26.     History is marked by change and the history of guns is no exception. Changes in firearms technology and American society in the nineteenth century led to the emergence of America's first gun violence problems.  The response of states to the emergence of new firearms that threatened the peace was a plethora of new laws.   The first notable expansion of regulation occurred during the period after the War of 1812, when cheap, reliable, and easily concealable pistols were produced for the first time in American history.  More than 90 percent of the firearms in circulation in the Founding era were long guns, so pistols were not a serious problem for the Founders.[39]

27.     In short, when addressing changes in technology, consumer behavior, and faced with novel threats to public safety, states used their ample authority under the police power to enact laws to address these problems.   Apart from a few outlier cases in the South, courts upheld such limits on the unfettered exercise of a right to keep and bear arms.[40]

---

[38] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[39] Sweeney *supra* note 37.

[40] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

28.      Weapons that posed a particular danger were regulated and, in some cases, prohibited.  Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment.[41]

29.      Anglo-American law treated unusually dangerous weapons as legitimate targets for strong regulation. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation described these types of limits in slightly different terms. The two different formulations related to weapons described as "dangerous and unusual" and more typically  as "dangerous or unusual."  Although some modern commentary on the Second Amendment have misread the Blackstonian principle as asserting that weapons must be both dangerous and unusual to justify government regulation, the term dangerous and unusual was not conjunctive, but a Latinate construction familiar to early American lawyers, hendiadys. Thus, the best translation of the term in modern parlance would be "unusually dangerous."  Indeed, this reading is the only parsing of the texts of Blackstone and Hawkins that reconciles the two author's treatment of the scope of government authority to regulate arms.[42]

30.      As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of a form of interest balancing undertaken by the people themselves in framing the federal constitution and the first ten amendments. Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary. Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point

---

[41] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[42] This phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016). Thus, the term was not conjunctive and is best rendered as "unusually dangerous."

crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits the diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed." In Founding era American English, the word "infringement" meant to "violate" or "destroy." Richard Burns, in his influential eighteenth-century legal dictionary, illustrated the concept of infringement by discussing the differences between the anarchic liberty associated with the state of nature and the well regulated liberty associated with civil society and the rule of law.  Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[43] Regulation was therefore not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the  proper exercise of that right as required by the concept of ordered liberty.[44] In short, when read with the Founding era's interpretive assumptions and  legal definitions in mind, the text of the two Amendments was seen to set up very different frameworks for thinking about the rights they protect. Members of the Founding generation would have understood that legislatures could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not negate the underlying *right*. In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.[45]  In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.

---

[45] *Supra* note 26.

### III.   THE POLICE POWER AND FIREARMS REGULATION, 1776-1868

31.     The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[46]  The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[47]  By the early nineteenth century, the term "police" was a fixture in American law.[48] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[49]  The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

32.     The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[50]  The adoption of

---

[46] PA. CONST. OF 1776, Ch. I, art iii.

[47] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[48] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[49] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

[50] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

the Constitution and the Bill of Rights did not deprive states of their police powers.  Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today.  Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gun powder.[51]

33.    Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible.  Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic] of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other  . . . ."[52]  Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress."  States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[53]  State police power authority was at its pinnacle in matters relating to guns or gun powder.[54]

34.    Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms.  These two rights were separate in the Founding era but were mutually reinforcing:  both rights were exercised in a manner that furthered the goal of ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the

---

[51] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[52] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

[53] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[54] CORNELL, *supra* note 35.

two together as one single constitutional principle.  This change reflected two profound transformations in American politics and law between 1776 and 1868.  First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty.  As a result, state constitutions no longer included free standing affirmations of a police right.  Secondly, the constitutional "mischief to be remedied" that arms bearing provisions addressed had changed as well.  Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military.  By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists.  In place of these ancient fears, a new apprehension stalked Americans:  the proliferation of unusually dangerous weapons and the societal harms they caused. The Reconstruction-era constitutional solution cast aside the eighteenth-century language that was steeped in fears of standing armies and substituted in its place new language affirming the state's police power authority to regulate arms, particularly in public. [55]

| Pennsylvania Constitution (1776) | Texas Constitution (1868) |
| --- | --- |
| "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."<br><br>"That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power."[56] | "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe.[57] |

[55] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

[56] PA. CONST. of 1776, amend. III, XIII.

[57] TEX. CONST. OF 1868, Art. I, § 13. For similarly expansive constitutional provisions enacted after the Civil War, see *infra-Table* 1.

