# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KATHERINE NOVOTNY, et al.

    *Plaintiffs*,

v.

WESTLEY MOORE, in his official capacity as
Governor of Maryland, et al.

    *Defendants*.

Case No. 1:23-CV-01295

**PLAINTIFFS' CONSOLIDATED
REPLY MEMORANDUM IN SUPPORT
OF MOTION FOR PRELIMINARY
INJUNCTION AND MEMORANDUM
IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ................................................................................................ 1

ARGUMENT ........................................................................................................ 4

I.      The Challenged "Sensitive-Place" Restrictions Burden Conduct Covered by the Second Amendment's Plain Text, and *Bruen* Did Not Approve that Burden .............. 5

II.     The State Does Not Have General Authority To Prohibit Firearm-Carry in Any Place It Deems "Sensitive" ................................................................................................ 7

        a.  Modern "sensitive places" must be specifically analogized to the locations specified in *Bruen* ............................................................................................ 9

        b.  There is no tradition of using "sensitive-place" restrictions for general public-safety purposes ........................................................................................ 14

        c.  The State's sensitive-place "principles" are unfounded ......................................... 19

III.    The State Does Not Act as a Proprietor or Market Participant When Regulating Second Amendment Conduct, and Regardless, the State Must Identify Historical Support Whenever It Burdens Second Amendment Conduct ...................................... 22

IV.     The State Lacks Valid Historical Support for Any of Its Challenged "Sensitive-Place" Regulations ............................................................................................................ 25

        a.  Healthcare facilities ............................................................................................ 27

        b.  Museums .............................................................................................................. 28

        c.  Locations licensed to sell or dispense alcohol for on-site consumption .............................................................................................................. 29

        d.  Mass transit ........................................................................................................ 30

        e.  State parks and forests ........................................................................................ 32

i

V.      The Anti-Carry Default Likewise Violates the Second Amendment ..........................34

        a.   Plaintiffs have standing to challenge the Anti-Carry Default ...............................35

        b.   The Anti-Carry Default burdens conduct covered by the Second Amendment's
             Plain Text ..............................................................................................................37

        c.   The State lacks valid historical support for the Anti-Carry Default .....................40

VI.     The Equities Favor Injunctive Relief .........................................................................43

CONCLUSION ..................................................................................................................44

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Antonyuk v. Hochul*, No. 122-cv-0986,
    2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ............................................40, 41

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) ......................................23

*Bridgeville Rifle & Pistol Club v. Small, Ltd.*, 176 A.3d 632 (Del. 2017) ...................33

*Brown v. Enter. Merchs. Ass'n*, 564 U.S. 786 (2011) ............................................36, 38

*Bldg. & Constr. Trades Council v. Associated Builders & Contractors*,
    507 U.S. 218 (1993) ..............................................................................................23, 24

*Camfield v. United States*, 167 U.S. 518 (1897) .........................................................23

*Christian v. Nigrelli*, No. 22-cv-695,
    2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ...................................................36

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) .........................36

*Dewhurst v. Century Aluminum Co.*, 649 F.3d 287 (4th Cir. 2011) ............................43

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..............................1, 5, 6, 7, 12, 17

*Engquist v. Or. Dep't of Agr.*, 553 U.S. 591 (2008) ....................................................23

*Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246 (2020) ..........................................17

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) .........................38

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) ..............................44

*Greer v. Spock*, 424 U.S. 828 (1976) .........................................................................24

*Hirschfeld v. ATF.*, 14 F.4th 322 (4th Cir. 2021) ........................................................11

*Hirschfeld v. ATF.*, 5 F.4th 407 (4th Cir.2021) ...........................................................11

*Johnson v. Lyon*, 406 F. Supp. 651 (W.D. Mich. 2018) ..............................................29

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) ...................................................7

*Koons v. Platkin*, No. 22-cv-7463,
    2023 WL 3478604 (D.N.J. May 16, 2023) .......................................................14, 34

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) ........................................43

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ..........................................................37

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
    No. 21-cv-1736, 2023 WL 4373260 (D. Md. July 6, 2023). .................................26, 27

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...............................................12, 41

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018) .................................................24

*Morse v. Frederick*, 551 U.S. 393 (2007) ...................................................................21

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)....1, 2, 3, 5, 6, 7, 9, 10, 11, 12, 13, 16, 17, 18, 19, 22, 26, 27, 29, 31, 32, 33, 34, 38, 39, 41, 42

*Nken v. Holder,* 556 U.S. 418 (2009) ................................................................34, 35

*North v. Bd. of Trs. of Univ. of Ill.*, 137 Ill. 296 (1891).........................................21

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009).............................................24

*Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389 (7th Cir. 2022) ..........................43

*Reeves, Inc. v. Stake*, 447 U.S. 429 (1980) .............................................................23

*Rosenbloom v. Pyott,* 765 F.3d 1137 (9th Cir. 2014) ..........................................11, 12

*Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet,*
260 F.3d 114 (2d Cir. 2001).........................................................................11

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976).........................................36

*State v. Huntly*, 25 N.C. 418 (1843).........................................................................16

*State v. Mizner,* 45 Iowa 248 (1876)........................................................................21

*State v. Pendergrass*, 19 N.C. 365 (1837) ................................................................21

*U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275 (4th Cir. 2006) .....................4

*United States v. Spears*, 449 F.2d 946 (D.C. Cir. 1971)............................................15

*Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673 (D. Minn. Mar. 31, 2023) ...........13, 40

## Statutes & Regulations

18 U.S.C.
    § 922(q)(2)(B)(i) ........................................................................................29
    § 922(q)(2)(B)(ii) .......................................................................................29

54 U.S.C.
    § 104906(a)(6) ..........................................................................................34
    § 104906(b)...............................................................................................34

Act of March 2, 1799, ch. 43, § 15, 1 Stat. 736 ........................................................15

COMAR
    § 08.01.07.14 (Chesapeake Forest Lands) ....................................................4
    § 08.07.01.04 (State forests) .......................................................................4
    § 08.07.06.04 (State parks) ..........................................................................4

FED. R. CIV. P.
    12(d) ......................................................................................................7, 8
    65(a)(2) .....................................................................................................4

MD. CODE, CRIM. LAW
    § 4-111 .....................................................................................................4
    § 6-411(d) ..................................................................................................5

MD. CODE, TRANSPORTATION § 7-705(b)(6) ..............................................................4

## Other Authorities

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014).................................................................14

Br. of Thirty-Four Professional Historians & Legal Historians as *Amici Curiae* (Jan. 6, 2010), *McDonald*, 561 U.S. 742 (No. 08-1521)..................................................................................8

Br. for *Amici Curiae* Profs. of History & Law (Sept. 21, 2021), *Bruen*, 142 S. Ct. 2111 (No. 20-843)...................................................................................8

Br. of *Amici Curiae* Jack N. Rakove et al. (Jan. 11, 2008), *Heller*, 554 U.S. 570 (No. 07-290) ...........................................................................................8

Brennan Rivas, *In the past, Americans confronted gun violence by taking action*, WASH. POST. (June 3, 2022) ...............................................................................................9

Census Bulletin No. 65, U.S. Census Bureau (June 8, 1901), https://bit.ly/3GkuFnm ...............33

David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 203, 247–48 (2018) .........................................................20, 21

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L., MEDICINE & ETHICS 183, 190 (2020).......................................39

Mark W. Smith, *'Not all History is Created Equal': In the Post-*Bruen *World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN (Oct. 1, 2022), https://bit.ly/3CMSKjw ........................................................13

Order, *Koons v. Att'y Gen. of New Jersey*, No. 23-1900, Doc. 29 (3d Cir. June 20, 2023) .........35

Patrick Charles, *The Invention of the Right to 'Peaceable Carry' in Modern Second Amendment Scholarship*, U. ILL. L. REV. ONLINE 195 (2021)....................................................................9

Patrick J. Charles, *The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It*, 71 CLEV. ST. L. REV. 623 (2023) ...........................................8

Saul Cornell, *Cherry-Picked History and Ideology-Driven Outcomes:* Bruen*'s Originalist Distortions*, SCOTUSblog (June 27, 2022), https://bit.ly/3CemrdV.................................8

Saul Cornell, *Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist*, Slate (June 24, 2022), https://bit.ly/3IcxXKn ..............................................................................8

Stephen P. Halbrook, Faux Histoire *of the Right to Bear Arms:* Young v. Hawaii *(9th Cir. 2021)* at 21 (2021), https://bit.ly/44k7hj3 ..................................................................................16

**INTRODUCTION**

Maryland does not dispute that the challenged provisions of Senate Bill 1 were passed in response to the Supreme Court's recognition in *Bruen* that the Second Amendment right to keep and bear arms extends to public places. In fact, Maryland effectively concedes that those provisions were passed in order to *undermine* that holding. *See* Defs.' Consolidated Mem. of Law in Supp. of Mot. To Dismiss & Opp. to Pls.' Mot. for Prelim. Inj., Doc. 36-1, at 52–53 (June 28, 2023) ("Defs.' Mem."). It is therefore to be expected that these new provisions are not part of "an enduring American tradition of state regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133, 2155 (2022). And the State's attempts to show that these extensive new restrictions are consistent with such a tradition show only that they are not.

The following propositions follow incontrovertibly from *Bruen* and from the historical record, and they are fatal to the State's arguments.

*First*, a location does not become a "sensitive place" where law-abiding citizens may be prevented from carrying firearms by the State's *ipse dixit*. In *Bruen*, the Supreme Court listed three specific "sensitive places"—"legislative assemblies, polling places, and courthouses"—where firearm-carry was historically prohibited, and it instructed lower courts to "use analogies to *those historical regulations* to determine" whether carry prohibitions "in *new* and analogous sensitive places are constitutionally permissible." *Id*. at 2133 (first emphasis added).

*Second*, the presence of particular populations—such as children, to use the State's favored example—is also not what converts a location into a "sensitive place." Children are present in many places, including in the home, where their parents have an undoubted constitutional right to maintain firearms "for defense of self, family, and property." *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008). Yet *Bruen* listed only three "sensitive places," none of which are unique

1

for the presence of children; if anything, the opposite would be true of legislative assemblies, polling places, and courthouses. At the same time, *Bruen*'s list *does not include schools*. And the historical record shows that schools were not places where firearm-carry was generally prohibited. Rather, carrying *by students* was prohibited in the exercise of *in loco parentis* authority. Analogies to schools thus cannot support the general prohibitions at issue here.

*Third*, the historical record shows that what connected the three "sensitive places" listed in *Bruen* was instead the presence of comprehensive, state-provided security that rendered the need for armed self-defense unnecessary. To draw a valid analogy to "those historical regulations," therefore, the State must show that any new purportedly sensitive place where it seeks to restrict firearm-carry shares that characteristic—which the State has not even attempted to show. *Bruen*, 142 S. Ct. at 2133. It does not suffice to assert that a modern "sensitive place" is analogous to one of *Bruen*'s specified, comprehensively secured locations based on the risk of violent conflict at the modern location. That is a risk in any public location, where *Bruen* recognizes a presumptive right to carry firearms. *See id*. at 2134. And the historical record shows that governments have traditionally addressed the risk of violent conflict not by restricting that right, but by encouraging or even requiring law-abiding citizens to exercise that right, and by targeting their prohibitions against firearm misuse.