**Private Property and the Founding Era's Default Rule about Arms**

35.     There was no right to carry firearms onto the property of others in the Founding era. Indeed, had such a right existed it would have undermined the peace, not preserved it. The castle doctrine, which included one's domicile and curtilage, meant individuals could respond with deadly force to perceived threats.[58]

36.     Anglo-American constitutionalism was founded on the Lockean trinity of life, liberty, and property. Property rights in the Founding era were not only highly esteemed, but English common law doctrine gave individuals broad authority over their lands and powerful tools to enforce their claims against those who committed trespass. It would have been unthinkable to members of the Founding generation that any person could enter another's land armed, without permission or appropriate legal authority. The limits on peace officers underscore this fact. Entry on private property by a constable, sheriff, or justice of the peace without proper legal authority was a trespass. Moreover, it is important to note that peace officers in the Founding era were not typically armed with firearms so even when serving legal process, justice of the peace, sheriffs, and constables did not typically enter private property armed. The most notable exceptions to this principle were the situation where one was in pursuit of a felon or a dangerous animal.[59]

37.     The default rule enacted by Maryland simply restores property to its rightful place alongside life and liberty in the Founding era's Lockean vision of liberty. Blackstone's discussion of the centrality of property to English common law is apposite and offers a foundation for

---

[58] On the history of stand your ground, see Richard Maxwell Brown, NO DUTY TO RETREAT: VIOLENCE AND VALUES IN AMERICAN HISTORY AND SOCIETY (1994).

[59] Stuart Bruchey, "The Impact of Concern for the Security of Property Rights on the L System of the Early American Republic," 1980 *Wisconsin Law Review* 1135, 1136; [23] James W. Ely, Jr., *The Guardian of Every Other Right: A Constitutional History of Property Rights,* 3rd ed (2008) 30-32; William J. Novak*, Common Regulation: Legal Origins of State Power in America,* 45 HASTINGS L.J. 1061, 1081–83 (1994)

understanding why a restoration of the default rule prohibiting entering another's lands while armed is consistent with Founding era constitutionalism:

> The third absolute right, inherent in every Englishman, is that of property: which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land. . . . The laws of England are therefore, in point of honor and justice, extremely watchful in ascertaining and protecting this right.[60]

The practical implication of this robust view of property rights was considerable. In a celebrated English case where the Lord Chief Justice of the King's Bench summarized the implications of this view for English law: "our law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all; if he will tread upon his neighbor's ground, he must justify it by law."[61]

38.     The default rule prohibiting firearms on private property adopted by Maryland simply restores the legal rule in place at the Founding, a rule rooted in English common law. The prohibition on entering another's land without permission was part of the background assumptions against which the right to keep and bear arms would have been understood by those who wrote it and enacted the Second Amendment into law.

39.     Blackstone's extensive discussion of the law of trespass elaborated this understanding and was well known to members of the Founding generation, including those who wrote and enacted the Second Amendment and similar state analogues.  Judge Zephaniah Swift, author of one of the first legal treatises written after the adoption of the Second Amendment, summarized this Blackstonian consensus when he wrote: "every unwarrantable entry upon the lands and tenements of another, without his consent, is deemed a breaking of his close, and is an injury."[62]

---

[60] William Blackstone, COMMENTARIES 1:134—35.

[61] *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765).

[62] Zephaniah, Swift, 2 A SYSTEM OF THE LAWS OF THE STATE OF

(continued…)

40.     Pennsylvania and New Jersey each enacted laws drawing on this tradition to pass broad restrictions on traveling armed on to private lands without permission:

> Be it enacted, That if any person or persons shall presume, at any time after the publication of this act, to carry any gun, or hunt on any enclosed or improved lands of any of the inhabitants of this province, other than his own, unless he shall have license or permission from the owner of such lands, or shall presume to fire a gun on or near any of the king's highways, and shall be thereof convicted, either upon view of any Justice of the Peace within this province, or by the oath or affirmation of any one or more witnesses, before any Justice of the Peace, he shall, for every such offence, forfeit the sum of forty shillings.[63]

41.     The restoration of the common law default rule by Maryland therefore fits squarely within the long tradition of the regulation of arms under Anglo-American law.