*Fourth*, the State's role as proprietor over certain of the locations covered by the challenged regulations (mass transit, State parks, and State forests) does not endow the State with its claimed authority to disregard constitutional rights at those locations. Otherwise, the State could infringe on the Second Amendment—and not just the Second Amendment—in any publicly owned and operated area, such as sidewalks, where, again, *Bruen* has already recognized a presumptive right to carry firearms. Moreover, the regulation of constitutional conduct, especially through the

2

enactment of criminal prohibitions such as the challenged provisions, is not an exercise of ordinary "proprietary" authority but of sovereign authority. The exercise of that authority must comport with the Second Amendment. In any event, the State lacks the necessary historical support for the challenged regulations even as "proprietary" acts.

*Fifth*, and finally, where a state attempts to carry its burden to prove that modern firearm regulations are "consistent with this Nation's historical tradition of firearm regulation" by analogizing to historical regulations, as the State does here, the State must produce historical analogues that are "well-established," "representative," and "relevantly similar" to the modern regulations. *Id*. at 2126, 2132–33. To be sufficiently "well-established," the historical analogues must come from the relevant historical period, which, under *Bruen*, centers on the Second Amendment's ratification in 1791. To be "representative," the analogues must have been more than outliers. And to be "relevantly similar," the analogues must relate to the modern regulation in "how and why" they "burden[ed] a law-abiding citizen's right to armed self-defense." *Id*. at 2133. The analogues that the State has offered for all the challenged provisions fail on all these metrics. They predominantly come from generations after the Founding era; indeed, the State concedes that governments did not begin to enact locational firearm regulations until the mid-to-late 19th century. The State repeatedly relies on regulations from jurisdictions that *Bruen* has already recognized as outliers. And none of the State's analogies, from hunting and poaching restrictions to overtly racist prohibitions, restricted the right to armed self-defense in a similar way or for similar reasons as the challenged provisions.

For all these reasons, and those outlined further below and in Plaintiffs' Memorandum in Support of their preliminary-injunction motion, Doc. 24-1 (May 24, 2023) ("Pls.' Mem."), Plaintiffs are likely to succeed on the merits of their constitutional claims. They have standing to

bring those claims against each of the challenged provisions, and the public interest inherently favors the protection of individual rights against unconstitutional restriction. Plaintiffs have therefore met the requirements for a preliminary injunction and, as a necessary consequence, have stated a claim for relief sufficient to defeat the State's motion to dismiss.

The State has successfully shown, however, that it would be appropriate in this case to consolidate the hearing on Plaintiffs' preliminary-motion with trial on the merits under Rule 65. *See* FED. R. CIV. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."). This case raises purely legal questions based on the accessible historical record, and the State has demonstrated—with the several exhibits and declarations, including three purported expert reports, attached to its response—that those questions can be resolved without further discovery. Plaintiffs therefore respectfully submit that trial on the merits should be advanced and consolidated with the hearing on Plaintiffs' preliminary-injunction motion and the State's motion to dismiss. *See, e.g., U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 281 (4th Cir. 2006) (noting that consolidation is proper where "the decision to grant a preliminary injunction may effectively decide the merits of the case").

## ARGUMENT

The State separates its defense of the challenged "sensitive-place" restrictions on firearm-carry in healthcare facilities, museums, and locations licensed to sell or dispense alcohol for on-site consumption, MD. CODE, CRIM. LAW § 4-111, mass transit, MD. CODE, TRANSPORTATION § 7-705(b)(6), State parks, COMAR 08.07.06.04, State forests, COMAR 08.07.01.04, and Chesapeake Forest Lands, COMAR 08.01.07.14, from its defense of the challenged Anti-Carry Default against wearing, carrying, or transporting a firearm in all privately owned buildings that are otherwise

open to the public absent a "clear and conspicuous sign" or other form of "express consent" to carrying firearms in the building, MD. CODE, CRIM. LAW § 6-411(d). This separation acknowledges, correctly, that the State cannot declare that all privately owned buildings that are open to the public, but that lack such signage, are a "sensitive place."

As to the challenged "sensitive-place" restrictions, the State argues that these restrictions do not burden Second Amendment conduct; that, despite *Bruen*'s recognition of the public-carry right, states may generally prohibit firearm-carry in public places that they deem sensitive; that states also have general power to prohibit firearm-carry in government-owned and -operated locations; and that the challenged restrictions all have specific historical analogues.

As to the Anti-Carry Default, the State argues that Plaintiffs lack standing to challenge this provision; that this provision does not burden Second Amendment conduct; and that this provision is supported by historical analogues.

Each argument is meritless, and Plaintiffs will address each in turn. In the process, this brief will address each historical statute on which the State relies, and this brief will show that the historical record supports traditions contrary to the State's claims.

## I.    The Challenged "Sensitive-Place" Restrictions Burden Conduct Covered by the Second Amendment's Plain Text, and *Bruen* Did Not Approve that Burden

The State observes that *Bruen* "went no further" than recognizing that "the Second Amendment protects the right to carry a firearm outside of the home," "characterizing the right as only a 'general right to public carry.'" Defs.' Mem. at 13 (quoting *Bruen*, 142 S. Ct. at 2135). That is correct—because that is where the Second Amendment's plain text ends. There are no locational restrictions in that text whatsoever. There is thus no doctrinal significance to *Heller*'s dicta that restrictions on carrying firearms in certain "sensitive places" are "presumptively lawful." *Heller*,

554 U.S. at 626–27 & n.26. Under *Bruen*, once the Second Amendment's plain text is implicated, the burden is on the government to justify the challenged firearm regulation in every case. *See* 142 S. Ct. at 2129–30.

The State thus misconceives *Bruen*'s text-and-history standard. At the textual level, the question that the Court must resolve is whether the Second Amendment's plain text covers the conduct in which the plaintiff wishes to engage. Here, that conduct is carrying firearms in various locations. That conduct is covered by the Second Amendment's plain text: as *Heller* says, and as *Bruen* confirms, "the right of the people to keep and bear Arms" is the "right to possess and carry weapons in case of confrontation." *Id*. at 2134 (quoting *Heller*, 554 U.S. at 592). That is undisputedly what Plaintiffs seek to do. Any limitations on the scope of that right must come from history. And it is the government's burden to demonstrate that challenged firearm restrictions are supported by history, *i.e.*, that they are "consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126. Simply labeling a location as a "sensitive place" does not somehow shift the government's burden any more than labelling speech "obscene" would somehow obviate the need for the government to prove that the speech is actually obscene. Indeed, *Bruen* rejected such an approach when it rejected the suggestion that the island of Manhattan could be considered a sensitive place. *See id*. at 2134.

The State also argues—based on an assertion in the declaration of Saul Cornell, who does not claim to be a linguistic historian—that there is some meaningful difference between the verb "abridge," as used in the First and Fourteenth Amendments, and the word "infringe," as used in the Second Amendment. Under the State's false dichotomy, the verb used in the Second Amendment's protection is purportedly more limited. But *Bruen* rejected such a cramped reading of "infringe," stating to the contrary that the Second Amendment establishes an "unqualified

command." *Id*. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). And in fact, the *Konigsberg* footnote that *Bruen* quotes for this proposition equates the scope of the First and Second Amendment's protections: "the commands of the First Amendment are stated in unqualified terms . . . . In this connection also compare the *equally unqualified* command of the Second Amendment." *Konigsberg*, 336 U.S. at 50 n.10 (emphasis added). This understanding is consistent with even earlier constructions of the Second Amendment's text, as illustrated in *Heller*. *See* 554 U.S. at 612–13 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846) ("The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia*, shall not be *infringed*, curtailed, or broken in upon, *in the smallest degree*") (emphases altered)).

Cornell's assertion thus simply begs the question. If there is a general right to carry, as the State acknowledges that there is, then, under *Bruen*, a restriction on carrying in a particular location negates that right unless the restriction is consistent with our Nation's historical tradition of firearm regulation. And the State must show that it is.

## II.   The State Does Not Have General Authority To Prohibit Firearm-Carry in Any Place It Deems "Sensitive"

Before turning to the State's historical arguments, it bears note that the State relies on purported expert reports from three historians not just in its arguments in response to Plaintiff's preliminary-injunction motion, but also in its arguments in support of its own motion to dismiss. The State's motion to dismiss is therefore properly considered a motion for summary judgment. *See* FED. R. CIV. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary

judgment under Rule 56."). But the State's reliance on this evidence also confirms that this case involves purely legal questions and that the Court can proceed to render judgment on the merits.

In addressing those legal questions, all that is relevant from these expert reports are the historical laws that they cite, not the interpretations that the purported experts provide. For one thing, those interpretations are not reliable. At least two of these witnesses have written critically, sometimes in extreme terms, of *Bruen*, which controls this case. *See* Saul Cornell, *Cherry-Picked History and Ideology-Driven Outcomes:* Bruen*'s Originalist Distortions*, SCOTUSblog (June 27, 2022), https://bit.ly/3CemrdV; Saul Cornell, *Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist*, Slate (June 24, 2022), https://bit.ly/3IcxXKn; Patrick J. Charles, *The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It*, 71 CLEV. ST. L. REV. 623 (2023).

The witness whose report the State most frequently cites, Saul Cornell, has also submitted an *amicus* brief in all three of the Supreme Court's major Second Amendment decisions, and his position has been rejected every time. In *Heller*, he argued that the Second Amendment did not protect the private right to possess firearms, a position that the Supreme Court rejected. In *McDonald*, he argued that states retained the power to ban certain types of firearms despite the Fourteenth Amendment's application of the Bill of Rights against the states, a position that the Supreme Court rejected. And in *Bruen*, he argued that the Second Amendment did not protect the private right to carry firearms in public for self-defense, a position that the Supreme Court rejected. *See* Br. of *Amici Curiae* Jack N. Rakove et al. (Jan. 11, 2008), *Heller*, 554 U.S. 570 (No. 07-290); Br. of Thirty-Four Professional Historians & Legal Historians as *Amici Curiae* (Jan. 6, 2010), *McDonald v. City of Chicago*, 561 U.S. 742 (No. 08-1521); Br. for *Amici Curiae* Profs. of History & Law (Sept. 21, 2021), *Bruen*, 142 S. Ct. 2111 (No. 20-843). The State's other experts have

expressed similarly rejected views on the scope of the Second Amendment and on the relevance of particular historical evidence. *See, e.g.*, Patrick Charles, *The Invention of the Right to 'Peaceable Carry' in Modern Second Amendment Scholarship*, U. ILL. L. REV. ONLINE 195 (2021); Brennan Rivas, *In the past, Americans confronted gun violence by taking action*, WASH. POST. (June 3, 2022).