**The Historical Meaning of Sensitive Places and Limits on Arms**

42.      The sensitive places doctrine described in *Heller* derives from well-established principles in Anglo-American law, including the Statute of Northampton (and its many analogs) and the common law itself.  The sensitive places doctrine did not, as some gun rights advocates have erroneously suggested, depend on the fact that government could provide comprehensive security, such as modern court houses which have metal detectors and armed guards.[64]  Founding era court houses did not enjoy anything remotely analogous to these types of security measures. The English tradition of bans on arms in fairs and markets singled out these locations because they were sites of commerce, entertainment, and politics. Indeed, it was the very fact that individuals congregated in large numbers and moved about freely, engaging in productive

---

CONNECTICUT (1795) at 74.

[63] 1 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred, to the Twentieth Day of March, One Thousand Eight Hundred and Ten 229(1810); Charles Nettleton, Laws of the State of New-Jersey (1821) at 26.

[64] David B. Kopel & Joseph G.S. Greenlee, The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms, 13 CHARLESTON L. REV. 203, 290 (2018).

economic, cultural, and political activities that was the reason arms were prohibited from these locations.[65]

43.     A good illustration of how early American governments understood sensitive places is provided by an early Louisiana law, prohibiting "any person to enter into a public ball-room with any cane, stick, sword or any other weapon" and requiring weapons be checked before entering a ball room. A similar statute was enacted by New Mexico.  The law prohibited "any person to enter said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with firearms or other deadly weapons, whether they be shown or concealed upon their persons."[66]  In both cases the laws prohibited arms in places where people gathered in large numbers and engaged in forms of recreation.

44.     Public universities in the early republic offer another good example of the potential scope of permissible firearms regulations consistent with the notion of sensitive places. Bans on guns on college campuses were an example of the ancient principle that strict regulation of arms in places where large numbers of people congregated.  The University of Georgia, one of the nation's oldest public institutions of higher education, passed a sweeping prohibition of guns on its campus: "[N]o student shall be allowed to keep any gun, pistol, Dagger, Dirk[,] sword cane[,] or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[67]  The University of North Carolina, likewise, enacted a total prohibition on possessing firearms.  The

---

[65] Jerome Bayon, General Digest of the Ordinances and Resolutions of the Corporation of New Orleans 371 (1831) (art. 1).

[66] 1852 N.M. Laws 67, § 3.  Although *Bruen* suggested that evidence from the territories was not probative, subsequent research published after the decision has established that territories were in fact the only locations in nineteenth century America in which the Second Amendment applied prior to the Fourteenth Amendment, a fact that has gained judicial notice in the litigation spawned by Bruen, *see Atkinson v. Garland*, No. 22-1557, 2023 WL 4071542 (7th Cir. June 20, 2023) ("Taking the Court at its word, new historical research should be welcome.")

[67] The Minutes of the Senate Academicus, 1799–1842, Univ. of Ga. Librs. (2008), https://tinyurl.com/3nxp4uwv.

law provided, "No Student shall keep a dog, or firearms, or gunpowder.  He shall not carry, keep, or own at the College, a sword, dirk, sword-cane, or any deadly weapon."[68]   The regulations enacted by the University of Virginia are particularly telling in this regard. In 1819, Jefferson helped establish the state-supported University of Virginia.  University of Virginia, About the University, https://www.virginia.edu/aboutuva (last accessed Nov. 4, 2022).  While both Jefferson and Madison were serving on the six-person University of Virginia Board of Visitors—the decision-making body for the university—the Board took an exceedingly strict view of guns on the Virginia campus, resolving: "No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind, or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon."[69]

**Reconstruction:  Constitutional Continuity and Social Change**

45.     During the Reconstruction era, many states enacted a variety of laws building on the history of sensitive place restrictions.   Thus, Reconstruction era laws did not represent a new constitutional principle different than the common law restrictions that existed for centuries, but an application of the same legal principals to new circumstances brought about by changes in firearms technology, consumer behavior, and the demographic changes associated with greater urbanization. The principle justifying such a decision, excluding arms from sensitive places such as fair and markets, was ancient and informed Founding era laws as well as those enacted in the era of the Fourteenth Amendment.

---

[68] Acts of the General Assembly and Ordinances of the Trustees for the Organization and Government of the University of North-Carolina 15 (Raleigh, Off. Of the Raleigh Reg. 1838), https://tinyurl.com/2p8cte3h.In 1859, the University of North Carolina expanded the reach of its prohibition on carrying deadly weapons, applying it not just to the college, but also "within the village of Chapel Hill."  Acts of the General Assembly and Ordinances of the Trustees for the Organization and Government of the University of North Carolina 31 (James M. Henderson 1859), ttps://docsouth.unc.edu/true/unc/unc.html.