These issues aside, *Bruen* makes clear that it is the historical regulations themselves, not a defense expert's interpretation of those regulations, that the Court must consider. "The test . . . set forth in *Heller* and appl[ied in *Bruen*] requires *courts* to assess whether modern firearm regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131 (emphasis added). More specifically, this Court must assess whether the challenged provisions are "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. And a regulation can be consistent with a regulatory tradition only if there *is* such a tradition, which requires the State to present firearm regulations in place at the relevant historical time. As will be seen, the State's purported experts fail to supply it with the evidence it needs.

### a.  Modern "sensitive places" must be specifically analogized to the locations specified in *Bruen*

The State's argument that *Bruen* gives states "significant flexibility" in labeling locations as "sensitive places," Defs.' Mem. at 15, rests on several misconceptions. As an initial matter, and contrary to the State's repeated assertions, the *Bruen* Court pointedly *did not* list "schools" and "government buildings" as places where firearm-carry may be prohibited. *Id*. at 11, 15. The Court listed only "legislative assemblies, polling places, and courthouses." *Bruen*, 142 S. Ct. at 2133. The Court then instructed lower courts to "use analogies" to "*these* locations" in determining whether "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive

9

places are constitutionally permissible." *Id.* (emphasis added). Many of the locations covered by the challenged provisions—including locations licensed to sell or dispense alcohol, museums, healthcare facilities, state parks and forest lands—are in no sense "new." They either existed or had analogues at the Founding. And *Bruen* did not give states carte blanche to designate these locations as "sensitive places." To the contrary, "the lack of a distinctly similar historical regulation" in these places "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. Any new "sensitive place" must therefore bear the characteristic that connects the three places that *Bruen* specifically listed, which, as explained in Plaintiffs' preliminary-injunction brief, "is the long tradition of the government providing comprehensive security" at those places. Pls.' Mem. at 26.

The State also argues that it requires only "relatively few analogues" to "establish the constitutionality of sensitive-place restrictions" because, according to the State, *Bruen* "acknowledged that the available historical record contained 'relatively few' examples of such restrictions." Defs.' Mem. at 15–16 (quoting *Bruen*, 142 S. Ct. at 2133). In fact, *Bruen* observed that the historical record yielded relatively few *locations*, namely the three listed in the opinion, that could be characterized based on the record as "sensitive places." *See Bruen*, 142 S. Ct. at 2133. And even if historical laws limiting firearm-carry in such locations might have been relatively rare, laws making such places classifiable as "sensitive places" according to *Bruen*'s criteria—*i.e.*, laws providing for comprehensive security at these locations—were widespread. These are all the laws providing for government security in the form of sheriffs and sheriffs' deputies, *see* THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 271 (Grimke ed., 1790) (Ex. A); A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed., 1800) (Ex. B); sergeants at arms and doorkeepers, *see* VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF

MARYLAND: NOVEMBER SESSION 1791, at *2 (Green ed., 1795) (Ex. C); PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, 378 (Stanley Ray ed., 1904) (Ex. D); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42 (Davis ed., 1796) (Ex. E); and justices of the peace, coroners, bailiffs, constables, and the like, *see* 1 LAWS OF THE STATE OF NEW YORK 176 (2d ed., Albany: Websters & Skinner 1807) (Ex. F); *see also* 1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811) (Ex. G); 2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams eds., 1797) (Ex. H). This historical record shows that analogizing a modern location to one of *Bruen*'s three specified "sensitive places" requires analogous comprehensive state-provided security, which in modern times would include features like metal detectors and armed guards at every point of entry—and which is generally lacking in the locations that the challenged provisions cover. *See* Pls.' Mem. at 27–28.

The State further argues that the Second Amendment's meaning ultimately depends on evidence of its public understanding at the Fourteenth Amendment's adoption in 1868, presumably because it was only around then that some states began adopting certain locational firearm restrictions. But *Bruen* reaffirmed that the relevant time period centers on the Second Amendment's adoption in 1791. *See Bruen*, 142 S. Ct. at 2135–36. Even before *Bruen*, the Fourth Circuit explicitly held that, "[w]hen evaluating the original understanding of the Second Amendment, 1791—the year of ratification—is 'the critical year for determining the amendment's historical meaning.'" *Hirschfeld v. A.T.F.*, 5 F.4th 407, 419 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021) (quoting *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012)).[1]

---

[1] Although *Hirschfeld* was vacated as moot when the plaintiffs no longer fell within the 18-20-year-old range (and were no longer subject to the challenged restrictions), such decisions are still entitled to persuasive effect. *See, e.g.*, *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 121 n.2 (2d Cir. 2001); *Rosenbloom v. Pyott*, 765 F.3d 1137,

This focus follows from two facts emphasized in *Bruen*: "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," and "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137 (internal quotation marks omitted). Thus, in *Heller*, the Supreme Court held that the Second Amendment has the same scope as applied against the Federal Government today as it had at the Founding. *See Heller*, 554 U.S. at 576–77. And in *McDonald*, the Court decisively rejected applying a different Second Amendment standard to the states. *See McDonald*, 561 U.S. at 765.

Accordingly, the *Bruen* Court cautioned that, "when it comes to interpreting the Constitution, not all history is created equal" and that "post-Civil War discussions of the right to keep and bear arms [that] 'took place 75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.'" *Id*. at 2136–37 (quoting *Heller*, 554 U.S. at 614); *see also id*. at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."). The *Bruen* Court did note an academic debate over whether courts should look to the Reconstruction era in determining the scope of individual rights, which the Court did not need to resolve. *See id*. at 2138 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."). But *Bruen* did not overturn—and in fact reaffirmed—*Heller* and *McDonald*. Indeed, the Court explained that its "interest in mid- to late-

---

1154 n.14 (9th Cir. 2014) ("decisions vacated for reasons unrelated to the merits may be considered for the persuasive[ness] of their reasoning"). And though *Hirschfeld* dealt with a federal restriction, the case on which it relied, *Moore*, dealt with a state-level restriction, as this case does.

19th-century commentary" in *Heller* had been "secondary": "*Heller* considered this evidence 'only after surveying what it regarded as a wealth of authority for its reading'" from the Founding era, treating "this 19th-century evidence . . . as mere *confirmation* of what the Court thought had already been established." *Id*. at 2137 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019)) (emphasis added); *see also Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *11 (D. Minn. Mar. 31, 2023) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters"); Mark W. Smith, *'Not all History is Created Equal': In the Post-*Bruen *World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN (Oct. 1, 2022), https://bit.ly/3CMSKjw.

Under *Bruen*, therefore, any treatises, state laws, and other sources that post-date the time of the Second Amendment's ratification are relevant only insofar as they confirm the amendment's scope as understood at the Founding. "[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. (internal quotation marks omitted).

As a result, the fact that "it was not until the mid-to-late nineteenth century that state and local governments within the United States began enacting express, location specific armed carriage restrictions," Defs.' Mem. at 18 (cleaned up), only works against the State here. Indeed, it is a concession that the State lacks historical evidence from the relevant period, as its own historical presentation shows.

13

**b. There is no tradition of using "sensitive-place" restrictions for general public-safety purposes**

The historical record does not establish a Founding-era tradition of preventing potential violent conflict by generally restricting the right to carry firearms in certain locations. To the contrary, the record establishes that the historical solution was not to disarm law-abiding citizens but to arm them. To the extent governments in colonial times regulated with respect to places where people were thought to be at heightened vulnerability and where comprehensive government security was not provided—for example, at places of worship—they did so by encouraging or even requiring law-abiding citizens to be armed. Maryland, for instance, required that "[n]oe man able to bear arms to goe to church or Chapell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott." 3 Archives of Maryland: Proceedings of the Council of Maryland 1636–1667, at 103 (Browne ed., 1885) (Ex. I); *see also* 5 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature 19 (Hening ed., 1819) (Ex. J) (1738 Virginia statute acknowledging the right to firearm-carry at church); 19 The Colonial Records of the State of Georgia: Part I, Statutes, Colonial And Revolutionary, 1768-1773, at 137–40 (Candler ed., 1904) (Ex. K) (1770 Georgia statute requiring militia members to carry firearms at church); *Koons v. Platkin*, No. 22-cv-7463, 2023 WL 3478604, at **72–73 (D.N.J. May 16, 2023) (collecting similar examples); Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 Liberty Univ. L. Rev. 653, 697–99 (2014) (reviewing colonial- and Founding-era historical precedent for requiring firearms at church services).

Similar requirements or codified acknowledgments of firearm-carry applied to public assemblies more generally, from the colonial era through the Founding. *See* 1 Records of the

GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (White 1853) (Ex. L) (1639 Massachusetts order that "persons . . . shall come to the publike assymblyes with their muskets, or other peeces fit for service, furnished w[i]th match, powder & bullets"); 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (Bartlett 1856) (Ex. M) (1639 Rhode Island prescription that "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon"); A New Conductor Generalis 168 (1803) (Ex. N) (treatise on New York law explaining that an "armed" person "in his way to the church or market" generally does not effect forcible entry when going over others' land).

The record also shows that the Founding generation focused on preventing firearm *misuse*, not the simple act of carrying, by enacting discharge restrictions and enhanced penalties for using firearms in connection with crimes. *See* THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 568 (1798) (Ex. O) (Rhode Island statute first enacted in 1731 prohibiting shooting at night in certain public areas); 1784-1785 N.Y. Laws 152, ch. 81 (Ex. P) (1785 New York statute restricting shooting near buildings around New Years Day); ACTS AND LAWS OF THE STATE OF CONNECTICUT 18 (1784) (Ex. Q) (1783 Connecticut statute providing enhanced punishment for being armed with a dangerous weapon in a manner that clearly indicated violent intent); Act of March 2, 1799, ch. 43, § 15, 1 Stat. 736 (federal statute originating in the early 1790s providing enhanced punishment for wounding or putting mail carrier's life in danger by using dangerous weapons while robbing the mail carrier, as discussed in *United States v. Spears*, 449 F.2d 946, 951 (D.C. Cir. 1971)).

By contrast, the State's proposed tradition—wherein states purportedly addressed the risk of violent conflict at certain locations by restricting the right of armed self-defense at those

locations—lacks any valid historical support. The State begins its story in 13th-century England, *see* Defs.' Mem. at 17, despite *Bruen*'s caution that "English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution," 142 S. Ct. at 2136. And the State is indiscriminate: It first relies on the Statute of Northampton, which *Bruen* has already explained was understood at the time of the Founding, like its Founding-era American counterparts, only to prohibit carrying firearms in a dangerous and unusual manner. *See id.* at 2143 ("Far from banning the carrying of any class of firearms, [certain colonial regulations] merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself."). Even if Virginia and North Carolina had both "enacted or retained their own versions of the Statute of Northampton" around the Founding (State's Exhibits 12 and 13), as it appears that only Virginia did,[2] those statutes would accordingly be no support for restrictions on the right to carry firearms in *any* manner. Defs.' Mem. at 18; *see* Defs.' Ex. 12, Doc. 36-12, at 2 (1786 Virginia statute against "go[ing]" or "rid[ing] armed . . . in terror of the county").