[69] Meeting Minutes of the University Board of Visitors, Oct. 4, 1824, https://tinyurl.com/543s44xk; *see also* Laws & Regulations of the College of William & Mary 19 (1830), https://tinyurl.com/2p93s7hd

46.      One of the most comprehensive statutes enacted during the era of the Fourteenth Amendment was adopted in Texas. The law prohibited firearms in a variety of public venues, building on a tradition that had existed for centuries.

> Section 1:     If any person shall go into any church or religious assembly, any school-room or other place where persons assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentle- men, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk, or butcher-knife, or firearms, whether known as a six-shooter, gun, or pistol of any kind, such persons so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same: *Provided*, That nothing contained in this section shall ap- ply to locations subject to Indian depredations: *And provided further*, That this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.[70]

47.      Texas not only adopted a broad range of modern style gun regulations, including this law, but further noted that the state's highest court recognized that such an exercise of the police power was entirely constitutional.  The Texas regime was not an outlier, but was consistent with the dominant conception of the right to bear arms in both the Founding era and the period of Fourteenth Amendment.  What distinguished Texas from other states was not its robust use of the police power, but the level of gun violence that precipitated the need for such regulations.[71]The first state constitutions enacted after the American Revolution typically

---

[70]  George Washington Paschal, 2 Reporter A Digest of the Laws of Texas: Containing Laws in Force, and the Repealed Laws on Which Rights Rest. Carefully Annotated. 3rd ed. at 1322 (1873).

[71] Justice Thomas dismissed the probative value of any evidence from Reconstruction era Texas as an outlier.  But subsequent historical research has demonstrated that Texas was well within the constitutional mainstream of post-Civil War America, Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study* 55 DAVIS, L. REV. (2022) 2603. The important evidence presented in this article only appeared after *Bruen* was argued. Rivas has demonstrated that Republicans enacted tough gun laws that were enforced in a racially neutral fashion until the Jim Crow era reversed the gains achieved during

(continued…)

separated the right of the people to regulate their internal police from specific statements about the right to bear arms.[72] The Founding era formulation of the right to bear arms was distinct from the right of the people to regulate their internal police. The new state constitutions adopted during Reconstruction omit references to the dangers of standing armies and the need for civilian control of the military. In place of these textual references state constitutions fused the right to regulate arms and the right to bear them into a single constitutional principle.[73]

48.     The new textual formulation of the right to keep and bear arms did not alter the constitutional principles framing firearms regulation,  these remained unchanged. What had changed were a new set of circumstances had created an unprecedented set of public safety concerns for states.  The new danger Americans faced during and after Reconstruction was the proliferation of firearms and more aggressive cultural norms about carrying them in public, particularly in urban areas.[74]

49.     The debates in the Texas constitutional convention during Reconstruction illustrate the centrality of this concern which had no parallel in the Founding era. The palpable fear of gun violence among the delegates was so great the convention passed a resolution prohibiting weapons in the convention hall. "The convention do order that no person shall hereafter be allowed in this hall, who carries belted on his person, revolvers or other offensive weapons."[75] Another delegate reminded the convention's members that the constitutional right to bear arms ought not be confused with the pernicious practice of habitually arming. The right, he cautioned ought not "be construed as giving any countenance to the evil practice of carrying

---

Reconstruction. For additional support for Rivas' conclusions, see Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting*, 1328–1928; *id.* at 2545.

[72] Cornell, *supra* note 55.

[73] *See, e.g.*, UTAH CONST. of 1896, art. I, § 6.

[74]  RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

[75] 1 CONSTITUTIONAL CONVENTION, JOURNAL OF THE RECONSTRUCTION CONVENTION, WHICH MET AT AUSTIN, TEXAS, JUNE 1,1868 (Tracy, Siemering & Co.1870) at 248.

private or concealed weapons about the person.[76] Although the level gun violence in Texas was especially grave, other states, and the western territories were all dealing with problems posed by the proliferation of handguns.  As a result of this broad societal trend firearms regulation increased dramatically during the era of the Fourteenth Amendment across the nation.[77]