---

[2] The alleged 1792 North Carolina law (State's Exhibit 13) is contained in a compilation that "later compilers wrote . . . 'was utterly unworthy' as 'omitting many statutes, always in force, and inserting many others, which never were, and never could have been in force.'" Stephen P. Halbrook, Faux Histoire *of the Right to Bear Arms:* Young v. Hawaii *(9th Cir. 2021)* at 21 (2021), https://bit.ly/44k7hj3. Moreover, in reviewing a conviction for carrying a firearm in a dangerous and unusual manner in 1843, the North Carolina Supreme Court evinced no awareness of this law, discussing the Statute of Northampton directly rather than this purported analogue. *See State v. Huntly*, 25 N.C. 418, 420 (1843). Even with respect to the Statute of Northampton, the court stated that "whether or not this statute was or was not formerly in force in this State, it certainly has not been since the first of January, 1838," when state law had formally declared that the statutes of England and Great Britain ceased to have effect. *Id.* And notably, unlike the *Bruen* dissent, the *Bruen* majority did not cite this law as a Statute of Northampton analogue. *Compare Bruen*, 142 S. Ct. at 2145, *with id.* at 2185 (Breyer, J., dissenting).

The State then moves past the Founding to the "mid-to-late nineteenth century." Defs.' Mem. at 18. For the reasons above, even a large number of regulations from this era—that is, from generations after the Second Amendment's ratification—could not indicate a relevant tradition of firearm regulation. *See Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246, 2258–59 (2020) (holding that "more than 30" state-law provisions enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" where they lacked grounding in Founding-era practice). But the State cites only a handful of purported "specific locational restrictions on firearms." Defs.' Mem. at 19–20. And here again, the State relies on regulations that *Bruen* has already rejected as support for firearm-carry prohibitions. The State cites an 1870 regulation from Texas (State's Exhibit 17), which *Bruen* recognized as an outlier at the time for its relatively limited view of the public-carry right. *See* 142 S. Ct. at 2153. The State cites an 1869 regulation and an 1874 regulation from Tennessee (State's Exhibit 14) and Missouri (State's Exhibit 18), both of which, as *Bruen* noted, appear to have interpreted their states' carry restrictions to allow for open carry, thus leaving at least one avenue for the exercise of Second Amendment rights. *See id*. at 2147 (discussing Tennessee); *id*. at 2155 n.30 (citing Missouri). Several of the other regulations come from territories or states that were only recently admitted to the Union (Arizona, Oklahoma, Idaho, and Montana), and *Bruen* categorically rejected reliance on laws enacted in the territories, including "Arizona, Idaho, New Mexico, Oklahoma," since they "are most unlikely to reflect 'the origins and continuing significance of the Second Amendment.'" *Id*. at 2154 (quoting *Heller*, 554 U.S. at 614).[3] Regulations that were adopted in

---

[3] The State has also produced a 1901 Idaho statute (State's Exhibit 21), which, in addition to covering little of the national population, falls far beyond the relevant historical period, *see Bruen*, 142 S. Ct. at 2154 n.28, and an 1869 New Mexico statute (State's Exhibit 15), which the State does not rely on in its brief. For good reason: this statute was also enacted when New Mexico

only a handful of states, or that covered only a small portion of the national population, provide little evidence of national consensus.

The State also cites an 1870 Georgia law (State's Exhibit 16) that prohibited carrying firearms "to any Court of justice, or any election ground," Defs.' Ex. 16, Doc. 36-16, at 2, which *Bruen* specifically recognized as "sensitive places." In large part, therefore, this statute merely supports that specific recognition. The same is true of Columbia, Missouri's 1890 ordinance (State's Exhibit 23). Granted, these provisions also mention churches and other public assemblies. At the Founding, however, Georgia itself required firearm-carry at such locations, *see* Ex. K, and under *Bruen*, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence," 142 S. Ct. at 2154. *Bruen* also noted the Georgia Supreme Court's holding earlier in the 19th century that, to the extent a law "prohibited bearing arms openly, . . . it was in conflict with the Constitution and void," suggesting that the 1870 Georgia law might also have been interpreted to leave open an avenue for the exercise of Second Amendment rights. *Id*. at 2147 (discussing *Nunn*, 1 Ga. 243) (cleaned up).

In short, even taken at face value, this handful of 19th-century regulations is hardly evidence of "an enduring American tradition of state regulation." *Id*. at 2155. For the same reasons, the State's evidence of "local ordinances," Defs.' Mem. at 20, cannot satisfy its burden to establish a relevant national regulatory tradition. Regulations adopted in relatively small jurisdictions, such as Columbia, Missouri, but not adopted in other jurisdictions, are merely exceptions that prove the rule that such regulations were not generally accepted.

---

was a territory, and in any event, this statute appears to have preserved citizens' right to armed self-defense by restricting public-carry "*except* it be in the lawful defense of themselves, their families or their property." Defs.' Ex. 15, Doc. 36-15, at 2 (emphasis added).

In any event, most of these examples restricted firearm-carry in large swaths of the municipalities' land—including carry prohibitions within the incorporated limits of entire towns and that, per the State, "would have restricted wholesale the carrying of firearms within the entire municipality," *id*.—which is plainly unconstitutional under *Bruen* even if such regulations happened to go unchallenged at the time. The State's general assertion that "armed carriage restrictions and the English common law against 'going armed' in urban and densely populated locations indeed made their way into the American Colonies and subsequent United States," *id*. at 18 (internal quotation marks omitted), likewise runs directly contrary to *Bruen*'s observation that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department," 142 S. Ct. at 2134.

### c.   The State's sensitive-place "principles" are unfounded

Lacking support in the historical record itself, the State next attempts to generalize its unanalogous historical examples into "principles" that supposedly support the challenged provisions. Defs.' Mem. at 21. These "principles" cannot carry the State's burden under *Bruen*, which, again, directs courts to draw analogies specifically from three types of "sensitive places" (legislative assemblies, polling places, and courthouses) in assessing modern sensitive-place restrictions. *See* 142 S. Ct. at 2133. In any event, the State's principles are unsupported.

First, the State argues that "the personal exercise of Second Amendment rights should yield when necessary to protect the exercise of other fundamental rights." Defs.' Mem. at 21–22. That is false: there is no hierarchy of constitutional rights, and the State cannot infringe on the Second Amendment purportedly in order to protect another right. *See Bruen*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right.'").

Second, the State argues that restricting firearm-carry in "sensitive places . . . protect[s] places where vulnerable or impaired people might ordinarily be present," including where people gather in any significant number; according to the State, that "explains why the Supreme Court used 'schools' as an undisputed category." Defs.' Mem. at 22. This is false on several levels. Absent comprehensive security, laws barring law-abiding citizens from carrying firearms makes them, and those around them, more vulnerable to attack. And that explains why, to the extent firearm-carry was subject to locational regulation at all, the Founding-era tradition was to encourage or even require firearms in places such as churches.

Moreover, as already noted, *Bruen* pointedly did not endorse schools as a "sensitive place." And historical laws and school codes that restricted firearm-carry applied only to *students*, not to faculty, staff, or visitors. *See* History of Harvard University, app. 141 (Peirce ed., 1833) (Ex. R) (1734 Harvard College law that "[n]o Undergraduate shall keep a gun or pistol in the College, or anywhere in Cambridge; nor shall he go a gunning . . . without leave from the President or one of the Tutors, under the penalty of three shillings"); The Laws of Yale College, in New-Haven, In Connecticut, Enacted by the President and Fellows, The Sixth Day of October, A.D. 1795, at 26 (Thomas Green and Son 1800) (Ex. S) (similar); Laws of the University of North-Carolina; Established by the Board of Trustees, at Their Session in December 1799, at 12 (Gales 1800) (Ex. T) (similar); The Laws of Rhode-Island College, Enacted by the Fellows and Trustees, at 12 (Carter 1803) (Ex. U); The Minutes of the Senatus Academicus, 1799-1842 at 86 (Univ. Ga. Lib. 1976) (Ex. V) (similar); Laws of the Columbian College in the District of Columbia, at 10 (1824) (Ex. W) (similar); *see also* David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203, 247–48 (2018) (describing the University of Virginia's prominent 1824 ban, adopted by a Board

20

of Visitors including Thomas Jefferson and James Madison, on student possession in response to the "spoiled and violent behavior" of students, who had previously "fired guns in the air, and shot at each other"). Similarly, an 1892 Mississippi law banned the concealed carry of weapons within two miles of a university, college, or school, but that law expressly applied only to possession by a "student or pupil," not to possession by teachers or other adults. THE ANNOTATED CODE OF THE GENERAL STATUTE LAWS OF THE STATE OF MISSISSIPPI 327, § 1030 (1892) (Ex. X).

These laws are therefore properly understood as an exercise of the state's *in loco parentis* authority over students, a doctrine that has historically applied "regardless of the student's age." *Morse v. Frederick*, 551 U.S. 393, 413 n.3 (2007); *see also, e.g.*, *State v. Pendergrass*, 19 N.C. 365, 366 (1837) (recognizing that the "teacher is the substitute of the parent"); *State v. Mizner,* 45 Iowa 248, 251 (1876) ("A person over twenty-one years of age becomes a pupil only of his own voluntary act. If he does so, and thus of his own will creates the relation of teacher and pupil, and claims privileges and advantages belonging only to those under age, he thereby waives any privilege which his age confers."); *North v. Bd. of Trs. of Univ. of Ill.*, 137 Ill. 296, 306, 27 N.E. 54, 56 (1891) ("By voluntarily entering the university, or being placed there by those having the right to control him, [the student] necessarily surrenders very many of his individual rights."). Historical exercises of this authority do not support restricting firearm-carry by anyone not subject to that sort of authority.

Finally, the State disputes that the validity of a modern "sensitive-place" regulation depends on its consistency with a tradition of comprehensive state-provided security at that location, arguing that "plaintiffs have no answer for why the Supreme Court would have identified schools as a paradigmatic sensitive place"—which, again, *Bruen* did not—"given that there is no evidence that schools were subjected to such security at any relevant time period." Defs.' Mem. at

23. But Plaintiffs have just identified such evidence: the states' historical *in loco parentis* authority. And the requirement of comprehensive security follows not only from the three "sensitive places" specified in *Bruen*, but from the historical record surveyed above.

This requirement is also not an arbitrary consideration susceptible to interest-balancing of the sort that *Bruen* rejected and that the State frequently attempts to resurrect. *See Bruen*, 142 S. Ct. at 2131. The existence of comprehensive, state-provided security is an objective metric demonstrating that a location is in fact sensitive. Granted, what comprehensive security looks like today differs from what it looked like at the Founding. But the principle is the same: if a location was considered a "sensitive place" at the Founding, and if it was not the type of place where firearm-carry was encouraged or required, then it had comprehensive, state-provided security. Thus, for a modern location to be validly deemed a "sensitive place" such that firearm-carry may be restricted there, it must also bear that characteristic.