**Table One**
**Post-Civil War State Constitutional**
**Arms Bearing Provisions about Regulation**

| Date | State | Provision |
|------|-------|-----------|
| 1868 | Georgia | GA. CONST. of 1868, art. I, § 14: [T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be borne. |
| 1868 | W. Texas | W. TEX. CONST. of 1868, Art. I, § 13: Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe. |
| 1869 | Texas | TEX. CONST. of 1869, art. I § 13: Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe. |
| 1870 | Tennessee | TENN. CONST. of 1870, art. I, § 26: That the citizens of this State have a right to keep and to bear arms for their common defense. But the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime. |
| 1875 | Missouri | MO. CONST. of 1875, art. II, § 17: That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons. |
| 1875 | North Carolina | N.C. CONST. of 1875, art. I, § 24. A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; and as standing armies in time of peace, are dangerous to liberty, they ought not to be kept up, and the military should be kept under strict subordination to, and governed by, the civil power.  Nothing herein contained shall justify the practice of carrying concealed weapon, or prevent the legislature from enacting penal statutes against said practice. |
| 1876 | Colorado | COLO. CONST. of 1876, art. II, § 13: That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons. |
| 1876 | Texas | TEX. CONST. of 1876, art. I, § 23: Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime. |
| 1877 | Georgia | GA. CONST. of 1877, art. I, § 22: The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne. |

---

[76] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95 (2016).

[77] Spitzer, *supra* note 31.

| 1879 | Louisiana | LA. CONST. of 1879, art. III: A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed. |
| 1885 | Florida | FLA. CONST. of 1885, art. I, § 20: The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne. |
| 1889 | Idaho | IDAHO CONST. of 1889, art. I, § 11: The people have the right to bear arms for their security and defense: but the legislature shall regulate the exercise of this right by law. |
| 1889 | Montana | MONT. CONST. of 1889, art. III, § 13: The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons. |
| 1890 | Mississippi | MISS. CONST. of 1890, art. III, § 12: The right of every citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons. |
| 1891 | Kentucky | KY. CONST. of 1891, § 1(7): The right to bear arms in defense of themselves and the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons. |
| 1896 | Utah | UTAH CONST. of 1896, art. I, § 6: The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law. |

50.     The new focus on regulation embodied in these revised state arms bearing provisions was not a departure from traditional views of the robust scope of police power authority to regulate arms in the interests of public safety.  This power was ancient and widely acknowledged as fundamental to Anglo-American law.  Nor did the adoption of the Fourteenth Amendment change this fact.  The recasting of these state constitutional texts represented an important shift in emphasis and a change in constitutional style, not substance.[78]

51.     One of the motivating forces behind the push for the Fourteenth Amendment was the enactment of repressive black codes across the South, which often included restrictions on the right to keep and bear arms.  Para-military violence against free people of color and Republicans in the South was among the most pressing threats to Reconstruction.[79] In response

[78] John Bingham, Speech, *in* CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell & Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?* 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[79] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019.

to the South Carolina Black Codes, Union General Daniel Sickles issued General Order No 1.[80] Sickles not only affirmed a right to bear arms, but also reasserted the right to regulate arms, including bans on concealed carry.  Crucially, Sickles restated the prevailing consensus that the right to bear arms did not sanction a right to travel armed onto private property. In *Bruen,* Justice Thomas singled out Sickles General Order No 1. as the quintessential embodiment of the meaning of the right to keep and bear arms, noting that Sickles views were consistent with both the ideals of 1791 and 1868.[81] General Order No. 1 offers one of the clearest pieces of evidence that the Maryland default rule about private property reflected a constitutional consensus deeply rooted in text, history, and tradition.  Sickles language was unambiguous on this point:  "[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons, nor to authorize any person to enter with arms on the premises of another against his consent."[82]

52.     The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters in Ohio that after the adoption of this Amendment, states would continue to bear the primary responsibility for "local administration and personal security."[83] As long as state and local laws were racially neutral and favored no person over any other, the people themselves,

---

[80] *See* Darrell A. H. Miller, Peruta, *The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. FORUM 238 (2014) at 241.

[81]   142 S. Ct. at 2152.

[82] Edward McPherson (ed.), A HANDBOOK OF POLITICS FOR 1868 (1868), 36-38.