### III. The State Does Not Act as a Proprietor or Market Participant When Regulating Second Amendment Conduct, and Regardless, the State Must Identify Historical Support Whenever It Burdens Second Amendment Conduct

The State also attempts to evade its evidentiary burden under *Bruen* by arguing that, as a general matter, the government may restrict firearm-carry in locations "owned or operated by a governmental entity." Defs.' Mem. at 24. But that plainly proves too much. The government also "owns" sidewalks and streets, but the government cannot simply ban firearms there. *See Bruen*, 142 S. Ct. at 2135. What is relevant is not the mere fact of government ownership. Instead, *Bruen* gave specific examples of *types* of government buildings where firearms could be prohibited: legislative assemblies, polling places, and courthouses. By analogy "to *those* historical regulations," the State can potentially justify new sensitive places. *Id.* at 2133 (emphasis added).

And as seen, what is relevant about those places at the Founding was the government's provision of comprehensive security.

Moreover, the State does not act as a "proprietor" in enforcing the challenged provisions, but as a sovereign. This case challenges provisions that are part of the State's criminal code and backed by criminal penalties and that directly regulate Second Amendment conduct, which no normal proprietor has the power to do. *See* Pls.' Mem. at 3–5. That separates this challenge from all the cases cited by the State where "a government-owned *business* act[s] as a proprietor rather than a sovereign," *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) (emphasis added), and from cases that recognize the government's general right "to operate freely in the free market," *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980), or to protect and exercise its interests as an "ordinary proprietor" in the property it owns, *see Camfield v. United States*, 167 U.S. 518, 524 (1897). None of that is what the State has done through the challenged provisions.

Indeed, the State effectively *concedes away* its purported authority to restrict firearm-carry in several challenged locations by acknowledging that its purported "ability to manage its property free from ordinary constitutional restrictions may be at its ebb when the property has been dedicated to a traditionally public function, such as sidewalks, streets, and other public thoroughfares." Defs.' Mem. at 26 n.17. The State provides no basis to distinguish between imposing criminal penalties on or otherwise prohibiting firearm-carry in those public spaces and in public spaces such as State parks, forests, and public transportation. And there is none: as explained in the State's own citations, when the government exercises "the power to regulate or license," it acts "as lawmaker," and "there is a crucial difference, with respect to constitutional analysis, between" such actions and the government's actions "as proprietor, to manage its internal operation." *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 598 (2008) (cleaned up); *accord Bldg. &*

*Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 227 (1993) (recognizing same distinction).

The State's remaining cases employ "distinct standard[s] of review" applicable to other constitutional questions, *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018), generally to First Amendment questions of government speech, *see Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009), or of speech restrictions in different forums, *see Greer v. Spock*, 424 U.S. 828, 836 (1976). These cases provide no further support either for the proposition that the State has acted as a proprietor or market participant in this case or for the authority that the State claims to restrict constitutional rights in areas, such as State parks and forests, open to public activity. Indeed, the State itself notes that the government "does not enjoy absolute freedom from" constitutional restraints under this caselaw. Defs.' Mem. at 27 n.18 (internal quotation marks omitted). The State attempts to smooth over this issue by arguing that, whereas the First Amendment "serves a more *collective* purpose," the Second Amendment serves only an individual interest. *Id*. But the individual right to public carry by law-abiding citizens inures to the benefit of the public just as the individual right protected by the First Amendment does. Regardless, what the State offers here is just a more abstract version of the interest-balancing that *Bruen* rejected. The individual right protected by the Second Amendment is defined by its text, and the text protects the right to public carry without restriction.

All that said, the State's purported status as a "proprietor" or "market participant" is ultimately irrelevant. Even if the State could be so characterized, *Bruen* would still require the State to produce historical analogies to support the view that the government, acting as a proprietor, may infringe on Second Amendment rights—which the State has failed to do. The argument that State proprietorship provides blanket authority to infringe on Second Amendment rights would

24

make a hash of *Bruen*'s identification of *specific* government buildings, namely legislative assemblies and courthouses, where firearm-carry may be prohibited, as well as *Bruen*'s instruction for courts to analogize from those specific locations when assessing other modern "sensitive-place" restrictions. If the *Bruen* Court instead meant that the government may prohibit firearm-carry in *any* government-owned building, then that is presumably what it would have said.

As a final effort, the State argues that "absurd consequences" would follow if the Court did not afford the State the broad authority it seeks. Defs.' Mem. at 28. For example, the State notes, "a private museum . . . could prohibit patrons from carrying weapons inside its premises, but a public museum . . . could not." *Id*. at 29. That is not absurd at all. Private parties are not *restricted* by the Second Amendment; the government is. Moreover, if the State wishes to ban firearms from public museums or Ravens stadium, it may provide comprehensive security. On the other hand, the State's position would have absurd consequences if adopted and applied generally. In the State's proposed world, where the Constitution does not apply in government-owned locations, citizens entering a Maryland-owned and -operated park or museum could find themselves subject to unreasonable searches and seizures, compelled to espouse the government's preferred messages, and prohibited from engaging in religious exercises like praying before meals.

## IV.     The State Lacks Valid Historical Support for Any of Its Challenged "Sensitive-Place" Regulations

The State does not argue that any of the challenged "sensitive-place" restrictions apply to locations with the sort of comprehensive, state-provided security that defines *Bruen*'s list of "sensitive places." From the outset, then, these restrictions cannot be supported as regulations of "sensitive places." But that is the only basis that the State offers for them. And the State's other attempted analogies fail on their own terms.

Plaintiffs acknowledge that this Court has recently denied a preliminary injunction against Montgomery County ordinances banning "handgun possession at or within 100 yards" of specified "place[s] of public assembly." *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 21-cv-1736, 2023 WL 4373260, at *3 (D. Md. July 6, 2023). The Court found that the plaintiffs lacked standing to challenge some of those restrictions, *see id.* at **3–7, which the State does not (and cannot) assert as to the "sensitive-place" provisions challenged here. Plaintiffs respectfully submit that the remainder of the opinion cannot be followed here, either. Under *Bruen*, all modern "sensitive-place" restrictions require an independent analogical connection to the three specified "sensitive places" of the Founding era (legislative assemblies, polling places, and courthouses). Many of the purportedly "sensitive places" implicated in *Maryland Shall Issue*—which included "a private school, public institution of higher education, childcare facility, place of worship, library, park, recreational facility, multipurpose exhibition facility, hospital, community health center, or long-term facility," *id.* at *3—are distinct from those implicated here. So any Founding-era support for the restrictions at issue there would not necessarily support those at issue here.

To the extent the groups of "sensitive places" overlap, the opinion in *Maryland Shall Issue* illustrates that the provisions challenged here lack the historical support that *Bruen* requires. The Court's two-paragraph discussion of the sufficiency of the historical record, *id.* at **15–16, does not apply *Bruen*'s detailed instructions for analogical reasoning. *Compare Bruen*, 142 S. Ct. at 2126, 2132–33 (requiring that historical analogues be "*well-established*," "*representative*," and "relevantly similar" to modern firearm regulations) (emphases added), *with Md. Shall Issue*, 2023 WL 4373260, at *16 (positing that *Bruen* "did not impose any specific requirement that the historical statutes considered must have applied to a certain number of states or a certain percentage of the relevant population"). The opinion also does not address the Fourth Circuit's

persuasive holding in *Hirschfeld* that the State's historical evidence must come from the period of the Second Amendment's ratification, instead following an out-of-circuit decision that advocates (incorrectly) for a focus on the Reconstruction Era. *See* 2023 WL 4373260, at *8. And the Court did not find that *any* purportedly sensitive place at issue met *Bruen*'s Founding-era parameters for "sensitive places," *i.e.*, comprehensive, state-provided security. Accordingly, this opinion provides the State no support here.[4] Neither does the State's own evidence.

### a.  Healthcare facilities

The State argues that "modern hospitals and other health care facilities are unlike anything that existed at the time of the Founding." Defs.' Mem. at 31. Although healthcare has certainly advanced, the Founding era had hospitals and other areas where the sick went for care. *See* Pls.' Mem. at 20–22. Yet as the State does not dispute, the Founding era did not have regulations preventing firearm-carry in these locations.

Instead, the State asserts that hospitals are "similar to the many historical analogues referenced above in which several states prohibited firearms in places where persons are assembled for 'scientific purposes.'" Defs.' Mem. at 32. But the handful of 19th-century statutes that the State

---

[4] Indeed, the Court's incomplete *Bruen* analysis yielded a result that is incompatible with *Bruen*. As the Supreme Court explained, "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place.'" *Bruen*, 142 S. Ct. at 2134. The island of Manhattan occupies approximately 23 square miles. Montgomery County occupies over 490 square miles. And there are likely thousands of the 100-yard exclusionary zones created by the county's firearm regulations, "effectively" extinguishing the carry right in large swaths of the municipality. *Id*. The Court also impermissibly credited the county's assertion of a general interest in public safety, the same interest the State invokes here. *See Md. Shall Issue*, 2023 WL 4373260, at **11, 13–15, 17. *Bruen* rejected such appeals to "public safety" in rejecting means-ends scrutiny. *See* 142 S. Ct. at 2126–27. And just as courts may not engage in such scrutiny "under the guise of an analogical inquiry," *id*. 2133 n.7, courts may not do so when balancing whether the equities favor injunctive relief. Doing so would effectively "eviscerate the general right to publicly carry arms for self-defense," just as means-end scrutiny did before *Bruen*. *Id*. at 2134.

then proceeds to cite—an 1870 Texas statute (State's Exhibit 17), 1874 Missouri statute (State's Exhibit 18), 1889 Arizona statute (State's Exhibit 19), 1890 Oklahoma statute (State's Exhibit 20), and 1903 Montana statute (State's Exhibit 22)—are the same examples that, as already seen, come from jurisdictions whose outlier regulations *Bruen* rejected as indicative of the historical scope of the public-carry right.

The State falls back on interest-balancing, asserting that the presence of firearms would "disrupt the sense of security and serenity that individuals with compromised health need," and irrelevantly citing *Heller*'s preservation of historical prohibitions on firearm possession by the mentally ill themselves. Defs.' Mem. at 32 & n.24. Plaintiffs would of course disagree with the State's view of the value of armed self-defense. But more to the point, that view is contrary to tradition, which protected the vulnerable by encouraging public carry by the law-abiding and which restricted the right to public carry only in locations with comprehensive, state-provided security. And again, not even the State argues that these locations have that characteristic.

### b. Museums

The basis for the State's defense of its restrictions at museums is that "museums share many of the same characteristics as schools." *Id*. at 33. That analogy cannot satisfy the State's burden—and not just because, once again, schools are *not* one of the specified "sensitive places" that *Bruen* directs courts to draw analogies from.