[83] John Bingham, Speech, *in* CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell & Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?* 50 SANTA CLARA L. REV. 1043, 1058 (2010).

acting through their representatives, were free to enact whatever reasonable measures were necessary to promote public safety and promote the common good.[84]

53.     The formulation of the right to bear arms adopted in post-Civil War state constitutions drew on antebellum jurisprudence and constitutional theory's robust view of state police power, including the right to regulate firearms. These post-war constitutional texts explicitly recognized broad legislative authority to regulate the right to bear arms. It would be difficult to understate the significance of this change: across the nation, state legislatures took advantage of the revised formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms, especially in public. Indeed, the number of laws enacted skyrocketed, as did the number of states passing such laws.[85] States fulfilled their role as laboratories of democracy by implementing a range of regulations aimed at curbing the problem of gun violence: limiting the sale of firearms, taxing particular types of weapons perceived to pose threats to public safety, imposing limits on the access of minors to weapons, and restricting the public places one might carry arms.[86] Texas banned "[a]ny person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing."[87] The law aimed to preserve the peace and prevent the intimidation of free persons, the exact opposite

---

[84] For a discussion of how the courts wrestled with the meaning of the Fourteenth Amendment, see WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE 148-51 (1998).

[85] Spitzer, *supra* note 31.

[86] *Id.*

[87] *An Act to Regulate the Keeping and Bearing of Deadly Weapons, Apr. 12, 1871*, *reprinted in* 2 GEORGE W. PASCHAL, A DIGEST OF THE LAWS OF TEXAS: CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST FROM 1864 TO 1872, at 1322 (1873).

of the claims of gun rights advocates who have insisted that gun control during Reconstruction was tainted by an insidious racist agenda.[88]

**Parks**

54.     There were no modern-style parks in the era of the Second Amendment.  The oldest urban public space in America, the Boston Common, was used primarily as a pasture, a place of execution, and site for the militia to muster and drill.[89]  Yet, even when used for militia purposes these public spaces were tightly regulated. Colonial Massachusetts prohibited coming to muster with a loaded firearm.[90] The Boston Commons and other similar urban spaces during the Founding era shared little with modern parks. There was little need in the sparsely settled colonies to set aside areas for preservation or recreation given that the population of the colonies was expanding rapidly and remained hemmed in by various Indian nations reluctant to cede any further territory to Europeans. Moreover, by the time of the adoption of the Second Amendment the nation was still 90% rural and majority of the population was engaged in agricultural pursuit.[91]

---

[88] Gun rights advocates have simply ignored the most recent scholarship on gun control and race relations during Reconstruction, including the new literature on gun regulation and enforcement. For more, see the discussion in Frassetto, *supra* note 76, at 102-04, and Rivas, *supra* note 71, at 287.

[89] Steven R.  Pendery, *Probing the Boston Common*  43 ARCHAEOLOGY (1990) at  42–47; Suzanne Scheld et. al,  RETHINKING URBAN PARKS: PUBLIC SPACE AND CULTURAL DIVERSITY (2009) at 19-20; Michael Rawson, EDEN ON THE CHARLES: THE MAKING OF BOSTON ( 2014) at 73.

[90] RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND (1853) at 98 and 1866 Mass. Acts 197, An Act Concerning The Militia, § 120. The prohibition on bringing a loaded gun to muster stretches from 1632 to 1866.

[91] Forrest McDonald, E PLURIBUS UNUM: THE FORMATION OF THE AMERICAN REPUBLIC, 1776-1790, (1965) at 72; Peter C. Mancall, *Economic History of the United States: Precolonial and Colonial Periods* OXFORD RESEARCH ENCYCLOPEDIA OF ECONOMICS AND FINANCE. 26 Apr. 2021; Accessed 24 Mar. 2023. https://oxfordre.com/economics/view/10.1093/acrefore/9780190625979.001.0001/acrefore-9780190625979-e-480.

55.      The creation of parks as we now know them began in the middle of the nineteenth century and was influenced by the slow impact of romanticism and the Transcendentalist ideas of visionaries such as Henry David Thoreau.  The new idea of parks as places of relaxation, repose, and recreation gradually inspired a new attitude toward nature and public spaces.  This new vision inspired urban planners, landscape architects, and government officials to embark upon an ambitious series of new parks. By the middle of the century these new public spaces, best exemplified by New York's Central Park, had become places of refuge from the congestion, grime, and stresses of city life. The creation of large urban public parks in the 1850s posed new challenges for those eager to preserve the peace and public safety: among the pressing issues were the regulation of firearms.[92]  The expansion of urban parks, the creation of new state parks, and eventually the involvement of the federal government in land preservation intensified in the post-Civil period.