As shown, historical restrictions on firearm-carry at schools applied only to students as an exercise of *in loco parentis* authority. Thus, the mere fact that many children are present at museums—which is the upshot of all the declarations that the State cites here, *see id*. at 33 n.25— does not convert a museum into a "public place." Many children are also present on, *e.g.*, sidewalks, where *Bruen* nevertheless recognized the right to carry firearms. Adults do not lose

Second Amendment rights merely because they happen to be at or near a place that cares for children. *See Johnson v. Lyon*, 406 F. Supp. 651 (W.D. Mich. 2018) (regulation invalid where it prevented foster parents from using firearms to protect their homes); 18 U.S.C. § 922(q)(2)(B)(i), (ii) (federal gun-free school-zone law, which expressly exempts possession on private property or where the person has a state-issued carry permit).

Rather, and even if schools were one of *Bruen*'s recognized "sensitive places," a museum could be analogized to a school for Second Amendment purposes only if museums exercised *in loco parentis* authority over the children brought to museums by their parents or guardians. And the State offers no support for that proposition. Nor are firearm restrictions in museums supported by a purported "more specific historical limitation related to any place where persons are assembled for educational, literary, or scientific purposes," which the State draws from the statutes already distinguished: an 1870 Texas statute (State's Exhibit 17), 1874 Missouri statute (State's Exhibit 18), 1889 Arizona statute (State's Exhibit 19), 1890 Oklahoma statute (State's Exhibit 20), and 1903 Montana statute (State's Exhibit 22).

### c.   Locations licensed to sell or dispense alcohol for on-site consumption

The only specific analogy that the State provides for its firearm-carry restrictions at sites licensed to sell or dispense alcohol for on-site consumption is, once again, at territorial law (from Oklahoma in 1890) that *Bruen* expressly declined to consider as evidence of a national tradition of firearm regulation. As *Bruen* observed, Oklahoma, along with four other territories, accounted for "about two-thirds of 1% of the population" in 1890. 142 S. Ct. at 2154. This regulation was thus necessarily an outlier.

The State also cites mid-to-late 19th-centruy laws "prohibiting outright the carrying by people who were intoxicated." Defs.' Mem. at 35. Plaintiffs have no objection to prohibiting

intoxicated people from carrying firearms. But intoxication is not contagious, and there is no historical basis for barring everyone in the same bar or restaurant from carrying firearms. As seen above, the traditional manner of preventing violent conflict in areas where crowds gather was to encourage or require armed self-defense by law-abiding citizens and otherwise to punish firearm misuse. As also seen, though "nothing in *Bruen* or *Heller* suggests that a restriction at schools could only be applied to students and not staff or visitors," a question not at issue in *Bruen* or *Heller*, the historical record does show that such restrictions applied only to students in order to prevent firearm misuse by students. *Id*. These restrictions offer no support for general disarmament where alcohol may be served.

### d.  Mass transit

The State's defenses of its restriction of firearm-carry on mass transit likewise rest on several propositions already shown to be false. First, the State asserts that it "operates . . . transportation services and facilities in its proprietary capacity." Defs.' Mem. at 35. Whether or not that is true, the State *regulates firearm carriage*—in this case by imposing carry restrictions backed by criminal penalties—in its *sovereign capacity*. And in any event, even "proprietary" acts that infringe on Second Amendment rights must be justified with valid historical evidence.

Second, the State argues that the Mass Transit Ban is consistent with historical "sensitive-place" restrictions even though it acknowledges that there are "no governmental regulations from the Founding or Reconstruction eras relating specifically to public transportation." *Id*. at 36. Contrary to the State's assertion, that is not because mass transit did not exist in those eras. As shown in Plaintiffs' motion, stagecoaches, riverboats, and ferries traveled both interstate and intrastate at the Founding. *See* Pls.' Mem. at 22–24. These examples—such as South Carolina's public ferry, established as early as 1725, *see id*.—contradict Cornell's assertion that "[a]ll forms

30

of transport were all privately owned" at the time. Defs.' Mem. at 36 (internal quotation marks omitted). Regardless, even if transportation was privately owned, it remains relevant that states *did not prohibit firearm-carry* on transportation, as the State does not dispute. Indeed, several states *exempted* travelers from firearm regulations. *See* Pls.' Mem. at 23.[5] And the fact that, according to another of the State's proffered experts, "*private companies* would have had the authority to decide where and how legally transported weapons could be stowed and carried by customers aboard their vehicles and within their stations" remains irrelevant to whether *the government*—which is bound by the Second Amendment—may do so. Defs.' Mem. at 38 (emphasis added; otherwise cleaned up). Nor, of course, can the State fashion a historical tradition by pointing to other modern restrictions of firearm-carry on public transit. *See id*. at 38–39; *see also Bruen*, 142 S. Ct. at 2154 n.28 (declining to "address any of the 20th-century historical evidence" offered in that case, since such late-in-time evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence").

Third, the State again tries to base mass transit's status as a "sensitive place" on the ground that "public transportation vehicles and facilities are crowded locations." Defs.' Mem. at 36. But as shown, the traditional manner of preventing violent conflict in those locations was to arm law-abiding citizens, not to disarm them. And the State's hypotheticals about the "disastrous and unintended consequences" of allowing armed self-defense in such locations, *id*. at 37, rests not on any sort of historical analogy, but on the kind of interest-balancing that *Bruen* forbids. *See Bruen*,

---

[5] The State argues that these exemptions were limited to travelers "merely passing through the area or conducting one's business." Defs.' Mem. at 39 (internal quotation marks omitted). But whatever the actual scope of these exemptions, neither the State, nor the purported expert on whom it relies for this argument, dispute that such exemptions existed. They thus remain evidence that transportation was not a historical "sensitive place" where firearm-carry was prohibited.

142 S. Ct. at 2131 ("The Second Amendment is the very *product* of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense.") (internal quotation marks omitted). Nor, as explained, does the potential presence of children convert any location into a "sensitive place."

> e. **State parks and forests**

The State's defenses of its firearm-carry restrictions in State parks and forests fail for all the same reasons. The State asserts that it is the "proprietor of lands dedicated to a recreational purpose," that "state parks and forests often host large gatherings of people, and specifically cater to children," and that "there were no modern-style parks in the era of the Second Amendment." Defs.' Mem. at 40–41 (cleaned up). But the State here is exercising its sovereign authority to regulate firearms. And there certainly were public commons at the Founding, and long before. *See* Pls.' Mem. at 24–26. Yet the State lacks a single law from the Founding era restricting firearm-carry in those spaces. To exercise its sovereign regulatory authority in those spaces consistently with the Second Amendment, therefore, the State must analogize those spaces to the locations specified in *Bruen* (legislative assemblies, polling places, and courthouses). There is no relevant analogy. To be sure, both types of space can host large gatherings. But the State's reliance on that fact proves *Bruen*'s observation that, unless courts closely examine "how and why the regulations burden a law-abiding citizen's right to armed self-defense," analogical reasoning is impossible, since "everything is similar in infinite ways to everything else." 142 S. Ct. at 2132–33 (cleaned up). And as the State does not dispute, public parks and forests otherwise lack the characteristic—comprehensive, state-provided security—that defines *Bruen*'s list of "sensitive places."

That some lower courts had upheld firearm-carry restrictions in certain recreational areas before *Bruen*, *see* Defs.' Mem. at 43, is of course irrelevant after *Bruen*. So is the State's evidence

from the "park movement." *Id.* at 42. The earliest of these examples comes from the mid-19th century, and many of these examples come from the 20th century—an era that *Bruen* categorically rejected as irrelevant to the meaning of the Second Amendment. *See* 142 S. Ct. at 2154 n.28.

Even putting aside this "temporal distance," *id.*, the State's anachronistic evidence is insufficient. The State has not identified a *single* statewide prohibition on carrying in all parks of all kinds in all parts of a state from *any* relevant time period. *See Bridgeville Rifle & Pistol Club v. Small, Ltd.*, 176 A.3d 632, 654 (Del. 2017) (holding, under Delaware's analogue to the Second Amendment, that the state's ban of firearms in all public parks, which totaled 23,000 acres, did "not just infringe—but destroy[ed]—the core . . . right of self-defense for ordinary citizens"). Instead, the State has only identified geographically limited restrictions from city governments, specifically, 14 municipal regulations in place by 1900. *See* Defs.' Mem. at 42 & n.30 (citing State's Exhibits 37, 39, 41, 42, 46, 49, 50, 51, 52, 53, 57, 58, 63, and 66).[6] The 1900 Census estimated that there were 10,602 incorporated cities, towns, villages, and boroughs in the United States. *See* Census Bulletin No. 65, U.S. Census Bureau (June 8, 1901), https://bit.ly/3GkuFnm. A national tradition of firearm regulation cannot be based regulations applicable to only a fraction of 1% of such municipalities.

Moreover, the State elides the distinction between urban parks—such as those in New York City (State's Exhibit 37), Philadelphia (State's Exhibits 39 and 40), Chicago (State's Exhibit 41 and 45), St. Louis (State's Exhibit 46 and 48), and Boston (State's Exhibit 49)—and non-urban parks and forest areas. Plaintiffs do not concede that the State may prohibit firearm-carry in urban parks. But the State also cannot establish a regulatory tradition applicable to *all* parks based on

---

[6] The State adds ten similar regulations passed after 1900, *see* Defs.' Mem. at 42 & n.31, which are categorically irrelevant under *Bruen*, 142 S. Ct. at 2154 n.28.

regulations of particular parks. Indeed, the State's own evidence suggests that urban parks, such as New York's Central Park and Philadelphia's Fairmount Park, were intended to have controlled entry and exit points, *see* Defs.' Ex. 37, Doc. 36-37, at 4 (Central Park) ("All persons are forbidden[:] To enter or leave the Park except by the gateways."); Defs.' Ex. 39, Doc. 36-39, at 6 (Fairmount Park) ("No person shall enter or leave the park except by such gates or avenues as may be for such purpose arranged."), whereas firearms regulations at National Parks were related to wildlife protection, *see* State's Ex. 104 at 8.[7] The State's examples are thus not similar even to each other in "how and why" they regulated firearm-carry. *Bruen*, 142 S. Ct. at 2133. And they are not similar to how or why the State has chosen to restrict firearm-carry at parks statewide.