56.      Millions of Americans, including the entire population of the nation's five largest cities, lived under a firearms regulatory regime  that prohibited firearms in parks.  During the era of the Fourteenth Amendment there was little disagreement that state and local governments had the authority under the police power to regulate and prohibit guns in parks.

**Table Two:  Post Civil War Limits on Public Carry in the Nation's Five Largest Cities**

| Rank | City | Population (1900)[93] | Date of Law | Gun Prohibition in Parks |
|---|---|---|---|---|
| 1 | N.Y. | 3,437,202 | 1861 | X |
| 2 | Chicago | 1,698,575 | 1881 | X |
| 3 | Phila. | 1,293,697 | 1869 | X |
| 4 | St. Louis | 575,238 | 1883 | X |
| 5 | Boston | 560,892 | 1886 | X |

---

[92] Galen Cranz, *The Politics of Park Design: A History of Urban Parks in America* (1989) at 19.

[93] 1 U.S. CENSUS OFF., CENSUS REPORTS 1xix tbl. XXII (1901).

Nor were such bans limited to the nation's largest municipalities.[94]  For example, during this period, San Francisco enacted an ordinance prohibiting guns in its parks as did the cities of Boulder and St. Paul.[95] Statutes prohibiting possession of arms in these important public spaces were enacted in major urban areas of every region of the nation. As Table Two vividly illustrates, limits on arms in public parks was the norm in America in the era of the Fourteenth Amendment.

57.      There was a close connection between the urban park movement and the rise of state parks. The primary architect behind New York's Central Park, Frederick Olmstead, also took a leading role in the creation of California's Yosemite State Park in the 1860s.  Although Congress ceded the land to the state, the expense and difficulty of managing it led to the state returning control of the park to the federal government several decades later.[96] The federal government's decision to create Yellowstone in 1872 added yet another type of park to the America's roster of public spaces.

58.      The federal government also passed laws limiting firearms in its parks. Such regulations are especially important because federal lands were indisputably governed by the Second Amendment, irrespective of the incorporation doctrine.[97]   The Secretary of the Interior

---

[94] A Digest of the Laws and Ordinances of the City of Philadelphia from the Year 1701 to the 21 Day of June, 1887. (1887) at 513; The Revised Municipal Code of Ohio (1899) at 196; Report of the Board of Park Commissioners of the City of Rochester, N.Y.: 1888 to 1898. (1898) at 98; The Municipal Code of the City of Spokane, Washington: Comprising the Ordinances of the City ... Revised to October 22, 1896  (1896) at 316;; Annual Report of the Park Commissioners of the City of Lynn for the Year Ending (1893) at 45; Charter and Ordinances of the City of New Haven: Together with Legislative Acts Affecting Said City (1898) at 293; A Digest of the Acts of Assembly Relating to and the General Ordinances of the City Pittsburgh (1897) at 496; The Revised Ordinances of the City of Danville (1883);   Law and Ordinances governing the Village of Hyde Park (1875). The Municipal Code of Chicago (1881) at 391.

[95] San Francisco Municipal Reports  (1874) at 499; Ordinances of the City of Boulder, 157, (1899); Proceedings of the Common Council of the City of Saint Paul (1892)  at 133.

[96] Ney C. Landrum, THE STATE PARK MOVEMENT IN AMERICA: A CRITICAL REVIEW ( 2013). On the creation of Yellowstone, see https://www.loc.gov/collections/national-parks-maps/articles-and-essays/yellowstone-the-first-national-park/

[97] Report of the Department of the Interior ... [with Accompanying Documents](1899) at 499 and Report of the Secretary of the Interior for the Fiscal Year (1900) at 125.

underscored the danger posed by firearms in parks when he wrote this about Yellowstone, an "Absolute prohibition of firearms in the park is recommended."[98] The federal government prohibited guns in the park.[99]

59.     The emergence of modern style parks in the middle of the nineteenth century was response to profound changes in American society, particularly urbanization. These places of repose and recreation were designed to offer Americans places to escape the increasingly chaotic world they encountered in the expanding cities of the nineteenth century.  From the outset the regulations governing these spaces prohibited firearms.  State parks were motivated by similar impulses.  Indeed, Frederick Olmstead, one of the leading landscape architects of the period also took a prominent role in helping to create these important public spaces. When the federal government organized its first national parks, it also tightly regulated the carriage of arms in public lands. Given that arms have been tightly regulated, and in many instances prohibited in parks since their creation, Maryland's regulations limiting guns in parks are well withing the long history of firearms regulation in America.