## V.    The Anti-Carry Default Likewise Violates the Second Amendment

The State's Anti-Carry default rule is a carbon copy of New Jersey's presumptive ban on firearm-carry on private property at issue in a challenge brought by similarly situated firearm owners in *Koons v. Platkin*, No. 22-cv-7463, 2023 WL 3478604 (D.N.J. May 16, 2023). In that case, the district court preliminarily enjoined that presumptive ban (along with other newly enacted New Jersey firearm regulations), holding that the ban violated the Second Amendment. *See id*. at *68. New Jersey appealed and moved to stay the injunction pending appeal; such motions are subject to standards of review similar to the preliminary-injunction standard. *See Nken v. Holder*, 556 U.S. 418, 428 (2009). In a 2-1 ruling, the Third Circuit granted New Jersey's motion as to a few portions of the district court's order but otherwise expressly refused to stay the injunction,

---

[7] Federal law expressly permits the carrying of firearms in the National Park System if "the possession of the firearm is in compliance with the law of the State in which the System unit is located." 54 U.S.C. § 104906(b). Congress enacted this provision to ensure against the "override [of] the 2d amendment rights of law-abiding citizens on 83,600,000 acres of System land." *Id*. § 104906(a)(6). Maryland carry-permit holders thus may freely carry a firearm within the National Park System. There is no rationale for the State's ban on firearms in State parks.

including the injunction against New Jersey's equivalent anti-carry default. The third judge on the motions panel would have denied a stay in its entirety. *See* Order at 2 & n.1, *Koons v. Att'y Gen. of New Jersey*, No. 23-1900, Doc. 29 (3d Cir. June 20, 2023).

That denial indicates that New Jersey had failed to show a "likelihood of success on the merits"—in other words, that the Third Circuit agreed that the anti-carry default was likely unconstitutional. *Nken*, 556 U.S. at 434. And in this sense, the Third Circuit was entirely correct. In this case, as in that one, Plaintiffs are likely to succeed on the merits of their challenge, because the Anti-Carry Default unconstitutionally infringes on their Second Amendment rights.

### a.  Plaintiffs have standing to challenge the Anti-Carry Default

The State argues that Plaintiffs lack an injury in fact because they have not show that "there exists some private building (that plaintiffs wish to enter armed) for which the owner both (1) consents to individuals entering their building armed, and (2) for whatever reason will decline to express that consent through a sign (or other express permission)." Defs.' Mem. at 45. But Plaintiffs do not need to establish (1). They need only establish (2), because, without a sign or express permission, the individual Plaintiffs and organizational Plaintiffs' members will be unable to exercise their right to carry firearms in private buildings open to the public. The individual Plaintiffs and their members currently do carry firearms into private buildings open to the public where no sign either expresses or denies consent to that act, but will be forced to cease doing so when the Anti-Carry Default takes effect. *See* Novotny Decl., Doc. 24-3, ¶¶ 5–7 (May 23, 2023); Burke Decl., Doc. 24-4, ¶¶ 5–12 (May 23, 2023); Rossberg Decl., Doc. 24-5, ¶¶ 5–10 (May 23, 2023); Carlin-Weber Decl., Doc. 24-6, ¶¶ 5–10 (May 24, 2023); Gottlieb Decl., Doc. 24-7, ¶¶ 5–10 (May 24, 2023); Combs Decl., Doc. 24-8, ¶¶ 5–10 (May 24, 2023). They thus suffer a concrete and particularized injury, just as they currently suffer an undisputed injury under the "sensitive-

place" restrictions. Moreover, the need to ensure consent before engaging in constitutionally protected conduct is itself a burden on that conduct and thus an injury in fact. *Cf. Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) ("Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing.").

These injuries are directly traceable to the Anti-Carry Default. The State notes that, in *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976), the Supreme Court found a lack of traceability where "indigent patients . . . challenge[d] an IRS ruling that extended charitable tax exemptions to nonprofit hospitals that did not provide hospitalization services to patients who could not pay." Defs.' Mem. at 46. That description aptly demonstrates the difference between such cases and this one. Plaintiffs might in some circumstances lack standing to challenge regulations *of third parties* on the ground that those regulations have an incidental effect on them. But here, Plaintiffs challenge a criminal prohibition that applies *directly to Plaintiffs*. That the property owner could ameliorate the injury by consenting to firearm-carry on the property does not, as the State suggests, "brea[k] the chain of constitutional causation" such that the injury otherwise traces to property owners who do not expressly consent. *Id.* at 47 (internal quotation marks omitted). It is the Anti-Carry Default that prohibits firearm-carry on the property absent such consent—in other words, that exercises on the government's behalf the property owner's traditional right of exclusion. *See Christian v. Nigrelli*, No. 22-cv-695, 2022 WL 17100631, at *9 (W.D.N.Y. Nov. 22, 2022) (noting that "carrying on private property" is "generally permitted absent the owner's prohibition"); *cf. Brown v. Enter. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (noting that laws "ma[king] [it] criminal to admit a person under 18 to church" would "not enforce

parental authority over children's speech and religion; they impose governmental authority, subject only to a parental veto," and as such would be subject to constitutional challenge).

By the same token, Plaintiffs' injuries would be redressed by the relief they seek: an injunction against the Anti-Carry Default. Again, Plaintiffs' injury is the threat of being subject to criminal prosecution in the absence of affirmative consent to firearm-carry from owners of property otherwise open to the public, which forces them to forego constitutionally protected conduct in which they would otherwise engage. Enjoining the criminal prohibition that causes that injury would redress that injury, regardless of whether property owners might otherwise exclude firearm-carry on their properties. The State notes that the plaintiffs in *Lujan* failed to establish redressability in a challenge to "regulations that they alleged would increase funding for programs that harmed endangered species." Defs.' Mem. at 48. But once again, those were regulations of *third-party conduct*. By contrast, as *Lujan* confirms, a party "in danger of sustaining a *direct* injury as the result of" a challenged government action, as Plaintiffs are, faces little trouble establishing injury in fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 575 (1992) (emphasis added) (internal quotation marks omitted).

### b. The Anti-Carry Default burdens conduct covered by the Second Amendment's Plain Text

As with the challenged "sensitive-place" restrictions, the State asserts that "plaintiffs fail to make the predicate showing that the Second Amendment's text confers a right to carry firearms into another's building absent their consent." Defs.' Mem. at 49. And as with the challenged "sensitive-place" restrictions, that assertion is incorrect. There are no locational restrictions in the Second Amendment's text. As a result, the text supports no distinction between the right to carry firearms in locations that the State might characterize as "public" and locations that the State might

37

characterize as "private." *Accord Bruen*, 142 S. Ct. at 2134 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."). In either case, the State must justify any restriction on that right with evidence of a relevant regulatory tradition. And in any event, Plaintiffs are challenging restrictions on privately owned buildings that are otherwise open to the public—*e.g.*, grocery stores and gas stations—and that would be properly characterized as "public" spaces even if such a distinction were relevant.

Plaintiffs fully recognize that private property owners have a general "right to exclude." The State goes on at length about that right, *see* Defs.' Mem. at 49–51, but Plaintiffs are not challenging any exercise of that right. Private property owners are not restricted by the Second Amendment and may therefore restrict the carrying of firearms on their property if they so choose. But the State is restricted by the Second Amendment, and it therefore cannot make that choice on private property owners' behalf by dictating a presumption against firearm-carry. *See Brown*, 564 U.S. at 795 n.3. The State notes that the Eleventh Circuit upheld a carry restriction on "limited" private property in *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), and asserts that "Plaintiffs have presented no reason for departing from the Eleventh Circuit's reasoning here." Defs.' Mem. at 51–52. But that case was decided before *Bruen*, and it is *Bruen*'s text-and-history reasoning—which the Eleventh Circuit did not apply—that controls here. In addition, the Eleventh Circuit framed that case as one that actually pitted the right to carry against the right to exclude, holding that "the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place of worship *against the owner's wishes*," a right that Plaintiffs do not assert. *GeorgiaCarry.Org*, 687 F.3d at 1265 (emphasis added).

That the Anti-Carry Default might "effectuate the preferences of the majority of Marylanders," Defs.' Mem. at 52, of course does not make it constitutional under the Second

38

Amendment, which, like the Bill of Rights generally, exists to protect rights from majoritarian overreach. But the State betrays that such overreach is its real goal. According to the study from which the State draws these preference statistics, the benefit of provisions like the Anti-Carry Default is that "many defaults *are never altered*," and thus "'no carry' defaults are public-regarding by *radically expanding the areas that are de jure gun free*." Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L., MEDICINE & ETHICS 183, 190 (2020) (emphasis added). Meanwhile, the State laments that, "[f]or over 50 years [before *Bruen*], Marylanders operated under a legal and social landscape in which only those individuals who had an atypical need for self-defense were permitted to carry handguns publicly" and thus "Marylanders could go about their daily lives with the understanding that very few ordinary citizens would be armed." Defs.' Mem. at 52.

The real issue addressed by the Anti-Carry Default, then, is not a historical interest in protecting "sensitive places" that might satisfy *Bruen*. The issue, from the State's perspective, is *Bruen* itself. Suffice it to say that a state may not use a default rule to undermine a Supreme Court opinion and "radically" expand the areas where an individual right recognized by that opinion will be disregarded.[8] That states might otherwise use default rules "to effectuate the preferences of their constituents in cases of silence," Defs.' Mem. at 53, says nothing about whether States may do so to regulate conduct covered by the Second Amendment, which is "silent" as to that conduct only in the sense that it "presumptively protects" the right to keep and bear arms without limitation, and thus requires the State to show that a default rule burdening that right is consistent with national regulatory tradition. *Bruen*, 142 S. Ct. at 2126.

---

[8] That "Marylanders are left in the dark as to who may be carrying a firearm," Defs.' Mem. at 53, is the fault of the State, which could adopt an open-carry regime.

### c. The State lacks valid historical support for the Anti-Carry Default

The State launches its historical defense of the Anti-Carry Default with Cornell's view that "it would have been unthinkable to members of the Founding generation that any person could enter another's land armed, without permission or appropriate legal authority." Defs.' Mem. at 55 (cleaned up). But as another court has recognized, the historical examples must speak for themselves; Cornell cannot speak for them. *See Worth*, No. 21-cv-1348, 2023 WL 2745673, at *13 (declining to adopt Cornell's interpretation of historical examples). And here, the historical record does not back Cornell's claim.

The State cites a handful of colonial laws that purported made "firearm carriage onto another's property a trespass absent consent." Defs.' Mem. at 55. But the 1715 Maryland statute (State's Exhibit 24) applied only to those that had been "convicted" of crimes, were of "evil fame" or a "dissolute liver." It was not a broad prohibition on ordinary, *law-abiding* citizens.

As another court has also already found, most of the State's other examples—namely, the 1721 Pennsylvania law (State's Exhibit 25), 1722 New Jersey law (State's Exhibit 26), and 1763 New York law (State's Exhibit 27)—"appear to be what are called 'anti-poaching laws,' aimed at preventing hunters . . . from taking game off of other people's lands (usually enclosed)." *Antonyuk v. Hochul*, No. 122-cv-0986, 2022 WL 16744700, at *79 (N.D.N.Y. Nov. 7, 2022). Hence the Pennsylvania law's application to anyone "carry[ing] any gun or hunt[ing] on the improved or inclosed lands of any plantation other than his own," the New Jersey law's reference to the problems arising "Persons carrying of Guns and presuming to hunt on other Peoples Land," and the New York law's reference to a "Fowling-Piece." Defs.' Mem. at 55–56. Other laws from the Founding show that if there *was* a tradition at the time of carry restrictions on private land, these were *limited* to hunting. *See, e.g.*, THE PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 276

40

(Ex. Y); ACTS AND LAWS OF THE STATE OF CONNECTICUT 37 (1784) (Ex. Z); "Hunting," A MANUAL OF THE LAWS OF NORTH CAROLINA 234–36 (1814) (Ex. AA); DIGESTS OF THE LAWS OF GEORGIA 428 (1800) (Ex. BB). And at least one law established that property owners had to post signage *banning* hunting for the hunting restriction to apply, *see* A MANUAL OF THE LAWS OF NORTH CAROLINA, *supra*, at 236 (Ex. CC), which is the exact opposite of Maryland's rule.