---

[98] The Abridgment: Containing Messages of the President of the United States to the Two Houses of Congress with Reports of Departments and Selections from Accompanying Papers (1893) at 618.

[99] Annual Report of the Superintendent of the Yellowstone National Park to the Secretary of the Interior .... United States: U.S. Government Printing Office, (1898) at 19.

## IV.   CONCLUSION

60.     The power to regulate and in some cases prohibit guns and gun powder has always been central to the police power authority of states and localities.  At different moments in American history communities have regulated weapons in a multitude of different ways. Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American law:  "the lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[100]  States and localities have regulated gunpowder and arms since the earliest days of the American republic.  The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present.  This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day.  The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

---

[100] Willinger *supra* note 34; Spitzer, *supra* note 31.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 26, 2023 at Redding, CT.

*Saul Cornell*

_____

Saul Cornell

# EXHIBIT 1

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✻ Bronx, NY 10458 ✻ 203 826-6608 (c) ✻ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| Prizes and Awards |
|---|

- 2006 Langum Prize in Legal History 2006
  2006 Pulitzer Nomination, History
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book
- 2000 Pulitzer Nomination History

| Book Publications |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge
  University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell]
  (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University
  Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)
  (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of
  Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition
  2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-
  2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme
  Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly*
  (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928,"
  55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the
  Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 Fordham Law Review (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and *C*ontemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The  1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum 125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae* 84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review (2008): 101-115

"Mobs, Militias, and Magistrates: Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review (2007): 883-903

"The Second Amendment and Early American Gun Regulation: a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," Stanford Law and Policy Review (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," Fordham Law Review 73 (2004): 487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies: A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. <u>Beyond the Great Story"</u> <u>American</u> <u>Quarterly</u> (1998): 349-357

"The Anti-Federalists," in  <u>The Blackwell Companion to American Thought</u>, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in <u>The Blackwell Companion to American Thought</u>, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," <u>American Studies</u> (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  <u>Reviews in American History</u> 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," <u>Law and History Review</u> (1994): 1-28

"Early American History in a Post-Modern Age," <u>William and Mary Quarterly</u> 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," <u>Reviews in American History</u> 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in <u>New York in the Age</u> <u>of the Constitution</u> (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," <u>Journal of American History</u> (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130

## **Book Reviews:**

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>American Studies</u> <u>Journal of the Early Republic</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>American Quarterly</u>
- <u>American Journal of Legal History</u>
- <u>Law and History Review</u>

## **Journal Manuscript Referee:**

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>Diplomatic History</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>Law and History Review</u>
- <u>Harvard Law Review</u>
- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

### **Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

### **Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria: Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke: The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition," Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy" The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America: Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders," NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"   To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

### **Federal Courts:**

United States of America,  v. Graylan Steve Johnson,United States District Court, S.D. Florida. February 20, 2023 Slip Copy 2023 WL 2308792

United States v. Posey, United States District Court, N.D. Indiana, Hammond Division. February 09, 2023 Slip Copy 2023 WL 1869095

United States v. Combs, United States District Court, E.D. Kentucky, Central Division., (at Lexington). February 02, 2023 Slip Copy 2023 WL 1466614

United States v. Barber, United States District Court, E.D. Texas, Sherman Division. January 27, 2023 Slip Copy 2023 WL 1073667

Range v. Att'y Gen. United States, No. 21-2835, 2022 WL 16955670 (3d Cir. Nov. 16, 2022).

Antonyuk v. Hochul, No. 122CV0986GTSCFH, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).

United States v. Bullock, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022).

United States of Am. v. Riley, No. 1:22-CR-163 (RDA), 2022 WL 7610264 (E.D. Va. Oct. 13, 2022).

United States v. Coombes, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022)
.
United States v. Medrano, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122650

United States v. Coleman, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122401

United States v. Goins, United States District Court, E.D. Kentucky, Central Division., Lexington. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17836677

Reese v. Bureau of Alcohol Tobacco Firearms & Explosives, United States District Court, W.D. Louisiana, Lafayette Division. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17859138

South Bay Rod & Gun Club, Inc. v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811113

Miller v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811114

Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose, No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022).

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

  Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

  Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii*  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]

Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]

Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera*  v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]


### **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington,* 21-cv-1348 (D. Minn.).


### **Law Review Symposia Organized**

**Second Amendment:**

"The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev.* 487 (2004).

"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev.* 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

**New Originalism:**

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915 (2015).