"Simply stated, the need to restrict fowling-piece-wielding poachers on fenced-in farms in 18th and 19th century America appears of little comparable analogousness to the need to restrict law-abiding responsible license holders in establishments that are open for business to the public today." *Antonyuk*, 2022 WL 16744700, at *80. The State's other two Founding-era examples—a later-enacted New Jersey law (State's Exhibit 28) and a 1789 Massachusetts law (State's Exhibit 29), which applied only to certain islands around Martha's Vineyard—appear to have served the same purpose. The New Jersey statute references dogs, traps, and deer, *see* Defs.' Ex. 28, Doc. 36-28, at 2, and, according to its title, the Massachusetts law was passed to protect the islands' sheep and stock, *see* Defs.' Ex. 29, Doc. 36-29, at 2. And if these laws served a different purpose, they would necessarily be outliers from the rest.

To make up for its lack of "relevantly similar" Founding-era evidence, the State adds three statutes from the late nineteenth century. *See* Defs.' Mem. at 56. As explained, this evidence comes too late. It also is too little. Indeed, the laws from Louisiana (State's Exhibit 30) and Texas (State's Exhibit 31) were part of those former Confederate states' discriminatory "Black Codes," which systematically sought to take away the newly freed slaves' rights. *McDonald*, 561 U.S. at 847 (Thomas, J., concurring in part and concurring in the judgment) (detailing this discriminatory history). Such laws should be left in the dustbin of history, not used as tools to restrict rights in the modern day. *Cf. Bruen*, 142 S. Ct. at 2149 (cautioning against reliance on laws where prosecutions

41

were directed only against "black defendants who may have been targeted for selective or pretextual enforcement"). That leaves an 1893 Oregon law (State's Exhibit 32), which does not appear to have turned the carrying of firearms onto others' property into a trespass offense, but which instead prohibited "go[ing] or trespass[ing] upon an enclosed premises or lands" with a firearm and without the owner's consent, and which again appears to have been aimed at hunting. Defs.' Ex. 32, Doc. 36-32, at 6 (also prohibiting armed persons from going onto others' property with a dog). Ultimately, however, the Court is "not obliged to sift the historical materials for evidence to sustain [the State's] statutes. That is [the State's] burden." *Bruen*, 142 S. Ct. at 2150. And even if this late-19th-century Oregon law were more than a hunting regulation, this outlier could not sustain the State's burden.

The State thus lacks any valid, "relevantly similar" historical analogues for the Anti-Carry Default from either the Founding or the Reconstruction era. *Id.* at 2133. As the State notes, relevantly similarity requires that the laws "use similar means to achieve similar purposes." Defs.' Mem. at 57. Presumably, the State does not mean to suggest that the Anti-Carry Default serves similar purposes as the Black Codes. Nor can preventing firearm-carry in, *e.g.*, a grocery store be said to serve any purpose akin to Founding-era anti-poaching laws.

What is more, the Anti-Carry Default will not simply result in the sort of neighborly exchange that the State posits between private property owners and firearm-owning visitors requesting consent to enter. *See id*. If a grocery store, for example, lacks prominent signage indicating consent to firearm-carry or a proprietor standing outside to voice that consent, a customer will not be able to enter that store while exercising the right to armed self-defense. The State lacks any example of a historical regulation limiting the right in that manner. If anything,

such a restriction runs contrary to the above-discussed tradition of encouraging or even requiring armed self-defense in places of public gathering.

*      *      *

In sum, Plaintiffs have made a "clear showing" that they are likely to succeed on the merits. *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (internal quotation marks omitted). And though this standard does not require plaintiffs to "prove beyond a preponderance of the evidence that [they] *will* win on the merits," *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 397 (7th Cir. 2022) (emphasis added), Plaintiffs have made that showing as well. The State has evidently scoured the historical record for any law, from any jurisdiction, that might support the challenged provisions. Yet the State has been unable to find any valid historical analogues. Accordingly, Plaintiffs have established entitlement not just to a preliminary injunction, but to a judgment on the merits. And at the very least, Plaintiffs have satisfied Rule 12(b)(6).

## VI.    The Equities Favor Injunctive Relief

The State does not dispute that the denial of a constitutional right is an irreparable harm, *see* Pls.' Mem. at 29–31, or that Plaintiffs face that irreparable harm from the various locational restrictions at issue here (at least insofar as the State does not incorrectly dispute that the Anti-Carry Default causes injury in fact). The State simply argues that, because the challenged provisions are "designed to prevent gun violence," they serve the public interest and their injunction would not serve the public interest. Defs.' Mem. at 58.

But the equitable prong of the injunction standard is not an opportunity to reintroduce the interest-balancing that *Bruen* rejected. If the challenged provisions are unconstitutional or likely unconstitutional, they are against the public interest—full stop. *See Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) ("[U]pholding constitutional rights is in the public interest.");

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("A state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.") (internal quotation marks omitted).

It also cannot be taken as given that any of the challenged provisions will actually advance public safety. The effect of these laws will be to make people whom the State itself describes as vulnerable to violent conflict—that is, people in so-called "sensitive places"—*more* vulnerable by removing law-abiding citizens' right to armed defense in those places. Similarly counterintuitive is the State's purported concern over "possible loss or theft of a firearm in sensitive places" like bars or museums. Defs.' Mem. at 59. With the State's extensive "sensitive-place" regulations in effect, more firearm owners will be forced to leave their firearms in their vehicles, where they are as (if not more) likely to be stolen than they would be if worn on their owners' persons.

Public safety is certainly an important governmental interest. But it is not one that governments have traditionally pursued through anything like the challenged provisions. Nor is it even one that would obviously be advanced by those provisions. The equities therefore favor injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should consolidate the hearing on Plaintiffs' and the State's motions with the trial on the merits under Rule 65(a)(2), and the Court should thereafter enter judgment declaring the challenged provisions unconstitutional and enjoining Defendants from enforcing them. Absent consolidation with a merits trial, the Court should grant Plaintiff's motion for a preliminary injunction and deny the State's motion to dismiss.

Dated: July 12, 2023

Respectfully submitted,

/s/ Mark W. Pennak
Mark W. Pennak (Bar ID# 21033)
LAW OFFICES OF MARK W. PENNAK
7416 Ridgewood Ave.
Chevy Chase, MD 20815
Tel: (301) 873-3671
Fax: (301) 718-9315
mpennak@marylandshallissue.org

*Attorney for Plaintiffs Katherine Novotny, Sue Burke, Esther Rossberg, Maryland Shall Issue, Inc., Second Amendment Foundation, and Firearms Policy Coalition*

Matthew Larosiere*
THE LAW OFFICE OF MATTHEW LAROSIERE
6964 Houlton Circle
Lake Worth, FL 33467
Tel: (561) 452-7575
larosieremm@gmail.com
*Admitted *pro hac vice*

*Attorney for Plaintiff Maryland Shall Issue, Inc.*

/s/ David H. Thompson
David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
*Admitted *pro hac vice*

*Attorneys for Plaintiffs Katherine Novotny, Sue Burke, Esther Rossberg, Maryland Shall Issue, Inc., Second Amendment Foundation, and Firearms Policy Coalition*

# INDEX OF EXHIBITS

Ex. A:    THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 271 (Grimke ed., 1790)

Ex. B:    A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed., 1800)

Ex. C:    VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND: NOVEMBER SESSION 1791 (Green ed., 1795)

Ex. D:    PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81 (Stanley Ray ed., 1904)

Ex. E:    ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42 (Davis ed., 1796)

Ex. F:    1 LAWS OF THE STATE OF NEW YORK 176 (2d ed., Albany: Websters & Skinner 1807)

Ex. G:    1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811)

Ex. H:    2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams eds., 1797)

Ex. I:    3 ARCHIVES OF MARYLAND PROCEEDINGS OF THE COUNCIL OF MARYLAND 1636–1667 (Browne ed., 1885)

Ex. J:    5 THE STATUES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 19 (Hening ed., 1819)

Ex. K:    19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES, COLONIAL AND REVOLUTIONARY, 1768–1773 (Candler ed., 1904)

Ex. L:    1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (White 1853)

Ex. M:    1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (Bartlett 1856)

Ex. N:    A New Conductor Generalis 168 (1803)

Ex. O:    THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 568 (1798)

Ex. P:    1784-1785 N.Y. Laws 152, ch. 81

Ex. Q:    ACTS AND LAWS OF THE STATE OF CONNECTICUT 18 (1784)

Ex. R:    HISTORY OF HARVARD UNIVERSITY, app. 141 (Peirce ed., 1833)

Ex. S:    THE LAWS OF YALE COLLEGE, IN NEW-HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795 (Thomas Green and Son 1800)

Ex. T:      LAWS OF THE UNIVERSITY OF NORTH-CAROLINA; ESTABLISHED BY THE BOARD OF TRUSTEES, AT THEIR SESSION IN DECEMBER 1799 (Gales 1800)

Ex. U:      THE LAWS OF RHODE-ISLAND COLLEGE, ENACTED BY THE FELLOWS AND TRUSTEES (Carter 1803)

Ex. V:      THE MINUTES OF THE SENATUS ACADEMICUS, 1799-1842 (Univ. Ga. Lib. 1976)

Ex. W:      LAWS OF THE COLUMBIAN COLLEGE IN THE DISTRICT OF COLUMBIA (1824)

Ex. X:      THE ANNOTATED CODE OF THE GENERAL STATUTE LAWS OF THE STATE OF MISSISSIPPI 327, § 1030 (1892)

Ex. Y:      THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 276 (Grimke ed., 1790)

Ex. Z:      ACTS AND LAWS OF THE STATE OF CONNECTICUT 37 (1784)

Ex. AA:     A MANUAL OF THE LAWS OF NORTH CAROLINA 234–36 (1814)

Ex. BB:     DIGESTS OF THE LAWS OF GEORGIA 428 (1800)

Ex. CC:     A MANUAL OF THE LAWS OF NORTH CAROLINA 236 (1814)

**<u>CERTIFICATE OF SERVICE</u>**

Counsel certifies that the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 12th of July, 2023.

Respectfully submitted,

<u>/s/ David H. Thompson</u>
David H. Thompson